DARRYL J. HOROWITT   CA #100898
SHERRIE M. FLYNN   CA #240215
COLEMAN & HOROWITT, LLP
Attorneys at Law
499 West Shaw, Suite 116
Fresno, California 93704
Telephone: (559) 248-4820
Facsimile: (559) 248-4830

J. ANDREW HIRTH, MO # 57807
Office of the Missouri Attorney General
P.O. Box 899
Jefferson City, MO 65102
Tel.   573.751.8828
Fax.   573.751.0774
(Pro Hac Vice to be filed)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI, ex rel., CHRIS KOSTER, Attorney General of Missouri,<br><br>            Plaintiffs,<br><br>       v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California,<br><br>            Defendant. | Case No. _____<br><br>**COMPLAINT TO DECLARE INVALID AND ENJOIN ENFORCEMENT OF AB1437 AND 3 CA ADC § 1350(d)(1) FOR VIOLATING THE COMMERCE AND SUPREMACY CLAUSES OF THE UNITED STATES CONSTITUTION** |

1    The State of Missouri, through its relator Attorney General Chris Koster, states the following for its Complaint to Declare Invalid and Enjoin Enforcement of AB1437 (California Health and Safety Code §§25995-97) and 3 CA ADC § 1350(d)(1) for Violating the Commerce and Supremacy Clauses of the United States Constitution:

## JURISDICTION AND VENUE

1. This case presents a federal question arising under 42 U.S.C. §1983 and the Commerce and Supremacy Clauses of the Constitution of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3).

2. Venue is proper in this Court under 28 U.S.C. §1391(b)(1) because the Defendant, California Attorney General Kamala D. Harris, maintains an office within the Eastern District of California.

## NATURE OF THE CASE

3. In 2008, California voters approved Proposition 2 ("Prop 2"), attached as Ex. A, a ballot initiative that will prohibit California farmers from employing a number of agricultural production methods in widespread use throughout the United States. Starting in 2015, for example, California egg producers will no longer be allowed to house that state's 20 million egg-laying hens in any enclosure it provides sufficient room for each hen to stand up, lie down, turn around freely, and fully extend their limbs. Almost all hens on commercial egg farms in California are currently kept in conventional cage-systems that house between 4 and 7 birds per cage and provide about 67 square inches of space per bird. Prop 2 effectively bans the use of these industry-standard cage-systems.

4. Although Prop 2 does not specify what size enclosures will satisfy its new behavior-based standards, animal behavior experts have estimated anywhere from 87.3 square inches to 403 square inches per hen, depending on how the statutory language is interpreted. JOY MENCH ET AL., FINAL REPORT - CDFA AGREEMENT 09-0854, DETERMINATION OF SPACE USE BY LAYING HENS at 5, 7 (2012), attached as Ex. B.

5. Even before the initiative passed, California farmers, economists, and legislators became concerned that Prop 2 would put their state's egg producers at a competitive disadvantage by increasing the cost of egg production *within* California. DANIEL A. SUMNER, ET AL., UNIVERSITY OF CALIFORNIA AGRICULTURAL ISSUES CENTER, ECONOMIC EFFECTS OF PROPOSED RESTRICTIONS ON EGG-LAYING HEN HOUSING IN CALIFORNIA at iii (2008), attached as Ex. C. To "level the playing field" and protect their own farmers from Prop 2's economic consequences, in 2010 the California Legislature passed AB1437 (attached as Ex. D), which requires egg farmers *in other states* to comply with behavior-based enclosure standards identical to those in Prop 2 if they want to continue selling their eggs in California.

6. As the second largest exporter of shell eggs to California, Missouri farmers face a difficult choice regarding AB1437. Either they can incur massive capital improvement costs to build larger habitats for some or all of Missouri's seven million egg-laying hens, or they can walk away from the state whose consumers bought *one third* of all eggs produced in Missouri last year. The first option will raise the cost of eggs *in Missouri* and make them too expensive to export to any state other than California. The second option will flood Missouri's own markets with a half-billion surplus eggs that would otherwise have been exported to California, causing Missouri prices to fall and potentially forcing some Missouri farmers out of business.

7. By conditioning the flow of goods across its state lines on the method of their production, California is attempting to regulate agricultural practices beyond its own borders. Worse, the people most directly affected by California's extraterritorial regulation—farmers in Missouri and elsewhere who must either comply with AB1437 or lose access to the largest market in the United States—have no representatives in California's Legislature and no voice in determining California's agricultural policy.

8. AB1437's extraterritorial reach, its undue burden on interstate commerce, and its clear purpose to protect California farmers from out-of-state competition violate the Commerce Clause of the United States Constitution.

## THE PARTIES

*Plaintiff*

9. Plaintiff State of Missouri ("Missouri") is a sovereign state, whose citizens enjoy all the rights, privileges, and immunities inherent in our federal system of government as guaranteed in the United States Constitution.

10. Missouri has standing to bring this case as *parens patriae* because it has quasi-sovereign interests in protecting its citizens' economic health and constitutional rights as well as preserving its own rightful status within the federal system.

11. Missouri's economy and status within the federal system will be irreparably injured if the California Legislature—who were not elected by, and are not answerable to, the people of Missouri—is allowed to regulate and increase the cost of egg production in Missouri.

12. This court can redress that injury by declaring AB1437 invalid and permanently enjoining its enforcement.

13. As the duly elected, qualified, and acting Attorney General of Missouri, relator Chris Koster is authorized under Mo. Rev. Stat. § 27.060 to institute, in the name and on behalf of the State, all civil proceedings at law or in equity necessary to protect the rights and interests of the State of Missouri.

### *Defendant*

14. Defendant Kamala D. Harris is the Attorney General of the State of California and the chief law officer for the state. She has all the powers of a district attorney and has a duty to prosecute violations of law of which the superior courts of California shall have jurisdiction. Cal. Const. Art. V, § 13. She also has direct supervision over all district attorneys and sheriffs in California. *Id.*

15. It will be the duty of Attorney General Harris and the district attorneys she supervises to enforce the provisions of AB1437 when they become effective on January 1, 2015.

16. Attorney General Harris is sued in her official capacity and is subject to the jurisdiction of this court under *Ex parte Young*, 209 U.S. 123 (1908).

## FACTUAL ALLEGATIONS

**Missouri egg producers depend on California's markets.**

17. Missouri farmers produce over 1.7 billion eggs per year.

18. One third of those eggs—about 540 million eggs per year—are sold in California. DON BELL ET AL., UNIVERSITY OF CALIFORNIA, EGG ECONOMICS UPDATE #338 APPENDIX ("UPDATE #338") at 5, attached as Ex. E.

19. Missouri farmers export more shell eggs to California than any other state except Iowa. *Id.*

20. Of the 9 billion eggs consumed in California each year, roughly 6% come from Missouri, 38% are imported from more than a dozen other states, and 56% are produced in California itself. *Id.*

21. Missouri farmers house more than seven million egg-laying hens in the same conventional cage-systems currently in use in California and throughout the United States. Each cage holds from 4 to 7 birds and provides about 67 square inches of space per bird.

**California voters restrict the production methods available to California egg farmers.**

22. In 2008, California voters passed Prop 2 "to prohibit the cruel confinement of farm animals" within California. Ex. A, § 2.

23. Prop 2 amended the California Health and Safety Code by adding five new sections numbered 25990 through 25994, which do not become effective until January 1, 2015. Ex. A, § 5. Section 25990(a)-(b) provides that "a person shall not tether or confine any covered animal [including egg-laying hens], on a farm, for all or the majority of any day, in a manner that prevents such animal from: (a) Lying down, standing up, and fully extending his or her limbs; and (b) Turning around freely." Ex. A, § 3. Section 25993 provides that a violation of §25990 shall constitute a misdemeanor punishable by up to a $1,000 fine and 180 days in county jail. Ex. A, § 1.

24. Researchers at the University of California–Davis have estimated that California egg producers will have to invest upwards of $385 million in capital improvements to bring their operations into compliance with Prop 2. HOY CARMAN, UC–DAVIS DEPARTMENT OF AGRICULTURAL AND RESOURCE ECONOMICS, ECONOMIC ASPECTS OF ALTERNATIVE CALIFORNIA EGG PRODUCTION SYSTEMS ("CARMAN PAPER") at 22 (2012), attached as Ex. F.

25. In addition to increased capital costs, researchers estimate that the larger enclosures required by Prop 2 will increase the ongoing cost of producing eggs in California by at least 20%. Ex. C at 2.

26. Recognizing that it would take several years to implement, Prop 2 gave California egg farmers a total of 2,249 days—from November 4, 2008 until January 1, 2015—to figure out how to comply with the law and to replace their existing cage systems with acceptable alternatives. Ex. A, § 5.

27. The new capital costs and increased production costs associated with complying with Prop 2 would have placed California egg producers at a significant competitive disadvantage when compared to egg producers in Missouri and other states, and would likely have eliminated virtually all large scale egg-production in California within six years of Prop 2's effective date. Ex. C at 3-4.

28. Article II, section 10, subdivision (c) of the California Constitution prohibits the Legislature from amending or repealing Prop 2 without voter approval.

**The California Legislature passes AB1437 to protect California's egg producers from interstate competition.**

29. Faced with the negative impact Prop 2 would have on California's egg industry starting in 2015, the California Legislature in 2010 passed—and Governor Schwarzenegger signed—AB1437, which added three additional sections (§§25995 through 25997) to the California Health and Safety Code.

30. Section 25996 provides that, "Commencing January 1, 2015, a shelled egg may not be sold or contracted to sell for human consumption in California if it is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in [§ 25990]." Ex. D. Section 25997 provides that a violation of §25996 shall

1  constitute a misdemeanor punishable by up to a $1,000 fine and 180 days in
2  county jail. Section 25996 was amended in 2013 to add "the seller knows or
3  should have known" after the word "if." S.B. No. 667 (2013), attached as Ex.
4  G.

5      31.    In addition to the minimum dimensions for hen enclosures based
6  on bird behavior under §§ 25990(a)-(b), the California Department of Food
7  and Agriculture ("CDFA") has promulgated the following regulations
8  establishing minimum dimensions based on floor space per bird—which may
9  or may not be co-extensive with §§ 25990(a)-(b):

10      Commencing January 1, 2015, no egg handler or producer
11      may sell or contract to sell a shelled egg for human
12      consumption in California if it is the product of an egg-
13      laying hen that was confined in an enclosure that fails to
14      comply with the following standards. . . . An enclosure
15      containing nine (9) or more egg-laying hens shall provide a
16      minimum of 116 square inches of floor space per bird.
17  3 CA ADC § 1350(d)(1), attached as Ex. H.

18      32.    If egg farmers may satisfy the behavioral requirements of
19  AB1437 with the spatial requirements of 3 CA ADC § 1350(d)(1), the cost of
20  producing eggs will increase by at least 12%. Ex. F at 15. If they must switch
21  to entirely cage-free production to satisfy AB1437, however, production costs
22  will increase by more than 34. %. *Id.*

23      33.    Whereas Prop 2 provided California egg farmers 2,249 days to
24  come into compliance with its mandate, AB1437 gives Missouri egg farmers
25  only 1,640 days—from July 6, 2010 until January 1, 2015—to do so. Put
26  another way, California granted its own farmers an extra 609 days—*one and*
27  *two-thirds years*—to bring their egg-production facilities into compliance with
28  California law. Compare Ex. A, § 1 with Ex. D, § 5.

1         **The purported public health purpose of AB1437 is pretextual.**

2         34.    The stated purpose of AB 1437 is "to protect California
3  consumers from the deleterious, health, safety, and welfare effects of the sale
4  and consumption of eggs derived from egg-laying hens that are exposed to
5  significant stress that may result in increased exposure to disease pathogens
6  including salmonella." Ex. D, §25995(e).

7         35.    However, no scientific study conducted to date has found any
8  correlation between cage size or stocking density and the incidence of
9  Salmonella in egg-laying hens. VAN IMMERSEEL ET AL, IMPROVING THE
10 SAFETY AND QUALITY OF EGGS AND EGG PRODUCTS, at 112 (2011), excerpt
11 attached as Ex. I. Additionally, the most recent studies establish that there
12 is no correlation between cage size or stocking density and stress levels in
13 egg-laying hens. J.A. DOWNING AND W.L. BRYDEN, THE EFFECTS OF HOUSING
14 LAYING HENS AS GROUPS IN CONVENTIONAL CAGES ON PLASMA AND EGG
15 ALBUMEN CORTICOSTERONE CONCENTRATIONS, AUST. POULT. SCI. SYMP., at
16 158-60 (2009), excerpt attached as Ex. J.

17        36.    The legislative history of AB 1437 suggests that bill's true
18 purpose was not to protect public health but rather to protect California
19 farmers from the market effects of Prop 2 by "leveling the playing field" for
20 out-of-state egg producers. An analysis by the California Assembly
21 Committee on Appropriations following its May 13, 2009 committee hearings
22 on AB 1437 stated as follows:

23              "Rationale. With the passage of Proposition 2 in November
24              2008, 63% of California's voters determined that it was a
25              priority for the state to ensure the humane treatment of
26              farm animals. However, the proposition only applies to in-
27              state producers. *The intent of this legislation is to level the*
28              *playing field so that in-state producers are not*

    *disadvantaged.* This bill would require that all eggs sold in California must be produced in a way that is compliant with the requirements of Proposition 2."

Bill Analysis of the California Assembly Committee on Appropriations, May 13, 2009 at 1 (emphasis added), attached as Ex. M.

  37. After AB 1437 passed both the California Assembly and the California Senate, the California Health & Human Services Agency (CHHS), prepared an Enrolled Bill Report for the Governor.  That report stated in pertinent part, "Supporters of Proposition 2 claimed that giving egg-laying hens more space may reduce this type of salmonellosis by reducing the intestinal infection with *Salmonella Enteritidis* via reducing the stress of intensive confinement. *Scientific evidence does not definitively support this conclusion.*" CHHS Enrolled Bill Report at 2 (emphasis added), attached as Ex. K.  Summarizing the arguments pro and con concerning AB 1437 later in its report, CHHS further stated that one of the arguments against enactment of the legislation is that there is "[n]o scientific evidence to support assertion of salmonella prevention." *Id.* at 5.

  38. Indeed, the California Department of Food and Agriculture ("CDFA") concedes in the Legal Impact section of its own Enrolled Bill Report for AB 1437 that the bill's purported public health rationale is likely untenable.  If AB 1437 were to be challenged on Commerce Clause grounds, the CDFA warned, California

    will have to establish that there is a public heath justification for limiting the confinement of egg-laying hens as set forth in section 25990.  This will prove difficult because, given the lack of specificity as to the confinement limitations, it will invariably be hard to ascribe any particular public health risk for failure to comply. . . . [W]e

1  doubt that the federal judiciary will allow the state to rely
2  exclusively upon the findings of the Legislature, such as
3  they are, to establish a public health justification for
4  section 25990.

CDFA Enrolled Bill Report at 5, attached as Ex. L.

39. Despite the absence of any scientific evidence to support the bill's purported public health rationale, CDFA urged the governor to sign AB1437 into law for purely economic reasons:

> RECOMMENDATION AND SUPPORTING ARGUMENTS: SIGN.  In November 2008, voters passed Proposition 2, requiring California farm animals, including egg-laying hens, have room to move freely. Approximately 35% of shell eggs consumed in California are imported from out of state. California is the fifth largest producer behind Iowa, Ohio, Indiana and Pennsylvania, in that order.  *This will ensure a level playing field for California's shell egg producers by requiring out of state producers to comply with the state's animal care standards.*

Ex. L at 1 (emphasis added).

40. Later in the same report, CDFA warned the governor that the danger in not signing the bill was competition, not contamination:

> When Proposition 2 requirements are implemented in 2015, these producers will no longer be economically competitive with out-of-state producers. *Without a level playing field with out-of-state producers, companies in California will no longer be able to operate in this state and will either go out of business or be forced to relocate to another state.*  This will result in a significant loss of jobs and reduction of tax

1       revenue in California.

2 *Id.* at 3 (emphasis added).

3     41.    In his signing statement, Governor Schwarzenegger makes no
4 mention of AB1437's purported public health rationale at all.  The only
5 purposes he cites for enacting the law is protecting California farmers from
6 the market effects of Prop 2: "The voters' overwhelming approval of
7 Proposition 2 demonstrated their strong support for the humane treatment of
8 egg producing hens in California. By ensuring that all eggs sold in California
9 meet the requirements of Proposition 2, this bill is good for both California
10 egg producers and animal welfare." *Schwarzenegger signs bill requiring*
11 *'humane' out-of-state eggs*, SACRAMENTO BEE CAPITOL ALERT (July 7, 2010)
12 attached as Ex. N.

13

14     **The purported public health purpose of AB1437 is preempted by federal**
15     **law in any event.**

16     42.    Even assuming that AB1437 served a legitimate public health
17 purpose *within* California by limiting the methods of egg production *outside*
18 California, the statute would be expressly and implicitly preempted by the
19 Federal Egg Products Inspection Act ("EPIA"), 21 U.S.C. § 1031 et seq.

20     43.    Section 1031 of the EPIA, which is entitled "Congressional
21 Statement of Findings," makes clear that one of the express purposes of the
22 EPIA is to protect human health in connection with the consumption of shell
23 eggs:

24         It is essential, in the public interest, that the health
25         and welfare of consumers be protected by the
26         adoption of measures prescribed herein for assuring
27         that eggs and egg products distributed to them and
28         used in products consumed by them are wholesome,

1
2
3
4
5
6
        otherwise not adulterated, and properly labeled and packaged. . . . It is hereby found that … regulation by the Secretary of Agriculture and the Secretary of Health and Human Services, … as contemplated by this chapter, are appropriate … to protect the health and welfare of consumers.

7      44.    Section 1032 of EPIA, which is entitled "Congressional
8 Declaration of Policy," contains a Congressional mandate for national
9 uniformity of standards for eggs:

10
11
12
13
14
15
16
17
18
        It is hereby declared to be the policy of the Congress to provide for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards for eggs, and otherwise regulate the processing and distribution of eggs and egg products as hereinafter prescribed *to prevent the movement or sale for human food, of eggs and egg products which are adulterated* or misbranded or otherwise in violation of this chapter.

19 (Emphasis added).

20      45.    Under EPIA, Congress expressly preempted state laws intended
21 to regulate the quality and condition of eggs: "For eggs which have moved or
22 are moving in interstate or foreign commerce, no State or local jurisdiction
23 may require the use of standards of quality, condition, weight, quantity, or
24 grade which are in addition to or different from the official Federal
25 standards…." 21 U.S.C. § 1052(b).

26      46.    The terms "condition" and "quality" are not defined within the
27 EPIA itself. Rather in Section 1043 of the EPIA, Congress delegated to the
28 Secretary of Agriculture broad authority to promulgate "such rules and

1  regulations as he deems necessary to carry out the purposes or provisions of
2  this chapter."  USDA carried out those obligations in part by enacting a
3  series of definitions for the purpose of the EPIA which are set forth in 7 CFR
4  § 57.1.  Those definitions provide in pertinent part that:

*Condition means any characteristic affecting a product's merchantability including*, but not being limited to, . . . *cleanliness*, soundness, *wholesomeness, or fitness for human food* of any product; or the processing, handling, or packaging which affects such product.

. . .

*Quality means the inherent properties of any product which determine its relative degree of excellence.*

(Emphasis added.)

47.  If AB1437's behavior-based standards for determining appropriate cage size were actually intended to reduce the risk of contamination from salmonella or other food-borne pathogens, such standards would be "in addition to or different from the official Federal standards" enumerated in EPIA, and would therefore be preempted by federal law.

**AB1437 regulates conduct wholly and exclusively outside California and substantially burdens interstate commerce.**

48.  The inescapable conclusion to be drawn from AB1437's legislative history is that California's *legislature* enacted AB1437 as a protectionist response to the competitive advantage California *voters* gave out-of-state egg producers when they passed Prop 2.

49.  As Prop 2 would already have required larger hen enclosures *within* the State of California starting on January 1, 2015, the sole effect of

1  AB1437 will be the extraterritorial regulation of egg production *outside* the
2  State of California in places like Missouri.
3     50.   AB1437 also imposes a substantial burden on interstate
4  commerce by forcing Missouri farmers either to forgo California's markets
5  altogether or accept significantly increased production costs just to comply
6  with California law.
7     51.   Those higher production costs will increase the price of eggs in
8  Missouri as well as California.  Because demand for eggs varies greatly
9  throughout the year, Missouri's egg producers cannot simply maintain
10 separate facilities for their California-bound eggs.  In high-demand months,
11 Missouri farmers may not have enough eggs to meet California demand if
12 only a fraction of their eggs are produced in compliance with AB1437.  In low-
13 demand months, there may be insufficient California demand to export all
14 compliant eggs, forcing Missouri farmers to sell those eggs in Missouri or
15 other states at higher prices than their competitors.  Given those
16 inefficiencies, most Missouri egg farmers will choose either to bring their
17 entire operations into compliance with AB1437 so that they always have
18 enough supply to meet California demand, or else simply leave the California
19 marketplace.
20    52.   Assuming they may comply with AB1437 by building new colony
21 housing with 116 square inches per bird—as required by 3 CA ADC §
22 1350(d)(1)—the necessary capital improvements will cost Missouri famers
23 approximately $120 million.
24    53.   Yet, because those costs would have been imposed on California
25 producers under Prop 2 already, the sole purpose and economic effect of
26 AB1437 is to increase capital improvement and production costs *outside*
27 California—i.e., to "level the playing field."
28

54. Even if Missouri farmers would choose to forgo the California market instead of incurring increased production costs, AB1437 would still impose a substantial burden on interstate commerce. Without California consumers, Missouri farmers would produce a surplus of 540 million eggs per year. If one third of Missouri's eggs suddenly had no buyer, supply would outpace demand by half a billion eggs, causing the price of eggs—as well as egg farmers' margins—to fall throughout the Midwest and potentially forcing some Missouri producers out of business.

### Missouri's suit to declare AB1437 and 3 CA ADC § 1350(d)(1) unconstitutional and enjoin their enforcement presents a case or controversy ripe for review.

55. Although AB1437 and 3 CA ADC § 1350(d)(1) do not become effective until 2015, the injury to Missouri farmers is "certainly impending." *See Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). Absent some additional action by Congress, the California Legislature, or this Court, Missouri farmers who continue to export their eggs to California will face criminal sanctions beginning January 1, 2015 unless they take action now to come into compliance by the law's effective date.

56. Constructing new, compliant housing for Missouri's seven million hens cannot be accomplished overnight. If Missouri farmers want to continue selling eggs in the California market on January 1, 2015, those eggs must be laid, inspected, packaged, and shipped before the end of 2014. In fact, those farmers need to begin making the necessary capital improvements to their farms *now* if they are to reach compliance with California law by January 2015. If AB1437 and 3 CA ADC § 1350(d)(1) are eventually held to be unconstitutional, those capital improvements will turn out to have been a tremendous and unnecessary expense.

57. The uncertainty surrounding the constitutionality of AB1437 and 3 CA ADC § 1350(d)(1) and their impending effective date less than one year away forces Missouri egg producers to literally bet the farm on the outcome of this law suit. They can proceed without making capital improvements in hopes that the law will be struck down, or they can begin the costly and labor-intensive process of changing their operations in case AB1437 and 3 CA ADC § 1350(d)(1) are upheld.

58. Whichever path they follow, an incorrect choice spells doom for their businesses. Coming into compliance will necessarily increase productions costs; if the law is eventually struck down, the farmer will not be able to compete with egg producers still using cage-systems. And although maintaining the status quo costs nothing now, if the law is eventually upheld, the farmer who has not preemptively complied will face an interruption of business during the months it will take her to retool after the law is already in effect.

59. A genuine case or controversy has arisen between the parties as to the constitutionality of AB1437 and 3 CA ADC § 1350(d)(1). Until that controversy is resolved, Missouri farmers do not know whether they need to renovate their henhouses in order to remain competitive after January 1, 2015. If they choose to comply, and AB1437 and 3 CA ADC § 1350(d)(1) are struck down, Missouri farmers will have priced themselves out of business. But if they wait and see, and the law is upheld, they will lose months of business trying to catch up after the law comes into effect.

60. Article III of the U.S. Constitution does not require Missouri to wait until AB1437 and 3 CA ADC § 1350(d)(1) become effective to seek a declaratory judgment as to their constitutionality because the damage to Missouri's economy will be irreparable at that point. This is precisely the kind of case for which declaratory relief is appropriate under 28 U.S.C. §2201.

# COUNT I

## VIOLATION OF THE COMMERCE CLAUSE

61. Missouri incorporates all allegations in Paragraphs 1 through 60 into Count I of this Complaint.

62. The Commerce Clause of the United States Constitution prohibits states from enacting legislation that protects its own citizens from competition from citizens of other states, that regulates conduct wholly outside of the state's borders, or that places an undue burden on interstate commerce.

63. AB1437 and 3 CA ADC § 1350(d)(1) violate the Commerce Clause because they are protectionist measures intended to benefit California egg producers at the expense of Missouri egg producers by eliminating the competitive advantage Missouri producers would enjoy once Prop 2 becomes effective.

64. AB1437 and 3 CA ADC § 1350(d)(1) also violate the Commerce Clause because they have the purpose and effect of regulating conduct in Missouri and wholly outside the State of California.

65. AB1437 and 3 CA ADC § 1350(d)(1) further violate the Commerce Clause because they impose a substantial burden on interstate commerce by forcing Missouri egg producers either to increase their production costs—raising the price of eggs not just in California but in Missouri and other states as well—or forgo the largest market in the United States and see the prices and profits plunge.

66. AB1437 and 3 CA ADC § 1350(d)(1) serve no legitimate state purpose because they do not protect the welfare of any animals within the State of California, and their stated purpose—to prevent salmonella contamination—is pretextual.

1   67.   Missouri therefore seeks declaratory and injunctive relief under
2 28 U.S.C. § 2201.

## COUNT II
## (IN THE ALTERNATIVE)
## FEDERAL PREEMPTION

68.   Missouri incorporates all allegations in Paragraphs 1 through 67 into Count II of this Complaint.

69.   If this Court were to rule that AB1437 and 3 CA ADC § 1350(d)(1) served a legitimate, non-discriminatory purpose to lower the risk of salmonella contamination by imposing new cage-size and flock-density standards for housing egg-laying hens, the statute and regulations would be in conflict with the express terms of 21 U.S.C. § 1052(b).

70.   Moreover, because Congress evidenced its intention to occupy the entire field of regulations governing the quality and condition of eggs by imposing uniform national standards, the Federal Egg Products Inspection Act, 21 U.S.C. § 1032, implicitly preempts AB1437 and 3 CA ADC § 1350(d)(1) as well.

71.   Missouri therefore seeks declaratory and injunctive relief under 28 U.S.C. § 2201 that AB1437 and 3 CA ADC § 1350(d)(1) are null and void under the Supremacy Clause of the United States Constitution.

WHEREFORE, the State of Missouri respectfully requests that this Court issue the following relief:

    A.   declare that AB1437 is invalid because it violates the Commerce Clause of the United States Constitution or, in the alternative, because it is expressly and implicitly preempted by the Federal Egg Products Inspection Act;

1      B.    declare that 3 CA ADC § 1350(d)(1) is invalid because it violates the Commerce Clause of the United States Constitution or, in the alternative, because it is expressly and implicitly preempted by the Federal Egg Products Inspection Act;

    C.    permanently enjoin Defendant from enforcing the provisions of both AB1437 and 3 CA ADC § 1350(d)(1);

    D.    award costs and fees; and

    E.    grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated February 3, 2014

COLEMAN & HOROWITT LLP

/s/ Sherrie M. Flynn           .
SHERRIE M. FLYNN


MISSOURI ATTORNEY GENERAL'S OFFICE

/s/ *J. Andrew Hirth*
J. ANDREW HIRTH


Attorneys for Plaintiff,
THE STATE OF MISSOURI, ex rel.,
CHRIS KOSTER

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF   Page 20