1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  SUSAN K. SMITH, State Bar No. 231575
   Deputy Attorney General
4    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
5    Telephone:  (213) 897-2105
     Fax:  (213) 897-1071
6    E-mail:  Susan.Smith@doj.ca.gov
   *Attorneys for Attorney General Kamala D. Harris*
7  *and California Department of Food and Agriculture*

8                    IN THE UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **THE STATE OF MISSOURI, ex rel., Chris**        2:14-CV-00341-KJM-KJN
    **Koster, Attorney General; THE STATE OF**
14  **NEBRASKA, ex rel. Jon Bruning, Attorney**      **NOTICE OF MOTION AND MOTION**
    **General; THE STATE OF OKLAHOMA,**              **TO DISMISS FIRST AMENDED**
15  **ex rel. E. Scott Pruitt, Attorney General;**   **COMPLAINT BY ATTORNEY**
    **THE STATE OF ALABAMA, ex rel. Luther**         **GENERAL HARRIS AND SECRETARY**
16  **Strange, Attorney General; THE**               **OF CALIFORNIA DEPARTMENT OF**
    **COMMONWEALTH OF KENTUCKY, ex**                 **FOOD AND AGRICULTURE**
17  **rel. Jack Conway, Attorney General; and**
    **TERRY E. BRANSTAD, Governor of the**           Date:           June 6, 2014
18  **State of Iowa,**                               Time:           10:00 a.m.
                                                     Courtroom:      3, 15th Floor
19                                     Plaintiffs,   Judge:          Hon. Kimberly J. Mueller
                                                     Trial Date:
20                  v.                               Action Filed:   February 3, 2014

21  **KAMALA D. HARRIS, solely in her official**
    **capacity as Attorney general of California;**
22  **KAREN ROSS, solely in her official**
    **capacity as Secretary of the California**
23  **Department of Food and Agriculture,**

24                                     Defendants.

25

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

INTRODUCTION .......................................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

    A.    The Provisions of AB 1437 .................................................................... 2

    B.    Shell Egg Food Safety Regulations ......................................................... 3

    C.    First Amended Complaint ...................................................................... 3

ARGUMENT .................................................................................................. 4

    I.    Legal Standards Applicable to 12(B) Motions .......................................... 4

    A.    Rule 12(B)(1) ..................................................................................... 4

    B.    Rule 12(B)(6) ..................................................................................... 4

    II.    Plaintiffs Lack Standing to Assert This Complaint .................................... 4

    III.    The Complaint Must Be Dismissed Because Plaintiffs' Claims Are Not Justiciable .... 8

    IV.    Plaintiffs Fail to State a Valid Claim Under the Commerce or Supremacy Clauses ..... 9

    A.    Plaintiffs' Commerce Clause Claim Fails and Should be Dismissed. ........... 10

        1.    Plaintiffs Have Not Alleged Discrimination Against Interstate Commerce ...... 10

        2.    Plaintiffs Fail to Allege That the Shell Egg Laws Regulate Interstate Commerce ..... 12

        3.    *Pike* Balancing Is Not Required Here, But Even if it Were, the Shell Egg Laws Serve a Legitimate Local Purpose and the Benefits Outweigh any Burden on Interstate Commerce ..... 13

    B.    Plaintiffs Preemption Claim Fails and Should be Dismissed ..................... 15

        1.    There is a Strong Presumption Against Preemption .............................. 15

        2.    The Shell Egg Laws are not Expressly Preempted by Federal Law ............. 16

        3.    The Shell Egg Laws are not Implicitly Preempted by Federal Law ............. 19

CONCLUSION ............................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico Ex Rel. Barez*
458 U.S. 592 (1982) .................................................................. 5, 7, 8, 9

*Altria Group, Inc. v. Good*
555 U.S. 70 (2008) ............................................................................ 16

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................................... 4

*Ass'n des Eleveurs de Canards Et D'Oies Du Quebec v Harris*
729 F.3d 937 (9th Cir. 2013) ..................................................... passim

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*
476 U.S. 573 (1986) .......................................................................... 11

*California v. ARC America Corp.*
490 U.S. 93 (1989) ........................................................................... 15

*Chandler v. State Farm Mut. Auto. Ins. Co.*
598 F.3d 1115 (9th Cir. 2010) ............................................................ 4

*Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*
958 F.2d 941 (9th Cir. 1992) .............................................................. 9

*Cipollone v. Liggett Group, Inc.*
505 U.S. 504 (1992) .......................................................................... 16

*Clapper v. Amnesty International USA*
133 S. Ct. 1138 (2013) .................................................................... 5, 6

*Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*
458 U.S. 141 (1982) ..................................................................... 15, 20

*Florida Lime & Avocado Growers, Inc. v. Paul*
373 U.S. 132 (1963) .......................................................................... 16

*Freedom Holdings Inc. v. Spitzer*
357 F.3d 205 (2d Cir. 2004) .............................................................. 13

*General Motors Corp. v. Tracy*
519 U.S. 278 (1997) .......................................................................... 14

*Great Atl. & Pac. Tea Co. v. Cottrell*
424 U.S. 366 (1976) .......................................................................... 14

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*H.P. Hood & Sons, Inc. v. Du Mond*
   336 U.S. 525 (1949) ................................................................. 14

*Healy v. Beer Inst.*
   491 U.S. 324 (1989) ......................................................... passim

*Hollingsworth v. Perry*
   133 S. Ct. 2652 (2013) ................................................................ 4

*Jones v. Rath Packing Co.*
   430 U.S. 519 (1977) ................................................................. 15

*Lazy Y Ranch Ltd. v. Behrens*
   546 F.3d 580 (9th Cir. 2008) ....................................................... 4

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ............................................................... 4, 6

*Maine v. Taylor*
   477 U.S. 131 (1986) ................................................................. 10

*MedImmune, Inc. v. Genentech, Inc.*
   549 U.S. 118 (2007) ................................................................... 8

*Oregon Waste Systems, Inc. v. Department of Environmental Quality*
   511 U.S. 93 (1994) .................................................................. 11

*Pacific Northwest. Venison Producers v. Smitch*
   20 F.3d 1008 (9th Cir. 1994) .................................................. 11, 14

*Pennsylvania v. New Jersey*
   426 U.S. 660 (1976) ............................................................... 5, 7

*Pike v. Bruce Church, Inc.*
   397 U.S. 137 (1970) ......................................................... passim

*Retail Clerks Int'l Ass'n v. Schermerhorn*
   375 U.S. 96 (1963) .................................................................. 16

*Rice v. Santa Fe Elevator Corp.*
   331 U.S. 218 (1947) ................................................................. 15

*Sacks v. Office of Foreign Assets Control*
   466 F.3d 764 (9th Cir. 2006) ....................................................... 9

Notice of Motion and Motion to Dismiss First Amended Complaint  (2:14-CV-00341-KJM-KJN)

## TABLE OF AUTHORITIES
### (continued)

Page

*Sprewell v. Golden State Warriors*
266 F.3d 979, *amended by* 275 F.3d 1187 (9th Cir. 2001) ...................................... 4

*Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*
256 F.3d 879 (9th Cir. 2001).......................................................................................... 4

*United States v. Salerno*
481 U.S. 739 (1987) ........................................................................................................ 9

*United States v. Stevens*
559 U.S. 460 (2010) ...................................................................................................... 16

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*
529 U.S. 765 (2000) ........................................................................................................ 4

*Washington State Grange v. Washington State Republican Party*
552 U.S. 442 (2008) ........................................................................................................ 9

*Western Mining Council v. Watt*
643 F.2d 618 (9th Cir.1981)........................................................................................... 8

*Wyeth v. Levine*
555 U.S. 555 (2009) ...................................................................................................... 16

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 8, cl. 3 ...................................................................................... 10
U.S. Const. Article III ................................................................................................. 6, 8

**FEDERAL STATUTES**

21 U.S.C. § 301............................................................................................................ 3, 16
21 U.S.C. § 1031 .............................................................................................................. 16
21 U.S.C. § 1033(f) and (g)............................................................................................ 17
21 U.S.C. § 1033(r) .......................................................................................................... 17
21 U.S.C. § 1033(v) .......................................................................................................... 17
21 U.S.C. § 1034 .............................................................................................................. 17
21 U.S.C. § 1052(a) .......................................................................................................... 17
21 U.S.C. § 1052(b) .................................................................................................. passim
28 U.S.C. § 2201 ................................................................................................................ 8
28 U.S.C. § 2201(a) ........................................................................................................... 8
42 U.S.C. § 201 ................................................................................................................ 16

## TABLE OF AUTHORITIES
### (continued)

**Page**

**CALIFORNIA STATUTES**

California Health and Safety Code .................................................................... 2, 18
    § 25990 ................................................................................................. 2, 3
    § 25991(b) ................................................................................................... 2
    § 25991(c) ............................................................................................. 2, 18
    § 25991(d) ................................................................................................... 2
    § 25991(f) ................................................................................................... 2
    § 25991(i) ................................................................................................... 2
    § 25992 ....................................................................................................... 3
    § 25993 ....................................................................................................... 3
    § 25994 ....................................................................................................... 2
    § 25995 ....................................................................................................... 2
    § 25995(e) ................................................................................................. 18
    § 25996 ......................................................................................... 2, 12, 18
    § 25997 ................................................................................................. 3, 12
    § 25997.1 ................................................................................................... 2

**OTHER STATE STATUTES**

Iowa Code § 196. ................................................................................................. 19
Mo. Ann. Stat. § 196.321 (2014) ....................................................................... 18

**COURT RULES**

Federal Rule of Civil Procedure
    Rule 12(b)(1) .............................................................................................. 4
    Rule 12(b)(6) .............................................................................................. 4

**OTHER AUTHORITIES**

7 C.F.R. § 56.1 .................................................................................................... 17
7 C.F.R. § 57.1 .............................................................................................. 17, 18
21 C.F.R. § 118 ................................................................................................... 19
21 C.F.R. § 118.3 ............................................................................................... 17
21 C.F.R. § 118.12(d) ......................................................................................... 19
63 Fed. Reg. 27502 ............................................................................................ 16
74 Fed. Reg. 33030 ............................................................................................ 19
Cal. Code Regs. Title 3
    § 1350 (2014) ................................................................................. 3, 17, 19
    § 1350(d)(1) ............................................................................................... 3

v

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 6, 2014 at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Kimberly J. Mueller in Courtroom 3 of the United States District Court for the Eastern District of California, located at 501 "I" Street, Sacramento, California, Defendants Attorney General Kamala D. Harris, and California Department of Food and Agriculture Secretary Karen Ross will move this Court to dismiss Plaintiffs' First Amended Complaint to Declare Invalid and Enjoin Enforcement of AB 1437 and 3 CA ADC § 1350(d)(1) ("Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This motion to dismiss is made on the following grounds: (1) plaintiffs lack standing to assert this Complaint; (2) plaintiffs' claims are not justiciable; (3) plaintiffs fail to state a claim upon which relief can be granted under the Commerce and Supremacy Clauses of the United States Constitution, and there is no basis for injunctive relief.

This motion is based on this Notice, the Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the Declarations of Anthony S. Herrera and Susan K. Smith, the papers and pleadings on file in this action, and upon such matters as may be presented to the Court at the time of the hearing.

i

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

California law prohibits the sale of eggs for human consumption in California, regardless of their origin, if they are the product of an egg-laying hen confined in violation of certain minimum animal care standards. The state had two main goals in passing this legislation and a separate regulation: protection of farm animal welfare and protection of public health and safety through the prevention of salmonella. The law is based on evidence and legislative findings that farm animals that are treated well and provided with minimum living space are healthier and safer for human consumption. Additionally, evidence and legislative findings demonstrate that reducing salmonella in egg-laying hen flocks causes a directly proportional reduction in human health risk.

In this action against Attorney General Kamala D. Harris and California Food and Agriculture Secretary Karen Ross, plaintiffs allege that the challenged California law facially violates the Commerce and Supremacy Clauses of the U.S. Constitution. As a threshold matter, however, the Complaint should be dismissed because plaintiffs do not have standing to bring this lawsuit. Furthermore, the Complaint should be dismissed because plaintiffs do not allege enough facts in support of their constitutional claims. Rather, the Complaint is comprised of little more than boilerplate legal conclusions that fail to satisfy fundamental pleading requirements.

As a substantive matter, the challenged California law is facially neutral, does not discriminate against interstate commerce and does not regulate extraterritorially. Additionally, the state law does not expressly or implicitly conflict with federal law, which, in fact, authorizes *more stringent* state laws with respect to the prevention of salmonella. Moreover, plaintiffs' broad preemption claim goes far beyond the express preemption clause in the federal Egg Products Inspection Act and would strike down many consistent state laws, including laws regarding the condition and quality of shell eggs codified in two of the plaintiffs, Missouri and Iowa. Because plaintiffs cannot demonstrate that the challenged California laws are unconstitutional, they cannot state a claim upon which relief is granted.

Accordingly, defendants respectfully request that this Court dismiss the Complaint with prejudice.

1

# STATEMENT OF FACTS

### A.   The Provisions of AB 1437

AB 1437 provides that "Commencing January 1, 2015, a shelled egg shall not be sold or contracted for sale for human consumption in California if it is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth [in Section 25990.]" Cal. Health & Safety Code § 25996 (Deering 2012)[1] ("Shell Egg Law"). Section 25990, approved by the voters in 2008, states that "a person shall not tether or confine any covered animal on a farm, for all or the majority of any day, in a manner that prevents such animal from: "(a) Lying down, standing up, and fully extending his or her limbs; and (b) turning around freely." § 25990.[2]

For purposes of section 25990, and hence AB 1437, "covered animal" means any pig during pregnancy, calf raised for veal, or egg-laying hen kept on a farm. § 25991(b). "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or guinea fowl kept for the purpose of egg production. § 25991(c). "Enclosure" means "any cage, crate, or other structure (including what is commonly described as . . . a 'battery-cage' for egg-laying hens) used to confine a covered animal." § 25991(d).

In addition, "fully extending his or her limbs" is defined as "in the case of egg-laying hens, fully spreading both wings without touching the side of an enclosure or other egg-laying hens." § 25991(f).  Finally, "turning around freely" is defined as "turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure." § 25991(i).

Section 25990's space requirements are subject to several exceptions. § 25992 (noting exceptions).  Under both Proposition 2 and AB 1437, any person who violates the law is guilty of a misdemeanor, and upon conviction is subject to a fine not greater than $1,000, or imprisonment in the county jail for 180 days or less, or both. § 25993 (Prop. 2); § 25997 (AB 1437).

---

[1] Unless otherwise stated, all statutory references are to the California Health and Safety Code.
[2] Sections 25990 through 25994 were added to the Health and Safety Code by passage of Proposition 2 in the November 2008 general election.  Enacted two years later, AB 1437 added Sections 25995 through 25997.1 to the Health and Safety Code.  2010 Cal. Legis. Serv. Ch. 51 (AB 1437) (West).

**B.   Shell Egg Food Safety Regulations**

The challenged Food and Agriculture regulation provides that egg producers or handlers shall do the following to prevent salmonella enterica serotype enteritidis ("salmonella"):  (1) implement the salmonella prevention measures regarding the production, storage, and transportation of shell eggs in accordance with federal law; (2) implement a salmonella environmental monitoring program, including testing for salmonella in "chick papers" (papers in which chicks are delivered); (3) implement a vaccination program for salmonella; and (4) beginning January 1, 2015, implement certain size enclosures for egg-laying hens.  Cal. Code Regs. tit. 3, § 1350 (2014) ("Shell Egg Regulations" and collectively with Shell Egg Law as "Shell Egg Laws").  The regulation specifies how many square inches per bird are required for egg-laying hens.  *Id.* at § 1350(d).  This regulation was implemented pursuant to California Food and Agriculture Code section 27521(a).  *Id.* at § 1350(a).

**C.   First Amended Complaint**

Six states—Missouri, Nebraska, Oklahoma, Alabama, Kentucky and Iowa—brought the Complaint to Declare Invalid and Enjoin Enforcement of AB 1437 and 3 CA ADC § 1350(d)(1) for violating the Commerce and Supremacy Clauses of the United States Constitution ("Compl." or Complaint; ECF #13 Document).[3]  Plaintiffs allege that they have standing to bring this suit as parens patriae because of their "quasi-sovereign interests in protecting [their] citizens economic health and constitutional rights as well as preserving [their] rightful status within the federal system."  Compl. ¶¶ 10, 17, 23, 27, 32; *see also* ¶ 36.

Plaintiffs allege in two separate counts that the Shell Egg Laws are unconstitutional under the Commerce Clause and preempted by section 1052(b) of the Egg Products Inspection Act ("EPIA;" 21 U.S.C. 1031 et seq.).  Compl. ¶¶ 95-105.

---

[3] Missouri, Nebraska, Oklahoma, Alabama, and Kentucky bring this action by and through their respective state attorneys general.  Iowa appears by and through its Governor, Terry E. Branstad.

3

# ARGUMENT

## I.   LEGAL STANDARDS APPLICABLE TO 12(B) MOTIONS

### A.   Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to raise the defense that a court lacks jurisdiction over the subject matter of a claim for lack of standing.  As with a Rule 12(b)(6) motion, courts accept as true all material allegations in the complaint, but, unlike with a Rule 12(b)(6) motion, the burden of proof on a Rule 12(b)(1) motion is on the party seeking to invoke the court's subject matter jurisdiction.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-22 (9th Cir. 2010).

### B.   Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court accepts as true all material allegations in the complaint and construes the allegations in the complaint in the light most favorable to the plaintiff.  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  However, a court need not accept as true conclusory allegations, unwarranted deductions of fact or unreasonable inferences.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended by* 275 F.3d 1187 (9th Cir. 2001).  A complaint must offer more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do."  *Ashcroft*, 556 U.S. at 678 (internal citations omitted).

## II.   PLAINTIFFS LACK STANDING TO ASSERT THIS COMPLAINT

Article III of the United States Constitution confines the power of the federal courts to deciding actual "Cases" or "Controversies."  One essential aspect of this requirement is that any party invoking the power of a federal court must demonstrate standing to do so.  "This requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision."  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citing *Lujan v. Defenders of Wildlife*, 504

4

1  U.S. 555, 573-76 (1992)).  The injury-in-fact requirement refers to an invasion of a legally

2  protected interest that is concrete, particularized, and actual or imminent.  *Vermont Agency of*

3  *Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771-72 (2000).  A generalized interest

4  in the proper application of law shared by the population at large does not satisfy the injury-in-

5  fact requirement.  *Lujan*, 504 U.S. at 573-76.  The "threatened injury" must be "certainly

6  impending."  *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1143 (2013).

7        It is "settled doctrine that a State has standing to sue only when its sovereign or quasi-

8  sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims

9  of its citizens."  *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (denying Pennsylvania's

10  parens patriae suit against New Jersey as nothing more than a "collectivity of private suits against

11  New Jersey for taxes withheld from private parties").  In order to maintain a lawsuit involving

12  parens patriae, a state must do the following: (1) "articulate an interest apart from the interests of

13  particular private parties, *i.e.*, the State must be more than a nominal party" and (2) "The State

14  must express a quasi-sovereign interest."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico Ex Rel.*

15  *Barez*, 458 U.S. 592, 607 (1982); *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris,*

16  *Inc.*, 256 F.3d 879, 885 (9th Cir. 2001) (parens patriae standing allowed when the sovereign

17  "alleges injury to a sufficiently substantial segment of its population," articulates an interest apart

18  from private parties and "expresses a quasi-sovereign interest").

19        As a threshold matter, plaintiffs fail to make even the most basic allegations necessary to

20  establish that there is an injury-in-fact.  Notably, plaintiffs fail to allege whether several of the

21  states *produce* any eggs *that are sold in California*:  Alabama, Nebraska, Oklahoma and

22  Kentucky.  Compl. ¶¶ 18, 23, 28 and 33.  Although plaintiffs make a statement that Alabama,

23  Nebraska and Kentucky are among the states whose producers' eggs account for 5.6 percent of

24  total California imports (Compl. at ¶ 55), this number includes liquid and dry eggs, commodities

25  not at issue in this lawsuit.  Compl. Ex. E at p. 5.  And, plaintiffs' own exhibits show that this

26  figure includes *thirteen* additional states not involved in this litigation.  *Id.*

27        Three of the four states for which this allegation is missing—Alabama, Nebraska, and

28  Oklahoma—do not appear to have any egg handlers registered to sell shell eggs in California.

5

1   *See* Anthony S. Herrera Declaration in Support of Defendants' Motion to Dismiss ("Herrera

2   Dec.") at ¶ 6.  And it appears that Oklahoma sells *no* shell eggs in California at all.  *Id.* at ¶¶ 6, 12.

3   These states are thus asserting a claim for a hypothetical private population that does no business

4   with California or a very small amount.  *Id.*  ¶¶ 6-12.  These four states have not articulated a

5   "concrete and particularized injury" much less one that is "certainly impending," and thus, have

6   not established standing.  *Lujan*, 504 U.S. at 573-76; *Clapper*, 133 S. Ct. at 1143.  Furthermore,

7   with respect to Missouri and Iowa, there is no indication that the egg producers from those states

8   would suffer a concrete and particularized injury from the Shell Egg Laws.  *See generally* Compl.

9   Plaintiffs speculate that some egg producers "can incur massive capital improvement costs to

10  build larger habitats for some or all of their egg-laying hens, or they can walk away from the

11  largest egg market in the country."  Compl. ¶ 6.  However, this is complete conjecture because

12  there are no allegations that egg producers in plaintiff states do not already comply with the Shell

13  Egg Laws, or *want* to comply with the Shell Egg Laws if they do not already—the only ones who

14  *could* assert these allegations are the egg producers themselves, and they are not parties to this

15  litigation.  Because plaintiffs failed to meet the burden of showing an injury-in-fact, they have

16  failed, at the threshold, to demonstrate standing.

17        But even assuming plaintiffs properly alleged an injury-in-fact, which they have not,

18  plaintiffs would still need to show that they meet the doctrine of parens patriae to bring this

19  lawsuit.  Plaintiffs allege that the states have standing because of the "quasi-sovereign interests in

20  protecting [their] citizens' economic health and constitutional rights as well as preserving [their]

21  own rightful status within the federal system."  Compl. ¶¶ 10, 17, 22, 27, 32.  Governor Branstad

22  of Iowa alleges standing for his state on the basis that "Iowa has quasi-sovereign interests in

23  regulating agricultural activity within its own borders and preserving Iowa's rightful status within

24  the federal system."  Compl. ¶ 36.  These allegations fail to allege a cognizable theory of parens

25  patriae standing.

26        First, plaintiffs allege claims that relate to private egg producers who could assert these

27  claims on their own, if they wanted to do so.  Plaintiffs have not asserted or alleged an interest

28  apart from the private egg producers.  *See generally* Compl.  The complaint is silent as to any

6

1  separate state interest beyond the alleged violations of federal law that could be prosecuted by

2  private egg producers or associations that represent private egg producers.  The Supreme Court

3  has not specified "any definitive limits" on the segment of the population that must be adversely

4  affected, but "more must be alleged than injury to an identifiable group of individual residents."

5  *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.  For example, as described in *Pennsylvania v. New*

6  *Jersey*, a parens patriae suit against a state may not be brought to collect "taxes withheld from

7  private parties" when those private parties could bring the suits themselves.  426 U.S. at 666

8  (noting that the "critical distinction, articulated in Art. III, § 2, of the Constitution, between suits

9  brought by 'Citizens' and those brought by 'States' would evaporate" if states were allowed to

10  bring suits to redress private grievances).  Similarly, here, if egg producers selling eggs in

11  California deem the Shell Egg Laws violative of their constitutional rights, the egg producers or a

12  collection of producers could assert these claims.  The states have no separate interest in asserting

13  what is essentially a private grievance.

14       Second, plaintiffs have not stated a "quasi-sovereign" interest.  Although the Supreme

15  Court did not give a definition of "quasi-sovereign" interest, it noted that the characteristics of

16  such a claim fall into two categories: "First, a State has a quasi-sovereign interest in the health

17  and well-being—both physical and economic—of its residents in general.  Second, a State has a

18  quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal

19  system." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.

20       Far from alleging an "injury to a sufficiently substantial segment of its population" (*Table*

21  *Bluff Reservation,* 256 F.3d at 885), plaintiffs have not articulated anything beyond a miniscule

22  general economic complaint limited to a small subset of their population.  While there is no set

23  minimum for the population that has to be impacted, plaintiffs' allegations of impact on a tiny

24  subset (or no subset in the case of Oklahoma) is clearly not enough—even at the pleading stage.

25  Nor have plaintiffs made the kind of allegations showing that the private egg producers are being

26  discriminated against in such a manner as would create state standing.  *See Alfred L. Snapp & Son,*

27  *Inc.*, 458 U.S. at 609 (finding parens patriae standing where the Commonwealth of Puerto Rico

28  alleged employment discrimination against its citizens in violation of federal law).  In *Alfred L.*

7

1   *Snapp & Son, Inc.*, Puerto Rico alleged that the named defendants discriminated against Puerto

2   Ricans in favor of foreign laborers, in violation of federal law, and that Puerto Ricans were

3   denied the benefits of access to domestic work opportunities that federal laws were designed to

4   secure for United States workers. *Id.* at 608. The Supreme Court held that Puerto Rico had a

5   separate state interest in "securing residents from the harmful effects of discrimination" beyond

6   the workers' interests. *Id.* at 609; *see also* at 605-606 (listing cases where states alleged

7   discriminatory action in parens patriae suits or stated an interest in abatement of public nuisances).

8   As described more fully below, there is no discriminatory impact or effect of the challenged

9   legislation.

10   The burden is on plaintiffs to demonstrate standing, but they have failed to allege an injury

11   to a "sufficiently substantial segment of [their] population." The general allegation of damage to

12   a states' economy, without more detailed allegations of harm to a substantial segment of their

13   population. is not enough for parens patriae standing. This complaint should be dismissed at the

14   outset for lack of subject matter jurisdiction.

15   **III.   THE COMPLAINT MUST BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS ARE NOT**

16   **JUSTICIABLE**

17   A court's role is to adjudicate live "cases and controversies" consistent with the powers

18   granted to the judiciary in Article III of the Constitution. Here, plaintiffs seek a declaratory

19   judgment pursuant to the Declaratory Judgment Act, which provides that in "a case of actual

20   controversy within its jurisdiction, . . . any court of the United States, upon the filing of any

21   appropriate pleading, may declare the rights and other legal relations of any interested party

22   seeking such declaration." 28 U.S.C. § 2201(a). The "actual controversy" requirement of section

23   2201 refers to the type of cases and controversies that are justiciable under Article III.

24   *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-127 (2007).

25   In a declaratory judgment action, "[t]he mere existence of a statute, which may or may not

26   ever be applied to plaintiffs, is not sufficient to create a 'case or controversy' within the meaning

27   of Article III, and is thus insufficient to satisfy the 'actual controversy' requirement of the

28   Declaratory Judgment Act." *Western Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir.1981)

8

1   (citations omitted).  Although plaintiffs make conclusory allegations that their states' egg

2   producers  will have to "incur massive capital improvement costs to build larger habitats for some

3   or all of their egg-laying hens, or they can walk away from the largest egg market in the country"

4   (Compl. ¶ 6), they cannot challenge the validity of the Shell Egg Laws because they have not

5   alleged imminent or even a likely prosecution for violating the statute.  *See generally* Compl.

6        The court can thus make no reasonable inference that any of the states or their producers

7   would suffer prosecution.  "[W]hile it is well-established that an individual need not await

8   prosecution under a law or regulation before challenging it, we require a genuine threat of

9   imminent prosecution and not merely an imaginary or speculative fear of prosecution." *Sacks v.*

10  *Office of Foreign Assets Control*, 466 F.3d 764, 772-73 (9th Cir. 2006) (citations and quotations

11  omitted).  Here, the speculation is twice-removed because the plaintiff states are assuming that

12  their egg producers will want to sell eggs in California but will not want to comply with the

13  California law.  There are no allegations supporting this speculation, and the claims are thus not

14  justiciable.

15  **IV.   PLAINTIFFS FAIL TO STATE A VALID CLAIM UNDER THE COMMERCE OR**

16  **SUPREMACY CLAUSES**

17       Plaintiffs bring a facial challenge to the Shell Egg Laws on the grounds that the laws

18  purportedly violate the Commerce and Supremacy Clauses of the United States Constitution.  In

19  order to succeed on a facial challenge, Plaintiffs "must establish that no set of circumstances

20  exists under which the [regulation or statute] would be valid." *United States v. Salerno*, 481 U.S.

21  739, 745 (1987); *see also Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 943

22  (9th Cir. 1992).  Plaintiffs cannot prevail by suggesting that in some future hypothetical situation

23  constitutional problems may possibly arise as to the particular *application* of the statute.  Rather,

24  they must show that the statute is unconstitutional in *all* of its applications.  *See Washington State*

25  *Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  Where, as here, a

26  statute has a "plainly legitimate sweep," a facial challenge must fail.  *Id.* at 449 (citation and

27  internal quotations omitted).  Indeed, plaintiffs have failed to state any cause of action under these

28  clauses, let alone facts demonstrating a total and fatal conflict with their prohibitions.  *See id.*

9

A.    **Plaintiffs' Commerce Clause Claim Fails And Should Be Dismissed.**

The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause includes an implied limitation on the states' authority to adopt legislation that affects commerce. This implied limitation is often referred to as the negative or dormant Commerce Clause. *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989). "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dept. of Rev. of Ky. V. Davis*, 553 U.S. 328, 337-338 (2008) (internal citations omitted). However, its restrictions are "by no means absolute" and "[s]tates retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (citations and quotations omitted). "As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." *Id.* at 151 (citations and quotations omitted).

Whether state legislation violates the dormant Commerce Clause is generally analyzed under a two-tiered approach. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). A statute is essentially per se invalid if it directly regulates or discriminates against interstate commerce. *Id.* at 579. On the other hand, when a statute is nondiscriminatory and "has only indirect effects on interstate commerce and regulates evenhandedly, [the Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

1.    **Plaintiffs have not alleged discrimination against interstate commerce.**

For purposes of the dormant Commerce Clause, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the

10

1  latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 99

2  (1994). But plaintiffs have not alleged that the Shell Egg Laws discriminate in favor of in-state

3  interests. Compl. ¶¶56- 61 (specifying the costs to California egg producers associated with

4  complying with the requirements of Proposition 2). At most plaintiffs allege that egg producers

5  in California were afforded more notice to comply with the provisions of AB 1437 while

6  acknowledging that *all* egg producers were given four and one half years to comply with AB

7  1437. Compl. ¶ 67. And there are no allegations that the Shell Egg regulations discriminate in

8  any way as they apply to all egg producers equally. *See generally* Compl.

9         Here, the Shell Egg Laws require that all eggs sold in California meet certain standards,

10  regardless of origin. There is no distinction between eggs produced in or out of state. A statue

11  that bans the sale of both intrastate and interstate products is not discriminatory. *Ass'n des*

12  *Eleveurs de Canards Et D'Oies Du Quebec v Harris.*, 729 F.3d 937, 948 (9th Cir. 2013); *see also*

13  *Pacific Northwest. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) (holding that

14  "[a]n import ban that simply effectuates a complete ban on commerce in certain items is not

15  discriminatory, as long as the ban on commerce does not make distinctions based on the origin of

16  the items").

17         Plaintiffs allege that the public health purposes of AB 1437 are pretextual and the bill's true

18  purpose was to protect California farmers from the market effects of Proposition 2. Compl.

19  ¶¶ 68-75.[4] This conclusory claim is not supported by the legislative findings or the law. First,

20  AB 1437 had two purposes: protection of farm animal welfare and protection of public health

21  and safety through the prevention of salmonella. §§ 25996, 25997; *see also* Request for Judicial

22  Notice (filed herewith) at pp. 9, 28, 30-37, 39-62 (HSUS Report), 66-98 (PEW report), 115-122,

23  255. Second, a "statute that 'treats all private companies exactly the same' does not discriminate

24  against interstate commerce." *Ass'n des Eleveurs de Canards*, 729 F.3d at p. 948. Regardless of

25  origin, all shell eggs (and those that produce and handle the shell eggs) are treated exactly the

26  same. Even if AB 1437 were discriminatory—it is not –the combined effect of Proposition 2 and

_____

27         [4] There are no allegations regarding discriminatory impact of the Shell Egg regulations.
*See generally* Compl.

28

11

1   AB 1437 taken in total is to subject in-state and out-of-state commerce to equivalent burdens, an

2   effect that does not violate the Commerce Clause. *Id.* at p. 949 (interpreting the interplay

3   between various state provisions and finding that there is no discrimination against out-of-state

4   commerce).

5        Plaintiffs have not alleged discrimination here; nor have they alleged that any burden on

6   them is not equivalent to any burden on California producers.  In-state and out-of-state producers

7   are subjected to equivalent standards under the California law. There is no discrimination against

8   interstate commerce.

9       2.    **Plaintiffs fail to allege that the Shell Egg Laws regulate interstate**

10             **commerce.**

11        The terms of the Shell Egg laws regulate only eggs sold in California.  Plaintiffs' Complaint

12   is devoid of any allegations that the Shell Egg laws regulate interstate commerce. *See generally*

13   Compl.  Plaintiffs acknowledge that the provisions of the Shell Egg Laws impose burdens on egg

14   farmers *in* California (Compl. ¶¶ 58-59, 64-67), but fail to make the same allegations regarding

15   egg farmers *outside* of California.  Rather, plaintiffs' allegations of discrimination revolve around

16   the theory that California egg farmers had more time to prepare for AB 1437 than did out of state

17   farmers. (Compl. ¶ 67.)  But all egg farmers (in or out of state) were given an adequate time to

18   prepare for the law—at least four-and-one-half years.  Additionally, the Shell Egg Laws regulate

19   *only* shell eggs sold for human consumption *in California.*  There is no allegation, nor could there

20   be, that AB 1437 regulates other egg products, such as liquid or dry eggs, or shell eggs sold out of

21   state.

22       Moreover, a statute impermissibly regulates extraterritorial conduct in violation of the

23   Commerce Clause where it "has the undeniable effect of controlling commercial activity

24   occurring *wholly* outside the boundary of the State." *Healy v. Beer Inst.*, 491 U.S. at 336

25   (invalidating a statute under the Commerce Clause because it had the practical effect of

26   controlling prices in other states) (emphasis added).  Plaintiffs make no allegation, and could not

27   in good faith do so, that the Shell Egg Laws either directly, or indirectly, control commerce

28

1    occurring wholly outside of California because the laws only control the sale of eggs *in*

2    California.

3           Plaintiffs allege that in regulating the method of production of eggs sold in the state,

4    California is "attempting to regulate agricultural practices beyond its own borders." Compl. ¶ 7.

5    But even assuming that the statute may have an effect on industries outside of California, "[t]he

6    mere fact that state action may have repercussions beyond state lines is of no judicial significance

7    so long as the action is not within that domain which the Constitution forbids." *Freedom*

8    *Holdings Inc. v. Spitzer*, 357 F.3d 205, 220-21 (2d Cir. 2004).  A statute is not "invalid merely

9    because it affects in some way the flow of commerce between the States." *Nat'l Ass'n of*

10   *Optometrists*, 682 F.3d at 1148 (citation omitted).  "States may not mandate compliance with

11   their preferred policies in wholly out-of-state transactions, but they are free to regulate commerce

12   and contracts within their boundaries with the goal of influencing the out-of-state choices of

13   market participants."  *See Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1103 (9th

14   Cir. 2013) (finding California "properly based its regulation on the harmful properties of fuel.  It

15   does not control the production or sale of ethanol wholly outside California").

16          California has not "projected its regulatory regime" into other states, and other states are

17   free to take any action they deem appropriate with respect to the shell eggs and chickens

18   producing eggs in their states.  *Healy*, 491 U.S. at 336-37.  Much like the fuel standards at issue

19   in *Rocky Mountain Farmers Union v. Corey*, the Shell Egg Laws do not control the production or

20   sale of shell eggs wholly outside California.  On its face, the Shell Egg Laws do not offend the

21   dormant Commerce Clause because they does not regulate commerce outside of the state.

22          **3.    *Pike* balancing is not required here, but even if it were, the Shell Egg
                    Laws serve a legitimate local purpose and the benefits outweigh any
23                  burden on interstate commerce.**

24          Application of the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. at 142,

25   is unnecessary because plaintiffs have not alleged that there is a substantial burden on interstate

26   commerce.  Application of the *Pike* test requires that a plaintiff first establish a substantial burden

27   on interstate commerce.  *See, e.g., Ass'n des Eleveurs de Canards*, 729 F.3d at 952 (finding that

28   state law did not substantially burden interstate commerce and thus no need to use balancing test).

                                              13

1    First, most statutes "that impose a substantial burden on interstate commerce do so because they

2    are discriminatory" (*Ass'n des Eleveurs de Canards*, 729 F.3d at 952), but as discussed above, the

3    Shell Egg Laws are not discriminatory.  Second, "less typically, statutes impose significant

4    burdens on interstate commerce as a consequence of 'inconsistent regulation of activities that are

5    inherently national or require a uniform system of regulation.'"  *Id.*  (citations omitted).

6         As the Ninth Circuit has also noted, a "state regulation does not become vulnerable to

7    invalidation under the dormant Commerce Clause merely because it affects interstate commerce."

8    *Nat'l Ass'n of Optometrists*, 682 F.3d at 1148.  Rather, "[a] critical requirement for proving a

9    violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate*

10   *commerce.*"  *Id.* (emphasis in original).  Burdens on commerce that result from regulations

11   pursuant to the state's police power to protect the public health and safety are generally not

12   regarded as significant even if they involve some loss of trade.  *See id.* (citing *Great Atl. & Pac.*

13   *Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)).  Indeed, the Supreme Court "generally has

14   supported the rights of states to 'impose even burdensome regulations in the interest of local

15   health and safety.'"  *Id.* (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535

16   (1949)).[5]  Here, plaintiffs make conclusory statements about possible burdens on interstate

17   commerce, asserting that farmers in plaintiff states can incur massive capital improvement costs

18   to build larger habitats for some or all of their egg-laying hens or they can walk away from the

19   largest egg market in the country.  Compl. ¶ 6, 88.  But interstate commerce is not burdened

20   "merely because a non-discriminatory regulation precludes a preferred, more profitable method of

21   operating in a retail market."  *Nat'l Ass'n of Optometrists*, 682 F.3d at 1154.  Additionally, it

22   appears some plaintiff states do not even have egg producers selling in the largest egg market in

23

24        [5] The Supreme Court has noted that many cases that have "purported to apply the undue
     burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory
25   character of the challenged state regulations."  *General Motors Corp. v. Tracy*, 519 U.S. 278, 299
     n.12 (1997).  As the Ninth Circuit has noted, "Because the purpose of the Commerce Clause is to
26   protect the nation against economic Balkanization, legitimate regulations that have none of these
     effects [of discriminating against or regulating interstate commerce] arguably are not subject to
27   invalidation under the Commerce Clause."  *Pacific Northwest Venison Producers*, 20 F.3d at
     1015 (internal citations omitted).

28

                                                    14

1    the country, California, nor is there any indication they seek to sell in California. *See* Complaint

2    ¶¶ 11-41.  Moreover, it is speculative to assume what Missouri and Iowa egg farmers would

3    choose to do—if they do not already comply with the California law.  Compl. ¶ 88.  Certainly,

4    plaintiffs did not allege in definitive terms that there would be a substantial burden on interstate

5    commerce—if there would be any burden at all.

6        For all these reasons, plaintiffs' have not met the "heavy burden" to demonstrate that the

7    Shell Egg Laws facially violate the Commerce Clause and this claim should be dismissed.

8        **B.        Plaintiffs Preemption Claim Fails and Should Be Dismissed.**

9        Federal law may preempt state law in one of two ways.  Congress may either explicitly

10   state its intent to preempt state law in the direct language of a statute, or Congress may imply its

11   unstated intent to preempt through the structure and purpose of a statute.  *California v. ARC*

12   *America Corp.,* 490 U.S. 93, 100 (1989); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977).

13   Express preemption occurs when Congress states in explicit terms its intent to preempt state law.

14   *Id.*  Implicit preemption can itself take two forms:  field preemption or conflict preemption.  That

15   is, Congress may either occupy a field by passing a statutory scheme so extensive that it covers an

16   entire legislative field, or Congress may enact a federal law which makes compliance with state

17   law impossible.  *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982);

18   *Hillman v. Maretta,* 133 S. Ct. 1943, 1950 (2013) ("conflict" preemption is when "compliance

19   with both federal and state regulations is impossible' . . . or when the state law 'stands as an

20   obstacle to the accomplishment and execution of the full purposes and objectives of

21   Congress.'").[6]

22       1.    **There is a strong presumption against preemption**

23       Preemption analysis "starts with the assumption that the historic police powers of the States

24   [are] not to be superseded by [a] Federal Act unless that [is] the clear and manifest purpose of

25   Congress." *California v. ARC America Corp.*, 490 U.S. at 101 (quoting *Rice v. Santa Fe Elevator*

26   *Corp.*, 331 U.S. 218, 230 (1947)).  Only if Congress intended to preempt state law will

27

28   _____
     [6] Plaintiffs have not and cannot allege a conflict preemption theory.  Compl. ¶¶ 102-105.

                                        15

1    compliance with state law be excused.  *See Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S.

2    96, 103 (1963) ("The purpose of Congress is the ultimate touchstone.").

3    There is a strong presumption against preemption.  *See, e.g., Cipollone v. Liggett Group,*

4    *Inc.*, 505 U.S. 504, 518 (1992).  This is particularly true where the state law concerns traditional

5    areas that come within the police power, such as health and safety laws.  *Wyeth v. Levine*, 555

6    U.S. 555, 565 (2009) ("In all pre-emption cases and particularly in those in which Congress has

7    'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the

8    assumption that the historic powers of the States were not to be superseded by the Federal Act

9    unless that was the clear and manifest purpose of Congress'") (citations omitted); *see also Altria*

10   *Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (presumption applies in express preemption case);

11   *see also Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963) (food safety

12   deemed "a matter of peculiarly local concern"); *United States v. Stevens*, 559 U.S. 460, 469 (2010)

13   (states have a long history of regulating animal cruelty).

14   2.    **The Shell Egg Laws are not expressly preempted by federal law**

15   Here, there is no express preemption of the Shell Egg Laws.  Plaintiffs allege that the EPIA

16   preempts the challenged state Shell Egg Laws.  21 U.S.C. § 1031 et seq.; Compl. ¶¶ 76-81, 103.

17   But plaintiffs' Supremacy Clause claim, like their Commerce Clause claim, is based largely on

18   legal conclusions and does not satisfy the pleading burden.  *See Iqbal*, 556 U.S. at 680-81

19   (citations omitted).  Plaintiffs assert that AB 1437's welfare standards are "in addition to or

20   different from the official federal standards" in violation of 21 U.S.C. § 1052(b).  Compl. ¶¶ 81,

21   103.  Plaintiffs seem to assume that the scope of the EPIA preemption clause encompasses the

22   state law and regulation at issue here, but the Shell Egg Laws are not within the scope of the

23   preemption clause in 21 U.S.C. § 1052(b), and are in fact, specifically provided for by federal law.

24   The Federal Drug Administration has jurisdiction over the safety of foods generally,

25   including shell eggs.  *See* 21 U.S.C. § 301, et seq. (Federal Food Drug and Cosmetic Act

26   ("FFDCA")).  FDA also has the authority to prevent the spread of communicable diseases under

27   the Public Health Service Act, including salmonella in shell eggs.  *See* 42 U.S.C. § 201 *et seq; see*

28   *also* 63 Fed. Reg. 27502 at 27508.  The USDA and FDA share authority under the EPIA.  *See* 21

16

1    U.S.C. § 1034; *see also* 21 U.S.C. §1052(b).  The preemption clause at issue here[7] states:

2       [N]o State or local jurisdiction may require the use of standards of quality, condition,
        weight, quantity, or grade which are in addition to or different from the official
3       Federal standards. . . .  However, any State or local jurisdiction may exercise
        jurisdiction with respect to eggs and egg products for the purpose of preventing the
4       distribution for human food purposes of any such articles which are outside of such a
        plant and are in violation of any of said Federal Acts or any State or local law
5       consistent therewith.  Otherwise the provisions of this chapter shall not invalidate any
        law or other provisions of any State or other jurisdiction in the absence of a conflict
6       with this chapter.

7    21 U.S.C. § 1052(b).  Plaintiffs' *sole* allegations regarding preemption focus on the phrase, "no

8    State or local jurisdiction may require the use of standards of quality, condition, weight, quantity,

9    or grade which are in addition to or different from the official Federal standards" and plaintiffs

10   allege that California law violates this provision.  Compl. ¶ 79, 80-81.  However, contrary to

11   plaintiffs' interpretation, "official standards" is defined as the "standards of quality, grades, and

12   weight classes for eggs . . . under the Agricultural Marketing Act."  21 U.S.C. § 1033(r); *see also*

13   7 C.F.R. § 57.1 (definition of "official standards" is same and available from Poultry Programs,

14   AMS); 7 C.F.R. § 56.1 ("official standards" defined as the official U.S. standards, grades, and

15   weight classes for shell eggs maintained by and available from Poultry Programs, AMS).

16   Pursuant to the Agricultural Marketing Act, *voluntary* standards were codified to grade certain

17   characteristics of shell eggs—standards, grades and weight classes.  (United States Standards,

18   Grades, and Weight Classes for Shell Eggs; found at www.ams.usda.gov (July 20, 2000) (noting

19   differences for grades of eggs such as "AA" grade or "B" grade.)

20       Contrary to plaintiffs' conclusory allegations, the Shell Egg Regulations at issue here do not

21   regulate the "standards of quality, condition, weight, quantity, or grade."  Rather, the Shell Egg

22   Regulations specify that in accordance with California Food and Agricultural Code section

23   27521(a) and 21 C.F.R. § 118.3, egg producers or handlers are to implement certain salmonella

24   prevention measures laws.  Cal. Code Regs., tit. 3, § 1350.  The prevention measures include

25

26   [7] Plaintiffs did not allege that section 1052(a) of the EPIA preempts state law, nor could
     they.  Section 1052(a) applies to the premises, facilities, and operation of any "official plant" and
27   official plant is defined to only include "a place of business where egg products are processed."
     21 U.S.C. §§ 1033(v), 1052(a).  "Egg product" is defined to include "dried, frozen or liquid eggs"
28   and does not include shell eggs.  21 U.S.C. § 1033(f) and (g).

17

1   enclosure size specifications, as well as a vaccination program and testing for salmonella in the

2   "chick papers" (papers in which chicks are delivered). *Id.* None of these state regulations

3   conflict with the EPIA provisions, or the "official standards" set out by the AMA—nor do

4   plaintiffs allege that they do. *See generally* Compl.

5         Similarly, the California Shell Egg Law is not expressly preempted by federal law. The

6   state law specifies that "it is the intent of the Legislature to protect California consumers from the

7   deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from

8   egg-laying hens that re exposed to significant stress and may result in increased exposure to

9   disease pathogens, including salmonella" by enforcing the specified animal welfare care

10  standards. § 25995(e); *see also* §§ 25996, 25990, 25991(c). The statute regulates the point of

11  sale of shell eggs in California. § 25996. Nothing in this statute is inconsistent with the

12  "standards of quality, condition, weight, quantity, or grade" of shell eggs specified by federal

13  law—nor have plaintiffs pointed to any inconsistency. *See* Compl. ¶¶ 76-81. Plaintiffs

14  misconstrue the phrase "standards of quality, condition, weight, quantity, or grade" to completely

15  encompass the general USDA definitions of "quality" as "the inherent properties of any product

16  which determines its relative degree of excellence" and "condition" as "any characteristic

17  affecting a product's merchantability including, but not being limited to, the following: The state

18  of preservation, cleanliness, soundness, wholesomeness, or fitness for human food of any product;

19  or the processing, handling, or packaging which affects such product." Compl. ¶ 80 (citing 7

20  C.F.R. § 57.1). However, there is no support for this reading of the phrase, which ignores the

21  statutory definition of "official standards" and ignores EPIA's authorization of *consistent state*

22  *laws.*

23        The preemption clause at issue here—section 1052(b)—provides a floor, not a ceiling for

24  shell egg regulation and specifically allows additional regulation by the states that is *consistent*

25  with federal law. Ignoring this explicit authorization for states to enact consistent laws would

26  render many state laws preempted, including laws in plaintiffs Iowa and Missouri. *See* Mo. Ann.

27  Stat. § 196.321 (2014) (standards and grades of eggs to be fixed by director provided that the

28  quality, standards grades "shall not be lower than those established by the United States

                                 18

1   Department of Agriculture"); Iowa Code §§ 196 *et seq.* (providing for the quality and storage of

2   shell eggs and conduct of egg handlers; violation is punishable by misdemeanor); Iowa Admin

3   Code 481-36.1(196) at 36.12 (provides "no person known to be affected by a communicable or

4   infectious disease shall be permitted to come in contact with [shell eggs]" and "personnel

5   engaged in egg handling operations shall maintain a high degree of personal cleanliness and shall

6   conform to good hygienic practices during working periods").

7          Additionally, a stated purpose of the challenged California laws is to reduce salmonella, a

8   goal that is authorized by federal regulations, and not preempted, as long as the state laws

9   established are not "less stringent than those required by [21 C.F.R. § 118]." 21 C.F.R.

10  § 118.12(d); *see also* 74 Fed. Reg. 33030, 33091 (FDA regulations do not preempt state and local

11  laws, regulations that establish "more stringent requirements with respect to prevention of

12  [salmonella] in shell eggs during production, storage, or transportation"). Federal regulations

13  promulgated by the FDA specifically authorize salmonella prevention measures in the production,

14  storage and transportation of shell eggs, and in doing so, the FDA specifies that states have a role

15  to play as long as the states do not implement less stringent regulations. 21 C.F.R. § 118.

16  Plaintiffs' allegations do not assert that the regulations and state statute challenged here provide

17  *less* stringent requirements than federal law. In fact, plaintiffs do not state a claim with respect to

18  the salmonella prevention regulations specified in federal law because federal law not only does

19  not preempt state law here, it asks for state compliance and authorizes state laws that would

20  require additional and more stringent salmonella prevention measures.

21         Thus, plaintiffs have failed to allege an express preemption claim because the California

22  laws at issue do not address the federal standards of "quality, condition, weight, quantity, or

23  grade" as alleged in the complaint. Rather, the California laws focus is on public safety

24  (salmonella prevention) and animal welfare—areas of law expressly not preempted by federal law.

25                 3.   **The Shell Egg Laws are not implicitly preempted by federal law**

26         With respect to field preemption, plaintiffs' conclusory allegations state that "Congress

27  evidenced its intention to occupy the entire field of regulations governing the quality and

28  conditions of eggs by imposing uniform national standards." Compl. ¶ 104. This is wrong as a

19

1   matter of law, as described above.  There is no evidence (or allegations from plaintiffs) that

2   Congress intended to preempt the entire field of shell egg production, handling and transportation.

3   As pointed out above, federal law authorizes state laws that are *consistent* with federal laws

4   regarding the "quality, condition, weight, quantity, or grade" of shell eggs.  Moreover, several

5   federal regulations specifically authorize state laws that are more stringent than federal laws and

6   regulations in the prevention of salmonella with respect to shell eggs.  Neither the EPIA or the

7   regulations promulgated by the FDA with respect to salmonella prevention in shell eggs are "so

8   pervasive as to make reasonable the inference that Congress left no room for the States to

9   supplement [them]."  *Rice*, 331, U.S. at p. 230; *see also Fidelity Federal Sav. & Loan Ass'n*, 458

10  U.S. at 153.  To the contrary, federal laws and regulations contemplate consistent state laws and

11  regulations that are *more* strict than federal law – precisely what the California law does.  There is

12  no implicit preemption and the plaintiffs' claim for preemption should be dismissed.

13                                      **CONCLUSION**

14       For the foregoing reasons, defendants respectfully request that the Court dismiss the First

15  Amended Complaint in its entirety without leave to amend.

16

17  Dated:  April 9, 2014                          Respectfully submitted,

18                                                 KAMALA D. HARRIS
                                                   Attorney General of California
                                                   MARK R. BECKINGTON
19                                                 Supervising Deputy Attorney General

20

21                                                 /s/ Susan K. Smith
                                                   SUSAN K. SMITH
22                                                 Deputy Attorney General
                                                   *Attorneys for Attorney General Kamala D.*
23                                                 *Harris and California Department of Food*
                                                   *and Agriculture*
24  SA2014114630
    51490878.docx
25

26

27

28

                                          20

# CERTIFICATE OF SERVICE

Case Name:   **State of Missouri, ex rel., et al.,**          No.      **2:14-CV-00341-KJM-KJN**
             **v. Kamala D. Harris, et al.**

I hereby certify that on <u>April 9, 2014,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT BY ATTORNEY GENERAL HARRIS AND SECRETARY OF CALIFORNIA DEPARTMENT OF FOOD AND AGRICULTURE

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>April 9, 2014,</u> at Los Angeles, California.

<table>
<tr><td>Angela Artiga</td><td>/s/ Angela Artiga</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

51490446.doc