# Exhibit 1

| 91st Congress 2d Session | HOUSE OF REPRESENTATIVES | Report No. 91-1670 |
|---|---|---|

# EGG PRODUCTS INSPECTION ACT

December 3, 1970.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. Poage, from the Committee on Agriculture, submitted the following

# REPORT

[To accompany H.R. 19888]

The committee on Agriculture, to whom was referred the bill (H.R. 19888) to provide for the inspection of certain egg products by the U.S. Department of Agriculture; restriction on the disposition of certain qualities of eggs; uniformity of standards for eggs in interstate or foreign commerce; cooperation with State agencies in administration of this act; and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 24, lines 13 and 14, strike out the words "less than five hundred hen flock." and insert in lieu thereof the following: "a flock of 3,000 or less hens.".

## GENERAL STATEMENT

This proposal is designed to strengthen the ability of Federal and State governments to protect the Nation's consumers and to provide an environment where the egg products and shell egg industries will continue to flourish. Thus, a concerted effort will be made to assure that eggs and egg products (i.e. liquid, frozen, or dried eggs) are safe and wholesome for consumers.

This bill prohibits the distribution of unwholesome shell eggs or their use in food products, and provides for mandatory continuous inspection of egg product processing plants.

It is applicable to intrastate as well as interstate and foreign commerce.

It provides for exemptions, identification of the egg products not intended for human food, recordkeeping, and Federal-State cooperation. States would generally be prohibited from imposing require-

48-006

2

ments conflicting with the bill, or certain other Federal laws. Imports would have to meet the same requirements as domestic products.

The cost of inspection, except for overtime and holiday work in official plants, would be borne by the United States. At present about 75 percent of the egg products are produced in plants operating under an USDA voluntary inspection program on a user-fee basis. The cost to USDA to carry out the bill would be about $5 million annually.

### BACKGROUND

The following statement by Assistant Secretary of Agriculture Richard Lyng sets forth the background, purpose, and need for this legislation.

> STATEMENT OF RICHARD E. LYNG, ASSISTANT SECRETARY OF AGRICULTURE, ACCOMPANIED BY GEORGE GRANGE, DEPUTY ADMINISTRATOR, CONSUMER AND MARKETING SERVICE, U.S. DEPARTMENT OF AGRICULTURE
>
> Mr. LYNG. Thank you, Mr. Chairman and members.
>
> Mr. Chairman and members of the committee, I would like to urge favorable action by this committee on H.R. 16092, a proposal to provide for the inspection of certain egg products and to restrict the disposition of certain qualities of eggs. This bill has the full support of the Department of Agriculture.
>
> This proposal is designed to strengthen the ability of Federal and State governments to protect the Nation's consumers and to provide an environment where the egg products and shell egg industries will continue to flourish. Thus, we must make every effort to assure that eggs and egg products, that is, liquid, frozen, or dried eggs, are safe and wholesome for consumers.
>
> Clean, sound shell eggs are not a public health problem. These eggs are marketed for retail sale under the various State egg laws which generally provide for proper grading and sizing and accurate labeling. States do an adequate job of surveillance at the retail levels to check these eggs for compliance with their requirements. However, leaking, cracked, or checked and dirty eggs do pose a public health hazard. Such eggs can carry salmonellae and other bacteria. Salmonellosis is one of the major food-borne illnesses affecting human beings. Salmonellae and other pathogenic bacteria are carried on the shell of the dirty egg and may result in contamination when the egg is broken. In addition, if the shell is cracked or broken, bacteria may enter the egg.
>
> Incubator rejects—eggs which have been subjected to incubation and have been removed during hatching operations as infertile or otherwise unhatchable—and loss or inedible eggs are unfit for human food and should be destroyed or denatured to prevent their use as human food. While these types are not sold into consuming channels in shell form, they could move to breaking plants to be incorporated in liquid, frozen, or dried egg products or directly to food manufacturers for use in their products.

63

3

The U.S. Department of Agriculture conducts a voluntary egg products inspection program which requires continuous resident inspection. In fiscal year 1970, approximately 80 percent of the total national production of egg products were produced in about 100 plants operating under the USDA program. Volume of all inspected products was about 608 million pounds. About 4.0 percent or almost 23 million pounds of the liquid product processed in official USDA plants were segregated as not fit for human food and were destroyed or decharacterized. Unscrupulous egg products processors and food manufacturers can use undesirable eggs and produce products that are difficult to distinguish from edible, wholesome products. This is done through the use of deodorants, filtering devices, flavoring ingredients, or pasteurization. Consequently, the use of undesirable raw material for breaking stock cannot always be detected through end-product testing nor adequately controlled by spot check inspection.

Most shell egg packing plants send their dirty and cracked eggs to breaking plants. Some shell egg packing plants also send their inedible and loss eggs to breaking plants. If such eggs are used in the manufacture of egg products in plants which do not have continuous USDA inspection, there is no assurance that an adequate job of segregating or processing was performed. Even if these plants had modern equipment and facilities, including pasteurizers, the products they produce can contain loss and inedible eggs which are unfit for human food. Due primarily to the cost of the raw material, noninspected product can compete unfairly with wholesome inspected egg products and may sell from 2 to 10 cents per pound, or up to 33 percent less than inspected product. Thus, food manufacturers and other users of egg products have a strong economic incentive to patronize these sources of supply.

A questionnaire was sent to the States in 1968 to find out the nature and scope of their existing legislative and inspection programs for eggs and egg products. There has been no substantial change in the data received from them since that time. Information received from the States for fiscal year 1968 indicated that there were about 700 non-USDA operations producing egg products. Total annual production from these plants amounted to approximately 213 million pounds. Over 600 of these plants were relatively small and produced only 37 million pounds, or less than 5 percent of the 800 million pounds of egg products produced in the United States during that period.

All States had shell egg laws dealing primarily with the grading, sizing, and labeling of eggs. Some of these laws, however, did not prohibit the movement of checks, leakers, and dirty eggs into consumption channels, such as to consumers, institutions and restaurants.

Only 18 States had specific egg products laws, and no State required continuous inspection. Only eight States required

4

pasteurization of egg products. Five States did not have any requirements for egg products. All other State egg products inspection programs were conducted either under general food laws or other nonspecific laws, which may also include a voluntary inspection program.

Legislation is needed to provide mandatory inspection of egg products and to prevent the sale of eggs that could pose a health hazard. Because of the universal use of eggs and egg products in manufacturing a host of food products, nearly everyone consumes eggs in one form or another every day.

At present, there are no laws requiring official inspection of egg products moving in interstate commerce as there are for meat and meat products and poultry and poultry products.

As you know, recent legislation has extended Federal meat and poultry inspection to cover meat and poultry products in intrastate commerce if the State programs are not at least equal to the Federal program.

In line with these and other measures to protect consumers, we believe the proposed bill would insure the safety and wholesomeness of our eggs and egg products through the following provisions:

Plants processing egg products for interstate, foreign, or intrastate commerce would be required to operate under continuous inspection of USDA unless they processed only eggs meeting consumer grades. At present grade standards, this minimum requirement would be U.S. Consumer Grade B.

USDA would administer inspection provisions in plants processing egg products on a continuous-inspection basis, would cooperate with States in administering such provisions, and fully reimburse the States for their assistance.

Egg products processing plants breaking only eggs meeting consumer grades would not be required to have continuous inspection, but would have to meet sanitation requirements established by the Secretary with respect to facilities and operating procedures. USDA would determine compliance of these plants on a periodic-check basis, and such plants would be subject to applicable local, State, and other Federal laws.

Bakeries, other food manufacturers, institutions, and restaurants which process egg products incidental to the preparation of other articles of human food would not be required to have continuous inspection if they use only eggs meeting consumer grades. The Food and Drug Administration would be responsible for enforcement of the law at such establishments. If such establishments elected to break ungraded or poor quality eggs, they would be considered in the same category as egg products processing plants and would have to come under continuous Federal inspection where proper segregation and processing of eggs could be made.

Restricted eggs could be imported into the United States only as authorized by the regulations of the Secretary. Egg

products capable of use as human food could be imported only if they comply with the standards of the act and the regulations for such articles within the United States. We interpret this to mean that egg products from abroad would have to come from plants under a continuous inspection system at least equal to ours and approved by a USDA review official. The cost of the continuous foreign inspection program would be borne by the foreign country. Because of the difficulty of maintaining a reliable review of periodic surveillance programs abroad, we would not accept products from plants not operated under continuous inspection. Egg products imports represent less than one-fourth of 1 percent of the total egg products used in the United States. In 1969, imports were about 1½ million pounds.

Specifically, to prevent the movement of unwholesome and potentially hazardous eggs to consumers, institutions, restaurants, et cetera, the bill would:

Prohibit producers, shell egg plant operators, and other persons from selling or offering for sale, or distributing in interstate, foreign, or intrastate commerce, any restricted eggs (dirty, check, leaker, incubator reject, loss, or inedible eggs) capable of use as human food, except as authorized by regulations of the Secretary. Such regulations, for example, could provide that ungraded eggs could move from producers to egg grading plants and that dirty and checked eggs could move to official USDA egg products processing plants for proper segregation and processing.

Prohibit persons engaged in any business involving, buying, or selling eggs or otherwise using eggs in preparing human food products from using or possessing with intent to use any restricted eggs in the preparation of human food, except as permitted by regulations of the Secretary.

Treat all eggs and egg products as capable of use as human food unless these products are denatured or identified as required by the regulations. It would also require the maintenance of records by specified classes of persons, including persons buying or selling eggs or processing egg products or otherwise using eggs in the preparation of human food products, and provide for the examination of such records by the Secretaries of Agriculture and Health, Education, and Welfare.

To insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce, the bill would provide that no State or local jurisdiction could impose labeling, packaging, or ingredient requirements for officially inspected egg products which are in addition to or different than those imposed under the bill or the Federal Food, Drug, and Cosmetic Act or the Fair Packaging and Labeling Act. Also, no State or local jurisdiction could restrict the entry of shell eggs to only those meeting certain of the Federal grade standards or weight classes or otherwise require the use of shell egg standards of quality, condition, quantity, or grade in addition

to or different from the Federal standards. In addition, no State or local jurisdiction could require labeling to show the State or other geographical area of production or origin for shell eggs in interstate or foreign commerce. Most States have closely patterned their requirements for standards, grades, and weight classes after the official standards used by the U.S. Department of Agriculture. A few States have different requirements. This has been of great concern to producers and handlers in States shipping their eggs into these areas, as they are virtually grading under two sets of requirements—one the requirements for the State of origin, and two, for the State where the eggs are received. Such barriers hinder orderly marketing and tend to increase marketing costs. These burdens should be eliminated. Efforts to obtain uniform standards among the States have not been successful.

To further insure the purity of our supply of eggs and egg products, authority would be provided for administrative detention and judicial seizure of such articles if they are in violation of the act, including restricted eggs in the possession of unauthorized persons, when found on any premises. Criminal penalties are provided for violations.

In conclusion, legislation is needed to regulate the movement of eggs that could pose a public health problem, insure the wholesomeness of egg products, and provide uniformity in labeling and standards for eggs and egg products.

Consumers should be able to buy eggs and egg products with complete confidence in their wholesomeness and quality. The Nation's egg producers and processors are very conscious of their dependence upon consumer confidence in these products. This bill will insure that Federal and State Governments have the necessary tools and resources to fulfill their obligations to the public.

Thank you, Mr. Chairman.

### HEARINGS

Hearings on H.R. 14687, 16092, 16159, 17338, and S. 2116 were held by the Dairy and Poultry Subcommittee on September 14 and 15, 1970. The subcommittee amended H.R. 16092 in several respects, and Mr. Stubblefield introduced H.R. 19757 which incoprorated the the subcommittee amendments. After consideration of H.R. 19757 by the full committee, Mr. Stubblefield introduced H.R. 19888 which included the full committee's recommendations.

### COMMITTEE AMENDMENT

The committee amendment simply increases the permissible flock exemption of 500 hens approved by the subcommittee to 3,000 or less hens.

### DEVELOPMENT OF LEGISLATION

H.R. 19888 contains several provisions which differ from S. 2116 and H.R. 16092.

7

These are as follows:
1. It requires all shell egg packers packing eggs for the ultimate consumer to be inspected at least once during each calendar quarter in order to assure a reasonable degree of consumer protection.
2. It restricts the Secretary's power to exempt during the intitation of operations under the act to a period not to exceed 2 years.
3. It permits the exemption of family farm operators who sell eggs from flocks of 3,000 or less hens.
4. It adds "weight" to the criteria of quality, condition, quantity, or grade set forth in section 23 of the bill.
5. It exempts Hawaii, Alaska, Puerto Rico, and the Virgin Islands from the prohibition against mandatory State of origin labeling requirements.
6. It requires that the cost for the USDA services rendered on special-type holidays not be charged to the egg industry or those processors covered by the Meat Inspection or Poultry Inspection Acts.
7. It authorizes loans through SBA to small businesses affected by this bill and the Meat Inspection and Poultry Inspection Acts.
8. It includes a provision in section 23(b) which would permit States to require that shell eggs sold within the boundaries of that State be labeled in such a manner that the name, address, and license number of the packer of such eggs is shown. This provision would be the sole and specific exception to the rule laid down in section 23 that no State or local jurisdiction other than those in noncontiguous areas of the United States may require labeling to show the State or other geographical area of production or origin. It is the intent of the committee that the exception in regard to name, address, and license number not be construed to permit any State to collect fees in addition to the fees charged producers and processors within the State. It is not the intention of the committee that this provision be used as a trade barrier to the sale of shell eggs in interstate commerce. It does, however, permit States to impose the minimal requirement of name, address, and license number on out-of-State eggs. Nothing in the bill, of course, precludes a State from requiring eggs produced within its own boundaries to be labeled in such manner as the State deems appropriate.

DEPARTMENTAL POSITION

The Department of Agriculture supported the enactment of H.R. 16092 and S. 2116, both by Secretary Lyng's testimony and by the following report. The Department's comments on the various committee-approved changes in H.R. 19757 also follow:
1. Department report on H.R. 16092:

DEPARTMENT OF AGRICULTURE,
OFFICE OF THE SECRETARY,
*Washington, D.C., August 27, 1970.*

Hon. W. R. POAGE,
*Chairman, Committee on Agriculture,*
*House of Representatives.*

DEAR MR. CHAIRMAN: This is in reply to your request of August 4, 1970, for a report on H.R. 16092, a bill to provide for the inspection

68

of eggs and egg products by the U.S. Department of Agriculture, and for other purposes.

This Department recommends that the bill be passed. We believe that the bill is needed in the interest of consumers and would not affect consumer prices of eggs and egg products.

This type of legislation is needed for the adequate protection of consumers. Lack of legislation for effective regulation of handling and disposition of poor quality eggs and for inspection of egg products to prevent adulteration or misbranding is injurious to the public welfare.

Clean and sound shell eggs are not a public health problem. However, eggs classified as leakers, checks, dirties, inedibles, loss, and incubator rejects can constitute a health hazard. Such eggs are frequently carriers of Salmonellae and other bacteria. These eggs should be destroyed for human food purposes or channeled to official egg products processing plants operating under continuous Federal inspection where proper segregation, disposition, and processing can be made.

We are enclosing more detailed information which is pertinent to this bill.

The Office of Management and Budget advises that enactment of this legislation would be consistent with the administration's objectives.

Sincerely,

J. PHIL CAMPBELL,
*Acting Secretary.*

DETAILED INFORMATION REGARDING H.R. 16092

Only clean and sound shell eggs should be sold to household consumers (70 percent of production); used by restaurants and other institutions (14 percent of production); or used by bakeries and other food manufacturers (2 percent of production). All dirty, cracked, and other poor quality eggs should be utilized only in egg products plants (8 percent of production) where they can receive special handling; where the product can be pasteurized; and where unfit eggs can be segregated and destroyed. (The remaining 6 percent of production is used for hatching eggs.) Therefore, in order to accomplish these objectives, the bill would:

(1) Prohibit any person from buying, selling, or transporting, or offering to buy or sell, or offering or receiving for transportation, in any business in interstate, foreign, or intrastate commerce any restricted eggs (i.e., dirties, checks, leakers, incubator rejects, inedible, and loss eggs), except as authorized by the Secretary.

(2) Prohibit any food manufacturer from using restricted eggs in the preparation of human food, except as authorized by the Secretary.

(3) Provide for continuous Federal inspection for any plant processing egg products, except that an exemption would be provided for the processing of egg products at any plants where the eggs used in in the manufacture of egg products contain no more restricted eggs than are allowed by the official standards of the U.S. Consumer Grades for Shell Eggs.

(4) Direct the Secretary, whenever he determines that it would effectuate the purpose of the bill, to cooperate with appropriate State

9

and other governmental agencies in carrying out any of its provisions and reimburse the States and other agencies for the costs incurred by them in such cooperative programs.

(5) Prohibit the importation of restricted eggs except as authorized by regulations of the Secretary and require imported egg products to be processed, labeled, and packaged in accordance with the same requirements as would apply to domestic products.

### JURISDICTION AND RESPONSIBILITY

The bill would give the Secretary of Agriculture exclusive jurisdiction over egg products processing plants with respect to matters within the scope of the act, but otherwise preserve the authority of the Secretary of Health, Education, and Welfare under the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act or other Federal officials by such other laws with respect to eggs and egg products. The bill would vest responsibility in the Secretary of Agriculture to enforce the restrictions on distribution or use of poor quality shell eggs by egg handlers, except that the Secretary of Health, Education, and Welfare would have such responsibility at restaurants, institutions, and food-manufacturing plants other than egg products processing plants.

### PRESENT INSPECTION PROGRAMS

Presently, the programs for the inspection of eggs and egg products consist of those enforced in States which have mandatory or permissive inspection programs, the voluntary USDA egg and egg products grading and inspection programs as authorized under the Agricultural Marketing Act of 1946, and the regulatory inspections of plants and products as authorized by the Federal Food, Drug, and Cosmetic Act.

*(1) USDA program*

Approximately 80 percent of the egg products are produced in plants operating under the U.S. Department of Agriculture's voluntary inspection program on a user-fee basis. The USDA regulations require all establishments using this service to (*a*) have approved premises, facilities, labeling, and identification of product; (*b*) operate in accordance with approved sanitary practices and operating procedures; (*c*) segregate and use only specific types of shell eggs for breaking stock; (*d*) process in accordance with specific processing and temperature requirements for cooling, freezing, and drying egg products; (*e*) pasteurize or heat-treat all egg products; (*f*) have continuous inspection during processing by a Federal or Federal-State inspector. The regulations also provide for final examination of finished egg products by an inspector and examination of samples of products for Salmonellae.

*(2) State programs*

A questionnaire was sent to States in 1968 to find out the nature and scope of their existing legislative and inspection programs for eggs and egg products. There has been no substantial change since that time.

All States had shell egg regulations. Their major provisions related to grade and labeling requirements for eggs sold at retail outlets. The

regulations, in approximately three-fourths of the States, prohibited the sale to consumers of leakers, loss, inedibles, and incubator rejects. About one-half of the States prohibited consumer sales of dirties and "nest-run" or uncandled eggs. Twenty-two States prohibited the sale of checks to consumers, except for the tolerances permitted in their grades. In a number of these States, the regulations did not cover the sale of these eggs to institutions, restaurants, and food manufacturers such as bakeries.

Eighteen States had egg products legislation. Twenty-six States had general food-type laws pertaining to all establishments processing or preparing food including egg products. Five States did not have any type of egg products legislation and one State did not respond. Only eight States required pasteurization and no State required continuous egg products inspection during processing. At present there is no uniformity among the States of inspection or plant requirements for egg products.

Most States have closely patterned their mandatory requirements for standards grades and weight classes for shell eggs after the official USDA standards. A few States however including some of the major consuming States have adopted different requirements. This practice has acted as a barrier to interstate trade and has been of serious concern to producers in other States because they are required to grade under differing sets of standards depending on destination. To eliminate these burdens one national standard should be adopted for eggs moving in interstate or foreign commerce. Voluntary efforts to achieve uniformity in these State regulatory standards have had little success. Another barrier that should be eliminated is the mandatory requirement by some States that all eggs or shipped-in eggs be labeled as to State of origin. This bill would prohibit such practices by States but would not however impose any restriction on State grades, weight classes or other standards designed for voluntary use to promote locally produced eggs.

### COST OF PROGRAM

The cost to this Department to carry out the provisions of this bill would be approximately $5 million annually.

Total staffing for this program would require approximately 450 man-years. It is estimated that staffing would consist of approximately 280 man-years for Federal employees and 170 man-years for State employees. The increase in Federal staffing over whiat is currently used in the voluntary egg products inspection program would be 150 man-years.

Data gathered from the States and the data for plants presently using USDA's egg products inspection service were used as a basis for calculating the staffing and costs. However the costs could vary dependent upon the number of plants and volume of production.

2. Secretary's letter on committee changes included in H.R. 19757 is as follows:

11

Department of Agriculture,
Office of the Secretary,
*Washington, D.C., November 30, 1970.*

Hon. W. R. Poage,
*Chairman, Committee on Agriculture,*
*House of Representatives, Washington, D.C.*

Dear Mr. Chairman: This is in response to your request for the Department's comments on the amendments included in H.R. 19757 introduced by Congressman Stubblefield which make this bill different from S. 2116. These bills would provide for the inspection of eggs and egg products by the U.S. Department of Agriculture.

(1) *Section 5(d)—page 13—lines 2–4*

*Amendment.*—Requires shell egg packers packing eggs for the ultimate consumer to be inspected at least once each calendar quarter.

*Response.*—We do not believe that requiring shell egg packers to be spot checked on a specified time basis is a practical or constructive statutory provision. In fact, we think that such a requirement could serve as a barrier to the effective administration of this requirement since regulatory manpower would be diverted by making unnecessary visits to plants which have a good record of full compliance. Inspections of shell egg packers likely will average four or more per year. However, enforcement needs and problems encountered with each plant should determine the number and frequency of spot-check inspections of each plant. If the committee feels strongly that a specified number of inspections should be included in the legislation, we suggest that the word "approximately" be substituted for "at least". This would give some flexibility to the enforcement needs while clearly showing the intent of Congress.

(2) *Section 8(d)(5), (6), and (7)—pages 17 and 18*

*Amendment.*—Deletes "knowingly" from these subsections.

*Response.*—We do not object to this. It is not a significant difference because of the common view of the courts that the prosecution should present evidence that a defendant knew (or should have known) that he was violating a law in order for conviction of a criminal offense to be justified.

(3) *Section 15(a)6—page 24—lines 7 and 8*

*Amendments.*—Limits Secretary's authority to exempt during initiation of operations under this act to "not to exceed 2 years."

*Response.*—We do not object to this.

(4) *Section 15(a)(7)—page 24—lines 13–15*

*Amendment.*—Adds a new paragraph which would exempt sale of eggs from flocks of less than 500 hens.

*Response.*—We do not object to this.

(5) *Section 23(b)(1)—page 32—line 12*

*Amendment.*—Adds the word "weight" when referring to "standards of quality, condition, etc."

*Response.*—We do not object to this. It clarifies the intent of the section.

12

(6) *Section 23(b)(2)—page 32—lines 15–17*

*Amendment.*—Exempts noncontiguous areas of the United States from the prohibition against mandatory State of origin labeling requirements.

*Response.*—This exemption would allow Hawaii, Alaska, Puerto Rico, and the Virgin Islands to require eggs shipped from the continental United States to be labeled as such. Presently, Hawaii and Puerto Rico require each egg to be stamped "U.S." Alaska requires cartons of eggs not produced in Alaska be marked "imported" or with the State of origin. To our knowledge the Virgin Islands has no requirement for imported eggs. These extra labeling requirements impede the free movement of products and add to the marketing cost. The egg industry strongly supports the elimination of these restrictions as do the majority of the State departments of agriculture. We support the provisions of the bill which would eliminate trade barrier labeling requirements and believe all States, including noncontiguous areas, should be treated equally. However, the total volume of eggs shipped from the mainland to these areas is estimated to be less than 1 percent of total U.S. production. Therefore, this amendment would not have a major impact on marketing of shell eggs. Consequently, this exemption may not warrant objection to the point which would jeopardize passage of this bill.

(7) *Section 24(b)—page 34*

*Amendment.*—Requires that the cost for special-type holidays not be charged to the industry. Also applies this to the Wholesome Meat and Poultry Inspection Acts.

*Response.*—We do not object to this.

(8) *Section 25—pages 34 and 35*

*Amendments*—Adds a new section dealing with loans for small business assistance; also provides that such loans would be available to plants operating under the Wholesome Meat and Poultry Inspection Acts.

*Response.*—We have been advised informally that the Small Business Administration would be opposed to this broadening of the disaster loan provisions of the Small Business Act for the reasons expressed in Administrator Sandoval's testimony before the Senate Small Business Subcommittee on July 9, 1969.

(9) *Section 26—pages 35–37*

*Amendment.*—Adds a new section dealing with annual reports to the Congress. Included in these reports would be information on the effectiveness of Federal and State activities under this act as well as the effectiveness of foreign inspection systems under this act.

*Response.*—We do not object to this, although we think the amendment is unnecessary since the Department cooperates fully with congressional committees seeking information.

The items above complete our comments on the differences between H.R. 19757 and S. 2116.

In addition, in accordance with your request, we are submitting below our views to the amendment proposed by the Commissioner of Agriculture of Texas.

73

13

*Section 23(b)(2)—page 32—line 17*

*Amendment.*—Adds the following to this section: "* * * *Provided, however,* This shall not preclude a State from requiring that the name, address, and license number of the person processing or packaging eggs, be shown on each container."

*Response.*—We object to this. The purpose of section 23(b) is to facilitate the free movement of eggs and egg products in commerce by providing for uniform standards and labeling requirements. This section is in the bill due in large measure to the near-unanimous support of the egg industry, including all national and regional trade associations, as well as the large majority of State departments of agriculture. Additional and differing labeling requirements on the part of States tend to act as trade barriers, disrupt orderly marketing, and increase marketing cost. Such action on the part of one State on behalf of a certain commodity can bring about retaliatory measures by another State on other commodities.

In administering regulatory programs, it is often necessary to determine the packer or processor of the product. This is done routinely by the use of numbering systems whereby each packer has an assigned number or records or a combination of both. It is not necessary to have the name and address of the packer for this purpose. Nor is it necessary for consumers to know the name and address of the packer.

Consumers definitely need to know who is responsible for the products they purchase. This information is required on all food products including eggs by laws which specify that the name and address of either the packer or distributor be prominently displayed on the container. In the case of eggs, the Fair Packaging and Labeling Act requires this. The bill would not change this requirement. Some States desire to promote their own product and build a strong market for locally produced items. The bill would not prohibit this. A State could require eggs produced and marketed within its boundaries to be labled as such. This would give consumers a clear choice between locally produced product and out-of-State product without imposing restraints on products from other States.

The Texas egg law presently requires the address of the packer, but does not require his name. This, in our opinion, would be in violation of the provisions of the bill prohibiting the mandatory requirement of State of origin labeling. We object to this amendment more strongly than the one dealing with noncontiguous areas of the United States because of the scope of the problem. The volume of eggs shipped from the mainland to Hawaii, Alaska, Puerto Rico, and the Virgin Islands is small. Therefore, the amendment dealing with these areas would not cause a major impact on egg marketing in this country. On the other hand, the amendment offered by the Commissioner from Texas would have a major impact on the free movement of eggs if other States on the mainland adopted laws which require the name and address of the packer.

Practically all States, including Texas, have laws or regulations requiring that the true grade and size of eggs sold at retail be marked on the cartons. Many States charge license fees to finance the enforcement of their regulations. The bill would not interfere with the continuation of State regulations of this kind or of such fees. We are not

14

informed that any other State requires the name and address of the packer on the retail carton of eggs, or considers that such labeling is needed in order to enforce their State regulations.

Sincerely,

RICHARD LYNG, *Assistant Secretary.*

○