Brian M. Boynton (SBN 222193)
Francesco Valentini (SBN 255264)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
(202) 663-6363 (fax)
brian.boynton@wilmerhale.com

Randall R. Lee (SBN 152672)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071
(213) 443-5300
(213) 443-5400 (fax)
randall.lee@wilmerhale.com

Attorneys for Defendant-Intervenor
ASSOCIATION OF CALIFORNIA EGG FARMERS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF MISSOURI, ex rel. Chris Koster, Attorney General; THE STATE OF NEBRASKA, ex rel. Jon Bruning, Attorney General; THE STATE OF OKLAHOMA, ex rel. E. Scott Pruitt, Attorney General; THE STATE OF ALABAMA, ex rel. Luther Strange, Attorney General; THE COMMONWEALTH OF KENTUCKY, ex rel. Jack Conway, Attorney General; and TERRY E. BRANSTAD, Governor of the State of Iowa,<br><br>Plaintiffs,<br><br>v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California; KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture,<br><br>Defendants,<br><br>THE HUMANE SOCIETY OF THE UNITED STATES,<br><br>Defendant-Intervenor,<br><br>ASSOCIATION OF CALIFORNIA EGG FARMERS,<br><br>Defendant-Intervenor. | CASE NO. 2:14-cv-00341-KJM-KJN<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS OF DEFENDANT-INTERVENOR ASSOCIATION OF CALIFORNIA EGG FARMERS**<br><br>Date: August 22, 2014<br><br>Time: 10:00 a.m.<br><br>Before: Hon. Kimberly J. Mueller |

Plaintiffs' opposition brief confirms that Plaintiffs' constitutional and preemption challenges to AB 1437 and § 1350 fail as a matter of law in multiple respects and should be dismissed.

## I. PLAINTIFFS LACK STANDING

Plaintiffs lack standing to bring this action for two independent reasons: (A) they fail the requirements of *parens patriae* standing; and (B) they have not even proven a viable injury in fact.

A. It is "settled doctrine" that a State may not sue as *parens patriae* when it is merely "litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976). Rather, it was incumbent on the Plaintiffs (1) to "'allege[] injury to a sufficiently substantial segment of its population'" and (2) to identify a legitimate "quasi-sovereign interest." *Table Bluff Reservation v. Philip Morris, Inc.*, 256 F.3d 879, 882, 885 (9th Cir. 2001) (quoting *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982)). Plaintiffs' opposition brief confirms that Plaintiffs cannot meet either of these requirements. Dkt. 54 ("Rev. Opp.") at 10-14.

Plaintiffs do not contest that the egg producers who may be affected by AB 1437 and § 1350 are a small, quantifiable group. In fact, Plaintiffs have now conceded that they may only "number in single or double digits" in some Plaintiff States, *see* Rev. Opp. 17, and that these few egg producers "could file their own lawsuits to enjoin AB 1437 and § 1350," Dkt. 52 at 16. These concessions alone confirm that the purported injury at the heart of Plaintiffs' claims—the economic loss that some of their egg producers allegedly might face—is too narrow to support *parens patriae* standing. *See Snapp*, 458 U.S. at 607 (requiring injury to more than "an identifiable group of individual residents"); *Table Bluff*, 256 F.3d at 885 (same); *Connecticut v. Physicians Health Servs.*, 103 F. Supp. 2d 495, 504 (D. Conn. 2000) (no standing when "the State act[s] on behalf of individuals who could … obtain complete relief through a private suit"), *aff'd*, 287 F.3d 110 (2d Cir. 2002).[1]

Plaintiffs also fail to identify a legitimate "quasi-sovereign interest." There is no merit to Plaintiffs' attempt to analogize the narrow and private interests they purport to represent to the systemic and broad-based interests at issue in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439

---

[1] While Plaintiffs now attempt to shift their focus to purported injuries to *consumers* in their States, that theory finds no support in Plaintiffs' allegations, which in fact predict a *decrease* in the price of eggs in the Midwest. *See infra* p. 4; First Am. Compl. ¶ 88, Dkt. 13 ("FAC").

(1945), and *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). In *Pennsylvania Railroad*, Georgia sought relief from an alleged price-fixing conspiracy that had resulted in freight rates that were 39% higher for Georgia shippers than for their out-of-state competitors. 324 U.S. at 444, 450-451. That systemic, economy-wide discrimination—which struck at the heart of the instrumentalities of interstate commerce—"shackle[d] [Georgia's] industries" and risked "retard[ing] her development." *Id.* at 451. In contrast, even under Plaintiffs' theory, AB 1437 and § 1350 would at most indirectly affect only egg producers and only those who might choose to sell in California. Neither provision affects, much less "'shackle[s]'" or "'retard[s]'" (Rev. Opp. 13), any other industry, let alone Plaintiffs' overall economies. *See supra* note 1; *infra* p. 4.

*Pennsylvania v. West Virginia* is likewise inapposite. The West Virginia law at issue in that case would have "largely curtail[ed] or cut off the supply of natural gas" available to Pennsylvania and Ohio, 262 U.S. at 581, causing millions of people to face shortages of the fuel they needed for basic life necessities, *id.* at 590 (natural gas "is the fuel with which food is cooked and water heated … with which hundreds of schoolhouses are heated"). In contrast, AB 1437 and § 1350 do not prevent Plaintiffs' citizens access to anything in any way. At most, under Plaintiffs' worst case scenario, there *might* be some unspecified "fluctuation" in the price of eggs. Rev. Opp. 14. No precedent has set the bar for *parens patriae* standing that low.[2]

Plaintiffs contend (at 14) that they have a quasi-sovereign interest in "preserving [their] rightful place as co-equal sovereigns in [the] federal system" against California's "attempt[] to regulate conduct that occurs in" Plaintiffs' States. But Plaintiffs have themselves conceded that AB 1437 "places no restrictions on the treatment of animals in California—*or anywhere else for that matter*." Dkt. 46 at 6 (emphasis added). In Plaintiffs' words, "[AB 1437] does not require egg producers to house hens in any particular way nor prohibit them from housing hens in any particular way. It merely proscribes the sale *in California* of a subset of otherwise indistinguishable goods

---

[2] Plaintiffs cite (at 12) two cases involving States' challenges to their neighbors' misuse of water resources—*Missouri v. Illinois* and *Kansas v. Colorado*. But, as *Snapp* makes clear, when States seek the "abatement of public nuisances, … the injury to the *public* health and comfort [i]s graphic and direct." 458 U.S. at 604 (emphasis added). In contrast, Plaintiffs' asserted injury is purely economic, which is why Plaintiffs must actually *establish* that it is quasi-sovereign.

1    based on production methods that are already illegal *in California*." *Id.* (emphasis in original).  In

2    any event, *Snapp* lends no support to Plaintiffs' "sovereignty" argument.  *Snapp* made clear that the

3    quasi-sovereign interest in preserving access to "the benefits of the federal system" applies only

4    when a State acts to ensure "that the benefits … are not denied *to its general population*."  458 U.S.

5    at 608 (emphasis added).  Accordingly, in *Snapp*, the Court concluded that Puerto Rico had *parens*

6    *patriae* standing to protect its residents generally from unemployment by ensuring they had "the full

7    benefit of federal laws designed to address this problem."  *Id.* at 609-610; *see also id.* at 599 & n.7

8    (recognizing "the serious dimensions of the unemployment problem in Puerto Rico and the general

9    condition of its economy").  Here, in contrast, Plaintiffs' complaint purports to protect only egg

10   producers—not Plaintiffs' general population.  *See supra* pp. 1-2 & note 1; *infra* p. 4; *Snapp*, 458

11   U.S. at 602 ("Interests of private parties are obviously not in themselves sovereign interests, and

12   they do not become such simply by virtue of the State's aiding in their achievement.").

13          B.      Plaintiffs also have not even established a non-speculative injury in fact.  Plaintiffs

14   have yet to identify *even one* egg producer who has the requisite "'concrete plans'" to export eggs

15   into California after AB 1437 and § 1350 go into effect, *see Summers v. Earth Island Inst.*, 555 U.S.

16   488, 496 (2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).  Instead,

17   Plaintiffs simply presume (at 15) that some producers who previously exported eggs to California

18   will do so again after January 2015.  But Supreme Court precedent forecloses this kind of theory.  A

19   "vague desire" to repeat past conduct or "'some day' intentions" to act are "insufficient to satisfy the

20   requirement of imminent injury."  *Summers*, 555 U.S. at 496 (quoting *Lujan*, 504 U.S. at 564).[3]

21   Moreover, to the extent that Plaintiffs rely on a "statistical probability" that some eggs will be

22   shipped from the Plaintiff States into California after January 1, 2015, the Supreme Court has

23   already rejected that "novel" argument as "a mockery of [the Court's] prior [standing] cases."

24   *Summers*, 555 U.S. at 497-498 (injury in fact for organizational standing not satisfied by

25   "probab[ility]" that some of Sierra Club's 700,000 members nationwide would visit the land at

---

[3] Indeed, the respondents in *Summers* had a stronger standing argument than Plaintiffs do here because the *Summers* respondents were able to identify specific individuals who claimed to be adversely affected by the government's actions.  *See* 555 U.S. at 495.

1  issue). "'Standing … is not an ingenious academic exercise in the conceivable'"; it "'requires … a
2  factual showing of perceptible harm.'" *Id.* at 499.  Given "the difficulty of verifying the facts upon
3  which such probabilistic standing depends," parties who invoke derivative standing must actually
4  "identify [individuals] who have suffered the requisite harm." *Id.*  This requires a showing of
5  "concrete plans." *Id.* at 497.  Plaintiffs have failed to satisfy that requirement here.

   Finally, there is no merit to Plaintiffs' contention (at 17) that consumers in their States would
7  be injured if AB 1437 and § 1350 go into effect as scheduled.  For one thing, this theory is devoid of
8  any support in Plaintiffs' factual allegations, which mention only the *California* consumers for
9  whose benefit AB 1437 and § 1350 were enacted.  FAC ¶¶ 68, 73, 88.  For another, under Plaintiffs'
10 own reasoning, AB 1437 and § 1350 will have a *positive* effect on Plaintiffs' consumers.  Plaintiffs
11 contend (at 17) that "[t]he forced withdrawal of producers [in Plaintiffs' States] … from the largest
12 market in the country[] would flood the markets in the remaining 49 states with surplus eggs."  *See*
13 *also* FAC ¶ 88 ("Without California consumers, …[the] supply [of Missouri eggs] would outpace
14 demand by half a billion eggs, causing the price of eggs … to fall throughout the Midwest.").

## II.  AB 1437 AND § 1350 DO NOT VIOLATE THE COMMERCE CLAUSE

### A.  The Ninth Circuit's Decision In *Association des Eleveurs* Is Controlling

17 Plaintiffs' dormant Commerce Clause challenge is foreclosed by the Ninth Circuit's recent
18 decision in *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th
19 Cir. 2013), *cert. filed*, No. 13-1313 (U.S.).  As in this case, California's foie gras laws separately
20 prohibited in-State *production* by a given method (force-feeding) and in-State *sale* of products of
21 that method (foie gras produced by force-feeding).  *Id.* at 942.  On those facts, the Ninth Circuit
22 rejected the same arguments Plaintiffs offer here.  *Id.* at 947-953; Dkt. 45-1 ("ACEF MTD") at 9-14.

23 None of Plaintiffs' attempts to distinguish *Association des Eleveurs* withstands scrutiny.  It is
24 immaterial that the Ninth Circuit's decision in *Association des Eleveurs* arose from the denial of a
25 motion for a preliminary injunction.  Rev. Opp. 22.  The Ninth Circuit affirmed the district court's
26 judgment because it rejected the foie gras farmers' *legal* arguments—not because their evidentiary
27 showing was insufficient.  729 F.3d at 947-953.  Those legal holdings control here.[4]  Nor is it

28 ─────────
[4] *See, e.g., Hillman v. Maretta*, 133 S. Ct. 1943, 1954 (2013) (citing *Arizona v. United States*, 132 S.

4                                                                REPLY ISO ACEF'S MOT. TO DISMISS

1  relevant that, in *Association des Eleveurs* and *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117
2  (1978), "there just weren't" any comparable in-State businesses before the challenged statutes were
3  enacted, whereas, here, California producers are phasing out conventional cages in part in response
4  to Prop. 2, Rev. Opp. 24.  In both *Association des Eleveurs* and *Exxon*, it sufficed that "in-state
5  [businesses] [would] have no competitive advantage over out-of-state [businesses]" in the in-State
6  market as it existed after the facially neutral legislation at issue took effect.  437 U.S. at 126;
7  *Association des Eleveurs*, 729 F.3d at 949.  Here, neither AB 1437 nor § 1350 gives California
8  businesses such an advantage:  California and out-of-State entities are equally prohibited from
9  selling noncompliant eggs, and equally permitted to sell compliant eggs—wherever they are
10 produced.  ACEF MTD 9-10.

11    Finally, Plaintiffs contend (at 25) that the different time and means of enactment of AB 1437
12 and Prop. 2 render "[t]he relationship between [those two provisions] … very different" from the
13 relationship between the production ban and the sales ban in *Association des Eleveurs*.  But neither
14 the time nor the means of enactment are germane to the Ninth Circuit's reasoning in *Association des*
15 *Eleveurs*:  Because California's production ban on force-feeding birds and sales ban on products
16 produced by force-feeding birds served "entirely different"—albeit complementary—purposes, they
17 simply could not be viewed as "functionally equivalent" provisions targeted, respectively, at in-State
18 and out-of-State entities.  729 F.3d at 949.  The same is true here—no matter when or how Prop. 2
19 and AB 1437 became law.

20    **B.    AB 1437 And § 1350 Are Not Discriminatory**

21    Plaintiffs acknowledge (at 4) that the Legislature enacted AB 1437 for the express purpose of
22 "'protect[ing] California consumers from the deleterious, health, safety, and welfare effects of'"
23 contaminated shell eggs.  Plaintiffs nonetheless ask this Court (at 4-7, 21) to discard that express
24 statement of purpose and second-guess the Legislature's "true purpose" based on "suggest[ions]"
25 culled from snippets of legislative history and post-enactment documents.  But courts must "assume
26 that the objectives articulated by the legislature are actual purposes of the statute, unless an
27
28 Ct. 2492 (2012), a case decided in a preliminary-injunction posture, *see id.* at 2498)).

examination of the circumstances forces [them] to conclude that they '*could not have been* a goal of the legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (emphasis added). Here, as ACEF has explained, the statements on which Plaintiffs rely do not come close to meeting that exceptionally deferential standard, ACEF MTD 15-16; tellingly, Plaintiffs do not even attempt to respond to ACEF's showing.

Plaintiffs also contend (at 3, 20, 25) that Prop. 2 allowed a longer compliance period than AB 1437. But, as Plaintiffs appear to concede, Prop. 2's "bird behavior" standards are "rather ambiguous[]" and provided no guidance; it was the promulgation of § 1350 in 2013 that provided actionable criteria to California egg farmers. Rev. Opp. 29. In any event, any difference in Prop. 2's and AB 1437's respective compliance periods is easily explained: Prop. 2 placed California egg farmers under a legal obligation to alter their production practices. AB 1437, in contrast, merely imposes conditions on California *sales* of eggs—not on out-of-State production practices—and leaves producers free to sell their eggs anywhere else.

Plaintiffs make much (at 25) of the fact that Prop. 2 and AB 1437 espouse different purposes. But any difference in these laws' stated purposes merely reflects the fact that the two laws do different things: Prop. 2 furthers animal welfare by compelling *farmers* to abandon a production method deemed cruel, whereas AB 1437 furthers public health by barring *vendors* from selling a product state law deems a public health hazard. California's experience—which includes the *Salmonella* poisoning of dozens of Californians in 2010 from eggs produced in Iowa[5]—confirms the wisdom of AB 1437's public-health rationale. *See Maine v. Taylor*, 477 U.S. 131, 151 (1986) (States "retain[] broad regulatory authority to protect the health and safety of its citizens," even to the point of banning the importation of commodities that pose such a threat). Moreover, the fact that the Legislature expressly viewed AB 1437 as a public-health measure only *strengthens* the law's police-power underpinnings. In *Association des Eleveurs*, the Ninth Circuit upheld California's sales ban on foie gras produced by force-feeding animals based on nothing more than the State's legitimate interests in "discourag[ing] the consumption of products produced by force feeding birds"

---

[5] *See* Reuters, *Criminal charges filed in food safety case against Iowa egg farm* (May 21, 2014); CNN Wire Staff, *California traces salmonella infections back to May prom* (Aug. 26, 2010).

and "prevent[ing] complicity in a practice that it deemed cruel to animals." 729 F.3d at 952.  This case follows *a fortiori*; AB 1437 and § 1350 not only "prevent complicity in a practice … deemed cruel to animals," but also protect the public health.  *Id.*; *Hillsborough Cnty. v. Automated Med. Labs.*, 471 U.S. 707, 719 (1985) (protection of public health within traditional state police powers).

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), is not to the contrary.  *Hunt* involved a North Carolina law that imposed draconian repackaging obligations on interstate shippers of apples into North Carolina.  The Court held that the law impermissibly offered "protection against competing out-of-state products." *Id.* at 352.  Unlike AB 1437 and § 1350, the North Carolina law at issue in *Hunt* did not impose a neutral ban applicable to all sales of a product the State deemed dangerous.  Rather, it imposed additional burdens on *otherwise-fungible* apples solely because they were shipped from another State.  In other words, in contrast to this case, *Exxon*, and *Association des Eleveurs*, what was impermissibly targeted in *Hunt* was *interstate commerce itself*,[6] not a *class of products* that happened to come primarily from out of State.  *See Exxon*, 437 U.S. at 126 (distinguishing *Hunt*).

Finally, there is absolutely no merit to Plaintiffs' suggestions (at 28) that § 1350(d), CDFA's facially neutral cage-size regulation, was promulgated for a "discriminatory purpose."  Plaintiffs' primary contentions (at 20-22) with respect to AB 1437—that it afforded out-of-State entities less time to adjust and that snippets of legislative history purportedly suggest a protectionist motive, *but see* ACEF MTD 14-16; *supra* pp. 5-6—do not even arguably apply to § 1350.  Instead, Plaintiffs note that § 1350(d) has a later effective date than § 1350(c)'s separate *Salmonella* monitoring and vaccination provisions, but that is wholly irrelevant to whether the regulation was enacted for a discriminatory purpose.  In any event, the reason for that differential treatment is plain:  Adapting to new cages calls for capital investments and installation time; § 1350(c)'s programs do not.  Nor is there any basis for Plaintiffs' assertion that the provisions set forth in § 1350(c) do not apply to out-of-State producers seeking to sell eggs in California.  To the contrary, § 1350(c) and its subsections apply to all "registered egg producers or handlers with 3,000 or more laying hens," § 1350(c)(1)-(3),

---

[6] *See Hunt*, 432 U.S. at 352 ("North Carolina singled out only closed containers of apples, the very means by which apples are transported in commerce").

which include "out-of-state egg handler[s] or egg producer[s] selling eggs into California," Cal. Food & Agric. Code § 27541.[7] As a result, even if Plaintiffs could show that AB 1437 was enacted for a discriminatory purpose (which they cannot), they could make no similar showing for § 1350. Thus, at a minimum, Plaintiffs challenge to § 1350 must be dismissed.

## C. AB 1437 And § 1350 Do Not Regulate Conduct Outside California

Plaintiffs mischaracterize the extraterritorial effect of AB 1437 and § 1350. These laws do not "forc[e] egg farmers in Plaintiff States to change their production methods." Rev. Opp. 30. Indeed, as noted above, Plaintiffs themselves have recognized that AB 1437 "places no restrictions on the treatment of animals in California—*or anywhere else for that matter*," Dkt. 46 at 6 (emphasis added), and that "[AB 1437] does not require egg producers to house hens in any particular way nor prohibit them from housing hens in any particular way. It merely proscribes the sale *in California* of" certain types of higher-risk eggs. *Id.* (emphasis in original). As such, California's laws have at most an indirect "upstream pricing impact" on Plaintiffs' commercial decisions, *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 220-221 (2d Cir. 2004), which is true of every state regulation of economic life. *See, e.g.*, *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940).[8]

*National Solid Wastes Management Association v. Meyer*, 63 F.3d 652 (7th Cir. 1995), which Plaintiffs excerpt at length, in fact undermines their contentions. The very language Plaintiffs quote explains that the Wisconsin law at issue barred "waste from out-of-state *not because it is more noxious* than waste produced the Wisconsin way, but *simply because it comes from a community whose ways are not Wisconsin's ways*." *Id.* at 662 (emphasis added) (quoted at Rev. Opp. 31). California's sales ban does not target eggs "simply because" of their geographic origin—it applies to eggs, regardless of origin, that have been produced in conditions the Legislature deems dangerous.[9]

---

[7] Any doubt about the purpose of § 1350's cage-size provision is also belied by the fact that § 1350 specifically exempts from its requirements pasteurized eggs, which do not pose a *Salmonella* risk.

[8] Plaintiffs cite (at 30) *Healy v. Beer Institute*, 491 U.S. 324, 339 (1989), but the law at issue in that case placed liquor merchants under a *legal obligation* not to alter their behavior *in another state*. *See also Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582 (1986) ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.").

[9] This case also lacks "[t]he most significant feature of the Wisconsin statute": AB 1437 and § 1350 do not require that all out-of-State producers abide by California's standard "whether or not they actually" sell their eggs in California—they only regulate sales *in California*. 63 F.3d at 655, 662.

### D. Plaintiffs' *Pike*-Balancing Arguments Fail

Plaintiffs' *Pike*-balancing contentions (at 33-34) turn on their promise to "offer expert testimony" disproving the Legislature's judgment that AB 1347 will reduce *Salmonella* contagion in California. But even such a showing would be insufficient as a matter of law. Plaintiffs challenging economic regulation cannot prevail by merely showing that the legislature acted unwisely. As the Supreme Court explained in *Williamson v. Lee Optical*, 348 U.S. 483 (1955), a state law may even "exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." *Id.* at 487. The Supreme Court's recent dormant Commerce Clause decisions have thus rejected "invitations to rigorously scrutinize economic legislation passed under the auspices of the police power." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007) (controlling opinion). Plaintiffs offer no support for their assertion (at 33) that *Pike* balancing is "a fact intensive inquiry." The Supreme Court has said otherwise. *Kentucky v. Davis*, 553 U.S. 328, 353 (2008); *see Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1155 (9th Cir. 2012) (*Pike* balancing considers a law's asserted benefits, not "actual benefits"), *cert. denied*, 133 S. Ct. 1241 (2013).

### III. PLAINTIFFS MISCONSTRUE THE EPIA'S PREEMPTION CLAUSE

Plaintiffs contend (at 37-38) that the EPIA displaces all state laws that so much as "relate[] to the quality or condition" of eggs. But, in relevant part, the EPIA preempts only "*standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards.*" 21 U.S.C. § 1052(b)(1) (emphasis added).[10] As already explained in ACEF's memorandum, the juxtaposition of the phrase "standards of quality [or] condition" with "the official Federal standards" makes clear that § 1052(b)(1) preempts only state laws that—like the Federal standards and unlike AB 1437 or § 1350—set *egg-grading* standards. *See* ACEF MTD 18-19. Nor is the EPIA's general "declaration of policy," 21 U.S.C. § 1032—upon which Plaintiffs now rely[11]

---

[10] For that reason, Plaintiffs' efforts to show (at 35-36, 37) that "*Salmonella* contamination" is a "condition" or "arguably" a "quality" of eggs according to USDA's definitions are beside the point.

[11] Plaintiffs also quote (at 37-38) certain statements from the EPIA's legislative history, but even those (severely truncated) quotations confirm that the EPIA preempts only competing *egg grading* standards. *See* H. R. Rep. No. 91-1670, at 6 (1970) (for States that had not adhered to the USDA standards, out-of-State producers and handlers were "virtually *grading under two sets of requirements*[.]" (emphasis added)); *see also id.* at 10 (same).

—to the contrary. At most, that provision indicates that the EPIA's uniform standards (i.e., "the official Federal standards" governing egg grading) are also aimed, among other goals, at preventing adulteration generally. It does not purport to impose uniformity on matters outside the scope of "the official Federal standards," such as *Salmonella* prevention measures.[12] *See* ACEF MTD 18.

Plaintiffs' overbroad reading of § 1052(b)(1) would obliterate vast swaths of state law unrelated to egg grading. *Every* State regulates egg production, handling, or use in order to ensure the "quality" of eggs produced, sold, or consumed in the State. *See* Nat'l Egg Reg. Officials, *Egg Laws by State*, http://nerous.org/state-laws-regulations/egg-laws-by-state/. Plaintiff Missouri, for example, "licenses egg producers, dealers, and retailers and also inspects eggs sold in Missouri for quality." Missouri Dep't of Agric., *Egg Licensing and Inspection*, http://agriculture.mo.gov/weights/device/egglic.php. Missouri imposes this requirement because "[e]gg *quality* is highly important to most consumers." *Id.* (emphasis added). Similarly, Iowa imposes an array of requirements related to egg quality. *See, e.g.*, Iowa Admin. Code §§ 481-36.3 (sanitation requirements for egg handlers), 481-36.7 (minimum egg grade requirements for restaurants and other businesses), 481-36.9 (limiting use of lower-quality "restricted" eggs). Congress could not have intended to displace such a vast range of laws in an area traditionally regulated by the States. But even if the question were close, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Group v. Good*, 555 U.S. 70, 77 (2008). That principle alone defeats Plaintiffs' preemption claim.

## CONCLUSION

The Court should dismiss Plaintiffs' claims or, alternatively, enter judgment against them.[13]

---

[12] Plaintiffs cite (at 36) *United Egg Producers v. Davila*, 871 F. Supp. 106, 108-109 (D.P.R. 1994). That district court decision did not consider the critical phrase "official Federal standards," the surrounding statutory context, or other relevant indicia of statutory meaning. No court appears to have cited *Davila*'s cursory and unpersuasive preemption analysis, and it is not precedential here.

[13] Plaintiffs suggest in passing (at 7 n.2) that ACEF's request for judgment on the pleadings is "premature" because the California defendants have not filed an answer to the complaint. But ACEF's motion requests, as primary relief, *dismissal* under Rule 12(b). *See, e.g.*, Dkt. 45 ("*Motion To Dismiss Or* For Judgment On The Pleadings" (emphasis added)); *id.* at 2 n.1 (motion to dismiss proper because ACEF's Proposed Answer has not been accepted for filing); ACEF MTD 4. For good reason, Plaintiffs do not object to ACEF's filing of a motion to dismiss in the current posture. In any event, Plaintiffs have stipulated that it is appropriate for ACEF to file a motion for judgment on the pleadings at this stage and have thus waived any objection. Dkt. 38 at 2.

| | | |
|---|---|---|
| DATED: | June 5, 2014 | Respectfully submitted, |

/s/ Brian M. Boynton
Brian M. Boynton           (SBN 222193)
Francesco Valentini         (SBN 255264)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
(202) 663-6363 (fax)
brian.boynton@wilmerhale.com

Randall R. Lee              (SBN 152672)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA 90071
(213) 443-5300
(213) 443-5400 (fax)
randall.lee@wilmerhale.com

Attorneys for Defendant-Intervenor
ASSOCIATION OF CALIFORNIA EGG FARMERS