| | |
|---|---|
| 1 | Diane L. McGimsey (SBN 234953) |
| | mcgimseyd@sullcrom.com |
| 2 | Edward E. Johnson (SBN 241065) |
| | johnsonee@sullcrom.com |
| 3 | Janet Y. Galeria (SBN 294416) |
| | galeriaj@sullcrom.com |
| 4 | Jonathon D. Townsend (SBN 293918) |
| | townsendj@sullcrom.com |
| 5 | SULLIVAN & CROMWELL LLP |
| | 1888 Century Park East, Suite 2100 |
| 6 | Los Angeles, California 90067-1725 |
| | Telephone:   (310) 712-6600 |
| 7 | Facsimile:   (310) 712-8800 |

*Attorneys for Amici Curiae Animal Legal Defense Fund, Compassion Over Killing, Inc. and Farm Sanctuary, Inc.*

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF MISSOURI, ex rel., Chris Koster, Attorney General; THE STATE OF NEBRASKA, ex rel. Jon Bruning, Attorney General; THE STATE OF OKLAHOMA, ex rel. E. Scott Pruitt, Attorney General; THE STATE OF ALABAMA, ex rel. Luther Strange, Attorney General; THE COMMONWEALTH OF KENTUCKY, ex rel. Jack Conway, Attorney General; and TERRY E. BRANSTAD, Governor of the State of Iowa, <br><br> Plaintiffs, <br><br> v. <br><br> KAMALA D. HARRIS, solely in her official capacity as Attorney General of California; KAREN ROSS, solely in her official capacity as Secretary of the California Department of Food and Agriculture, <br><br> Defendants. | Case No. 2:14-cv-00341-KJM-KJN <br><br> **ANIMAL LEGAL DEFENSE FUND, COMPASSION OVER KILLING, INC. AND FARM SANCTUARY, INC.'S** *AMICUS CURIAE* **BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Date:   August 22, 2014 <br> Time:   10:00 a.m. <br> Judge:  Kimberly J. Mueller |

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICI CURIAE* ...................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ...................................................................................................................................2

I.  California has a Legitimate Interest in AB 1437. ..............................................................2

    A.  Prevention of Animal Cruelty Is a Legitimate State Interest. .................................3

    B.  Protection of Public Health Is a Legitimate State Interest. .....................................5

    C.  AB 1437 Furthers These Substantial State Interests. ..............................................7

II. AB 1437 was Not Motivated by An Improper Purpose........................................................9

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ass'n des Eleveurs de Canards et d'Oies du Quebec* v. *Harris*,
729 F.3d 937 (9th Cir. 2013) ..................................................................................2, 5, 7

*Barnes* v. *Glen Theatre, Inc.*,
501 U.S. 560 (1991)....................................................................................................4

*Barsky* v. *Bd. of Regents of Univ.*,
347 U.S. 442 (1954)....................................................................................................5

*Cavel Int'l, Inc.* v. *Madigan*,
500 F.3d 551 (7th Cir. 2007) ......................................................................................4

*Chinatown Neighborhood Ass'n* v. *Harris*
No. 12-CV-03759-WHO, 2014 WL 1245047 (N.D. Cal. Mar. 25, 2014) ...........4, 5, 6

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
508 U.S. 520 (1993) ................................................................................................3, 4

*Clason* v. *State of Indiana*,
306 U.S. 439 (1939)....................................................................................................6

*Cresenzi Bird Importers, Inc.* v. *State of New York*,
658 F. Supp. 1441 (S.D.N.Y. 1987)............................................................................7

*Great Atl. & Pac. Tea Co., Inc.* v. *Cottrell*,
424 U.S. 366 (1976)....................................................................................................5

*Hovila* v. *Tween Brands, Inc.*,
No. C09-0491RSL, 2010 WL 1433417 (W.D. Wash. April 7, 2010) ......................13

*Hughes* v. *Oklahoma*,
441 U.S. 322 (1979)....................................................................................................3

*Humane Soc'y* v. *Lyng*,
633 F. Supp. 480 (W.D.N.Y. 1986)............................................................................4

*In re Kelly*,
841 F.3d 908 (9th Cir. 1988) ....................................................................................11

*Maine* v. *Taylor*,
477 U.S. 131 (1986)...........................................................................................6, 7, 12

*Minnesota* v. *Clover Leaf Creamery Co.*,
449 U.S. 456 (1981)............................................................................................ *passim*

*New York* v. *Ferber*,
458 U.S. 747 (1982)....................................................................................................8

*Pac. Nw. Venison Producers* v. *Smitch*,
20 F.3d 1008 (9th Cir. 1994), *cert. denied*, 513 U.S. 918 (1994)..........................4, 5

*Pike* v. *Bruce Church, Inc.*,
  397 U.S. 137 (1970) ................................................................................................................3

*Rocky Mountain Farmers Union* v. *Corey*,
  730 F.3d 1070 (9th Cir. 2013) ............................................................................................9, 11

*United States* v. *Story*,
  891 F.2d 988 (2d Cir. 1989) ..................................................................................................13

*W. & S. Life Ins. Co.* v. *State Bd. of Equalization of Cal.*,
  451 U.S. 648 (1981) .................................................................................................................7

*Yakima Valley Mem'l Hosp.* v. *Wash. State Dep't of Health*,
  654 F.3d 919 (9th Cir. 2011) ..................................................................................................13

**STATE CASES**

*Johnson v. District of Columbia*,
  30 App. D.C. 520 (D.C. 1908) .................................................................................................4

*Lewis Food Co. v. State Dep't of Public Health*,
  110 Cal. App. 2d 759 (1952) ....................................................................................................6

*Olszewski* v. *Scripps Health*,
  30 Cal. 4th 798 (2003) ..........................................................................................................5, 6

*Stephens v. State*,
  3 So. 458 (Miss. 1888) ..............................................................................................................4

*Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*,
  41 Cal. 4th 929 (2007) ..............................................................................................................7

*Waste Mgmt. of Alameda Cnty., Inc. v. Biagini Waste Reduction Sys., Inc.*,
  63 Cal. App. 4th 1488 (1998) ...................................................................................................6

*Waters v. People*,
  46 P. 112 (Colo. 1896) .............................................................................................................4

**STATE STATUTES**

Cal. Health & Safety Code § 25990(a)-(b) ...............................................................................1, 2

Cal. Health & Safety Code § 25995 ..................................................................................2, 8, 9,12

Cal. Health & Safety Code § 25996 .................................................................................................2

**OTHER AUTHORITIES**

Emily Stewart Leavitt & Diane Halverson, *The Evolution of Anti-Cruelty Laws in the
  United States*, in ANIMALS AND THEIR LEGAL RIGHTS: A SURVEY OF AMERICAN LAWS
  FROM 1641 TO 1990 (1990) .....................................................................................................3

The Body of Liberties § 92 (Mass. Bay Colony 1641), reprinted in American Historical
  Documents 1000–1904, 43 Harvard Classics 66 (C. Eliot ed. 1910) ........................................3

**INTEREST OF *AMICI CURIAE***

Animal Legal Defense Fund, Compassion Over Killing, Inc. and Farm Sanctuary, Inc. (together, "*Amici*") respectfully submit this brief in support of the motion to dismiss filed by Defendants Harris and Ross ("Harris MTD") and the motion to dismiss filed by the Humane Society of the United States ("Humane Society MTD").  (Dkt. Nos. 27-2, 36.)  *Amici* are animal welfare organizations with a strong interest in AB 1437, which was passed in part to promote animal welfare and which Plaintiffs The State of Missouri, The State of Nebraska, The State of Oklahoma, The State of Alabama, The Commonwealth of Kentucky, and Terry E. Branstad (together, "Plaintiffs") are challenging in this case.

Protecting the welfare of animals is a part of the core mission of all three *Amici*. That includes eliminating the cruelty associated with the use of battery cages in egg production, an issue that all three organizations have spent considerable time, financial resources, and institutional goodwill in addressing, as discussed more fully in *Amici*'s Motion for Leave to File an *Amici* Brief.  (Dkt. No. 44).  Therefore, each *Amicus* has a significant interest in the outcome of this case.  *Amici* submit this brief to provide the Court with additional authority and argument regarding California's legitimate interests in, and reasons for passing, AB 1437 that is not contained in the briefs submitted by the parties or Intervenors to date, and therefore may assist the Court in resolving the important issues raised by this case.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In 2008, California voters overwhelmingly passed the Prevention of Farm Animal Cruelty Act, also known as Proposition 2 ("Prop 2").  Prop 2 provides, in relevant part, that "a person shall not tether or confine any covered animal [including egg-laying hens], on a farm, for all or the majority of any day, in a manner that prevents such animal from: (a) Lying down, standing up, and fully extending his or her limbs; and (b) Turning around freely."  Cal. Health & Safety Code § 25990(a)-(b).  Two years later, the California Legislature enacted AB 1437, which provides: "Commencing January 1, 2015, a shelled egg may not be sold or contracted for sale for human consumption in California if it is the product of an egg-laying hen that was confined on a

farm or place that is not in compliance with animal care standards set forth in [§ 25990]." *Id.* § 25996.

In passing AB 1437, the California Legislature had two main objectives: preventing animal cruelty and protecting public health. (Dkt. No. 36, Harris MTD at 11.) The law is based on legislative findings that, *inter alia*, "[e]gg-laying hens subjected to stress are more likely to have higher levels of pathogens in their intestines," while "food animals that are treated well . . . are healthier and safer for human consumption." Cal. Health & Safety Code § 25995(a), (c). The stated purpose of AB 1437 is "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella." *Id.* § 25995(e).

Plaintiffs contend that AB 1437 violates the Commerce and Supremacy Clauses of the U.S. Constitution. Those claims are meritless. *Amici* support the motions to dismiss submitted by Defendants and by Intervenor the Humane Society of the United States, and agree with the arguments therein. This brief provides additional detail regarding two aspects of Plaintiffs' dormant Commerce Clause claim: (i) whether California's claimed interests in passing AB 1437 are legitimate, and (ii) whether those claimed interests were actually a pretext masking a true intent to discriminate against out-of-state egg producers. As set forth below, AB 1437 even-handedly advances the State's legitimate interests in preventing animal cruelty and protecting public health. And not only does AB 1437 further legitimate State interests, but the legislative history shows that those interests are, in fact, what motivated the California Legislature to pass the bill.

### ARGUMENT

**I.    CALIFORNIA HAS A LEGITIMATE INTEREST IN AB 1437.**

AB 1437 is an even-handed statute that treats California and non-California entities alike. *See* Harris MTD at 10-12; Humane Society MTD at 9-10; *Ass'n des Eleveurs de Canards et d'Oies du Quebec* v. *Harris*, 729 F.3d 937, 948 (9th Cir. 2013) ("[A] statute that 'treat[s] all private companies exactly the same' does not discriminate against interstate

commerce." (quoting *United Haulers Ass'n, Inc.* v. *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007))). The Supreme Court has held that "[w]here [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly* excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (emphasis added).

Plaintiffs have failed to allege facts (as opposed to speculation) that, if true, would establish a significant burden on interstate commerce. (Harris MTD at 14-15; Humane Society MTD at 10-11.) But even if they had, their Commerce Clause claim would fail as a matter of law, because AB 1437 furthers important local interests: it promotes animal welfare and public health by ensuring that eggs consumed by California residents are produced in keeping with California's standards. The Supreme Court has recognized that States have a legitimate interest in "protecting the public health and preventing cruelty to animals." *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 538 (1993); *accord Hughes* v. *Oklahoma*, 441 U.S. 322, 337 (1979) ("We consider the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens."). Each of those interests outweighs any alleged burden on interstate commerce. Because plaintiffs cannot allege that the burden on interstate commerce is "clearly excessive" relative to AB 1437's benefits, the Court should dismiss Plaintiffs' Commerce Clause claim with prejudice. *See Pike*, 397 U.S. at 142.

### A.  Prevention of Animal Cruelty Is a Legitimate State Interest.

Prohibitions on animal cruelty have a long tradition in American law. Such laws first appeared in this country during the colonial period. *See* The Body of Liberties § 92 (Mass. Bay Colony 1641), reprinted in American Historical Documents 1000–1904, 43 Harvard Classics 66, 79 (C. Eliot ed. 1910) ("No man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man's use"). By 1913, every State had a law banning animal cruelty. *See* Emily Stewart Leavitt & Diane Halverson, *The Evolution of Anti-Cruelty Laws in the United States*, in ANIMALS AND THEIR LEGAL RIGHTS: A SURVEY OF AMERICAN

-3-

LAWS FROM 1641 TO 1990, at 4 (1990). These laws reflect a deep-seated revulsion against specific practices in which animals suffer abuse and a "public policy . . . to avoid unnecessary cruelty to animals." *Humane Soc'y* v. *Lyng*, 633 F. Supp. 480, 486 (W.D.N.Y. 1986).

Anti-cruelty laws aim to protect animals, but also reflect an interest in public morality. *See Waters* v. *People*, 46 P. 112, 113 (Colo. 1896) ("[The anti-cruelty law's] aim is not only to protect these animals, but to conserve public morals . . . ."). As Justice Scalia noted in *Barnes* v. *Glen Theatre, Inc.*, "[o]ur society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the traditional phrase, '*contra bonos mores*,' *i.e.*, immoral . . . for example . . . cockfighting." 501 U.S. 560, 575 (1991) (Scalia, J., concurring in the judgment). Courts and legislatures have long recognized that "[c]ruelty to [animals] manifests a vicious and degraded nature, and it tends inevitably to cruelty to men." *Stephens* v. *State*, 3 So. 458, 459 (Miss. 1888); *see also Johnson* v. *District of Columbia*, 30 App. D.C. 520, 522 (D.C. 1908) (preventing animal cruelty "is in the interest of peace and order and conduces to the morals and general welfare of the community").

Reflecting these long-standing principles, it is well-settled that States have a legitimate interest in the protection of animals. *See Lukumi*, 508 U.S. at 538; *accord Cavel Int'l, Inc.* v. *Madigan*, 500 F.3d 551, 557 (7th Cir. 2007) ("States have a legitimate interest in prolonging the lives of animals that their population happens to like . . . . They can ban bullfights and cockfights and the abuse and neglect of animals."). In *Pacific Northwest Venison Producers* v. *Smitch*, venison producers challenged Washington's ban on the private ownership and exchange of several species of wildlife. 20 F.3d 1008, 1010 (9th Cir. 1994), *cert. denied*, 513 U.S. 918 (1994). The Ninth Circuit explained that the State's interest in protecting wildlife "is one of the state's most important interests" and that "[r]egulations promulgated pursuant to [that interest] carry a strong presumption of validity." *Id.* at 1013-14. Because the venison producers failed to show that the burden on interstate commerce was "so great that [it] outweigh[ed] this vital state interest," the court rejected their claim. *Id.* at 1015. The district court in *Chinatown Neighborhood Association* v. *Harris* similarly emphasized the State's strong interest in animal protection in rejecting a Commerce Clause claim. 2014 WL 1245047, at *9 (N.D. Cal. Mar. 25,

-4-

2014).  In that case, various Asian American groups challenged California's ban on the possession and sale of shark fins.  *Id.* at *1.  The court found that California had a legitimate interest in protecting public health and wildlife, and held that the ban did not violate the Commerce Clause because the plaintiffs failed to rebut the "strong presumption" that regulations aimed at preserving wildlife are valid.  *Id.* at *9.

Importantly, the State interest in protecting animals is not limited to in-state behavior that affects animals located within the State—it extends equally to in-state behavior that affects out-of-state animals.  For example, in *Association des Eleveurs*, plaintiffs argued that California's ban on the sale of products produced by force-feeding birds did not prevent animal cruelty in California because California already prohibited the act of force-feeding birds.  729 F.3d at 952.  The Ninth Circuit rejected that argument, reasoning that the ban "may discourage the consumption of products produced by force feeding birds and prevent complicity in a practice that is deemed cruel to animals."  *Id.*; *see also Chinatown Neighborhood Ass'n*, 2014 WL 1245047, at *9 (finding that California has a legitimate interest in regulating in-state consumption of shark fins that came from sharks killed outside of California).  Like the laws at issue in *Smitch*, *Chinatown Neighborhood Association*, and *Association des Eleveurs*, AB 1437 furthers the State's interest in protecting animals and in avoiding complicity in practices that it deems cruel.  It is, therefore, entitled to a "strong presumption of validity" because protecting animals is "one of the state's most important interests."  *Smitch*, 20 F.3d at 1013-14.

**B.**   **Protection of Public Health Is a Legitimate State Interest.**

In addition to preventing animal cruelty, States have broad authority to enact laws to protect public health.  *See Great Atl. & Pac. Tea Co., Inc.* v. *Cottrell*, 424 U.S. 366, 371 (1976) ("[U]nder our constitutional scheme the States retain 'broad power' to legislate protection for their citizens in matters of local concern such as public health, and . . . not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States."); *Barsky* v. *Bd. of Regents of Univ.*, 347 U.S. 442, 449-50 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone.  It is a vital part of a state's police power."); *Olszewski* v. *Scripps Health*,

-5-

30 Cal. 4th 798, 815 (2003) ("The regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state."); *Lewis Food Co.* v. *State Dep't of Pub. Health*, 110 Cal. App. 2d 759, 762 (1952) ("To conserve and protect the health of its citizens is a paramount duty of the state, and a fair and reasonable exercise of the sovereign power.").

Courts have frequently upheld state laws aimed at protecting public health and safety, even when they impose a burden on interstate commerce. *See, e.g.*, *Clason* v. *State of Indiana*, 306 U.S. 439, 443 (1939) ("The power of the state to prescribe regulations which shall prevent the production within its borders of impure foods . . . is well established. . . . Nor does it make any difference that such regulations incidentally affect interstate commerce, when the object of the regulation is not to that end, but is a legitimate attempt to protect the people of the state."); *Chinatown Neighborhood Ass'n*, 2014 WL 1245047, at *8 ("The Supreme Court has even recognized states' 'right to impose even burdensome regulations in the interest of local health and safety.'" (quoting *H.P. Hood & Sons, Inc.* v. *Du Mond*, 336 U.S. 525, 535 (1949))); *Waste Mgmt. of Alameda Cnty., Inc.* v. *Biagini Waste Reduction Sys., Inc.*, 63 Cal. App. 4th 1488, 1498 (1998) ("When a state statute regarding safety matters applies equally to interstate and intrastate commerce, the courts are generally reluctant to invalidate [it] even if [it] may have some impact on interstate commerce.").

Indeed, in *Maine* v. *Taylor*, the Supreme Court held that the States' interest in protecting public health was so compelling that it justified a state law that facially discriminated against interstate commerce. 477 U.S. 131, 151-52 (1986). In that case, Robert Taylor challenged a Maine statute that prohibited the importation of live baitfish. *Id.* at 132-33. Maine argued that the ban was necessary to "protect[] the State's fisheries from parasites and nonnative species that might be included in shipments of live baitfish." *Id.* at 133. The Supreme Court upheld the ban even though it "discriminate[d] on its face against interstate trade." *Id.* at 138. The Court explained, "[e]ven overt discrimination against interstate trade may be justified where, as in this case, out-of-state goods or services are particularly likely for some reason to threaten the health and safety of a State's citizens or the integrity of its natural resources." *Id.* at 148

*AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

n.19. Therefore, the Constitution permits States to enact law "to protect the health . . . of its citizens," especially where, as here, the law does not discriminate against interstate commerce. *See id*. at 151.

### C. AB 1437 Furthers These Substantial State Interests.

AB 1437 advances California's legitimate and substantial interests in animal welfare and public health. *First*, it advances the State's interest in preventing animal cruelty, by "cleansing [the State] market[] of commerce which the Legislature finds to be unethical." *Cresenzi Bird Importers, Inc.* v. *State of New York*, 658 F. Supp. 1441, 1447 (S.D.N.Y. 1987). Plaintiffs' allegation that AB 1437 serves no legitimate State interest because it does not "protect the welfare of any animals within the State of California" misses the point. (Dkt. No. 13, Pls.' First Amended Compl. ("FAC") ¶ 100). In passing AB 1437, the California Legislature determined that California should not support the production of eggs using battery cages, whether the eggs are produced in California or elsewhere.[1] California's interest in preventing California consumers from being "complicit[] in a practice that [the State] deemed cruel to animals" is a legitimate one under settled law. *Ass'n des Eleveurs*, 729 F.3d at 952; *see also Cresenzi*, 658 F. Supp. at 1447 ("The states' authority to establish local prohibitions with respect to out-of-state wildlife has, since the late nineteenth-century, been recognized by the courts.").

Plaintiffs' assertion that California lacks the ability to regulate the in-state sale of products that are produced unethically (in the view of California) outside the State runs directly contrary to this settled authority, and has troubling implications beyond the animal welfare context. For example, under Plaintiffs' reasoning, a law banning the sale in California of child

---

[1] It is not the role of this Court to second-guess the Legislature's judgment regarding whether the confinement of egg-laying hens in battery cages is cruel, or whether it is ethical for merchants to sell eggs produced by hens kept in such conditions. *See W. & S. Life Ins. Co.* v. *State Bd. of Equalization of California*, 451 U.S. 648, 670 (1981) ("[T]he courts are not empowered to second-guess the wisdom of state policies. Our review is confined to the *legitimacy* of the purpose."); *Viva! Int'l Voice for Animals* v. *Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 934 (2007) ("It is not our role to judge the wisdom of Australia's wildlife management practices . . . nor the wisdom of California's wildlife rules or the federal government's statutes or regulations."). California is free to decide for itself, as it did in passing AB 1437, what constitutes animal cruelty and to pass laws ensuring that in-state consumers do not subsidize it.

-7-

pornography produced outside of California would be constitutionally suspect, as it would impose a burden on out-of-state pornographers to satisfy California's ethical judgment. But State regulation of child pornography is unquestionably constitutional. *See New York* v. *Ferber*, 458 U.S. 747, 766 n.19 (1982) ("States have not limited their distribution laws to material produced within their own borders because the maintenance of the market 'itself leaves open the financial conduit by which the production of such material is funded and materially increases the risk that [local] children will be injured.'"). Plaintiffs' reasoning would extend the dormant Commerce Clause far beyond any reasonable bound.

*Second*, AB 1437 advances the State's interest in protecting public health by requiring that all eggs sold in California come from hens that "are treated well and provided with at least minimum accommodation of their natural behaviors and physical needs." *See* Cal. Health & Safety Code § 25995(a) (citing a Pew Commission study finding that such eggs are "healthier and safer for human consumption"). Without AB 1437, California merchants could sell eggs produced by hens confined in battery cages, and the California Legislature determined that those eggs are more likely to carry "disease pathogens including salmonella." *Id.* § 25995(e). States routinely and legitimately pass laws that prohibit the sale of goods that may injure the public health.

Again, it is not for this Court to second-guess whether the California Legislature's findings are correct or supported by empirical evidence. In *Minnesota* v. *Clover Leaf Creamery*, milk sellers challenged the constitutionality of a Minnesota statute banning the retail sale of milk in plastic containers, but permitting such sale in paperboard milk cartons. 449 U.S. 456, 458 (1981). The milk sellers argued that there was no "empirical connection" between a ban on plastic containers and the State's articulated interest in protecting the environment, and produced evidence that the ban would, in fact, be environmentally harmful. *Id.* at 463-64. Rejecting that argument, the Supreme Court explained that "States are not required to convince the courts of the correctness of their legislative judgments." *Id.* at 464. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental

-8-

decisionmaker." *Id.* (quoting *Vance* v. *Bradley*, 440 U.S. 93, 111 (1979)). So too here. California need not show that AB 1437, in fact, will reduce incidents of Salmonella. *See id.* There is no allegation that the legislative findings "could not reasonably be conceived to be true," and therefore they must be accepted by this Court for purposes of determining the strength of the State interest at stake. *Id.*

## II. AB 1437 WAS NOT MOTIVATED BY AN IMPROPER PURPOSE.

Plaintiffs allege that the stated purpose of AB 1437 was pretextual, and the real purpose was to benefit in-state businesses at the expense of out-of-state businesses. (FAC ¶¶ 68-81.) "The party challenging a regulation bears the burden of establishing that a challenged statute has a discriminatory purpose or effect under the Commerce Clause." *Rocky Mountain Farmers Union* v. *Corey*, 730 F.3d 1070, 1097 (9th Cir. 2013). Here, the FAC does not plead facts that even begin to meet this burden—Plaintiffs' accusations of protectionism are fantasy.

As an initial matter, Plaintiffs' allegation that the Legislature had a discriminatory purpose makes no sense because the law unquestionably regulates only the sale of goods in California, and does not give California businesses an advantage over their out-of-state competitors. Plaintiffs' claim that a law that treats everyone the same is discriminatory or "protectionist" (FAC ¶ 82) turns the dormant Commerce Clause on its head.

Even passing this fundamental problem, the FAC fails to sufficiently allege that AB 1437 was passed for a discriminatory purpose. According to the legislation itself, the purpose of AB 1437 is "to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella." Cal. Health & Safety Code § 25995(e). In determining whether a statute has a discriminatory purpose, the Court must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude that they could not have been a goal of the legislature." *Rocky Mountain*, 730 F.3d at 1097 (quoting *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981)). This high burden is seldom met, and here Plaintiffs' factual allegations, even accepting them as true,

do not come close to meeting it. In fact, the legislative history demonstrates that the stated purpose of protecting animal welfare and public health was the Legislature's *actual* purpose.

*First*, plaintiffs argue that AB 1437's public health purpose must be pretextual because "no scientific study conducted to date has found any correlation between cage size or stocking density and the incidence of Salmonella in egg-laying hens." (FAC ¶ 69.) Even if that were true, whether the legislature's findings are supported by scientific evidence is irrelevant. *See Clover Leaf Creamery*, 449 U.S. at 463-64. Plaintiffs do not allege that the California Legislature's findings "could not reasonably be conceived to be true." *Id.* at 464. In fact, Plaintiffs' allegations about the lack of empirical evidence of a connection between Salmonella and stocking density are strikingly weak. (FAC ¶ 69 & Exs. I, J.) Plaintiffs cite only one article, which addresses stress in hens but does not even mention Salmonella. (FAC, Ex. J.) And Plaintiffs quote a book which states that "[b]ased on the few studies exploring the stress response of hens housed in different housing systems, no consistent conclusion on the influence of the housing system can be drawn." (FAC, Ex. I.) Plaintiffs badly mischaracterize this quote. Two pages earlier—on a page which Plaintiffs omit from the passage they submitted to this Court— the book states that "the majority of the studies indicate that housing of laying hens in conventional battery cages significantly increases the risk of detecting Salmonella compared to housing in non-cage systems." (RJN, Ex. 2 at 110.) Thus, Plaintiffs' allegation is directly rebutted by Plaintiffs' own source.

*Second*, Plaintiffs rely on an analysis by the California Assembly Committee on Appropriations to argue that AB 1437's "true purpose" was "to protect California farmers from the market effects of Prop 2 by 'leveling the playing field.'" (FAC ¶ 70 & Ex. M.) The FAC quotes a portion of the "Rationale" section of the analysis, but ignores the portion that immediately follows, which states:

> Californians have a history of establishing basic animal welfare standards for the products they consume. In 1996, California voters banned the consumption, sale and transport of horse meat. In 2004, the California Legislature banned the sale of foie gras by prohibiting the sale of a product that is the result of force feeding a bird.

-10-

(FAC Ex. M at 1.)  This passage makes clear, to the extent this analysis reveals the Legislature's purpose, that purpose was at least in large part to promote animal welfare.

Moreover, one committee analysis is insufficient to plead that the stated purpose of AB 1437 is a pretext.  In *Clover Leaf Creamery*, the milk sellers presented evidence that several legislators sought to obtain votes for the law by recounting "the evils of the out-of-state plastics industry and the need to protect Minnesota businesses."  *See* Brief for Respondents at 30, *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) (No. 79-1171), 1980 WL 339367 at *30.  The Supreme Court found such evidence insufficient, explaining, "We will not invalidate a state statute . . . merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry."  *Clover Leaf Creamery*, 449 U.S. at 463 n.7; *In re Kelly*, 841 F.3d 908, 912 n.3 (9th Cir. 1988) ("Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill.").  It follows, *a fortiori*, that one analysis, prepared by one person on a committee staff, is insufficient.  There is no allegation that this analysis was even considered by any legislator, much less that it accurately states the will of the Legislature in its entirety.  Therefore, it does not come close to demonstrating that animal welfare and public health "could not have been a goal" of AB 1437.  *See Rocky Mountain*, 730 F.3d at 1098.

*Third*, Plaintiffs omit mention of a different legislative analysis that further undermines their allegations. (Senate Rules Committee, Third Reading, Bill Analysis (Request for Judicial Notice ("RJN"), Ex. 1.)  On May 26, 2010, the day that the bill passed the Senate, the Office of Senate Floor Analyses released a bill analysis stating that AB 1437 is designed to protect public health and welfare:  "According to the author's office, requiring all eggs sold for human consumption in California to conform to the animal care standards will protect California's consumer's health and welfare.  Reports cited by the author state that egg-laying hens subjected to stress have a greater chance of carrying bacteria or viruses, thus having a greater chance of exposing consumers to food borne bacteria and viruses."  (RJN Ex. 1.)  The analysis also explained that the bill would "ensure that all eggs consumed in California are

-11-

produced by hens raised according to animal welfare standards that meet the expectations for animal care and food safety of the California consumer." *Id.*

*Fourth*, plaintiffs allege that the California Health & Human Services Agency ("CHHSA") and the Department of Food and Agriculture ("CFDA") prepared Enrolled Bill Reports ("Reports") for Governor Arnold Schwarzenegger stating that there is "[n]o scientific evidence" to support the assertion that AB 1437 will prevent Salmonella, and "it will . . . be hard to ascribe any particular health risk for failure to comply [with AB 1437]." (FAC ¶¶ 71, 72.) Plaintiffs also allege that the CFDA Report urged the Governor to sign AB 1437 to ensure "a level playing field for California's shell egg producers" because "[w]ithout a level playing field . . . companies in California will no longer be able to operate in this state and will either go out of business or be forced to relocated to another state." (*Id.* ¶ 73-74.)

Statements made by state administrative agencies *after* the California Assembly and Senate had already passed AB 1437 "constitute weak evidence of legislative intent." *See Maine* v. *Taylor*, 477 U.S. at 150. Moreover, even assuming the Reports are relevant, they do not support plaintiffs' claim. The CHHSA Report expressly states that the purpose of AB 1437 is to protect public health. *See* FAC, Ex. K at 1 ("The purpose of the bill is to protect California consumers from increased exposure to disease pathogens, including salmonella, by improving living conditions and overall health of egg-laying hens."). Although the Report states that there is no "scientific evidence" to support these public health benefits, it also notes that "[s]ome informal reports claim that food animals, such as egg-laying hens, are healthier and safer for human consumption if the animals are provided with at least a minimum accommodation of their natural behaviors and physical needs." *Id.* As shown by the legislative findings incorporated into the bill, Cal. Health & Safety Code § 25995, regardless of what this particular staffer thought of the evidence, California's elected legislators accepted the evidence of a connection between Salmonella and housing for egg-laying hens.

The CFDA Report states that the purpose of AB 1437 is to "prohibit the sale of shell eggs for human consumption if it is the product of an egg-laying hen that was caged or confined on a farm or place that is not in compliance with animal care standards." (FAC, Ex. L

-12-

at 1.) It also states that AB 1437 will "ensure a level playing field," but it does so in the context of analyzing the bill's fiscal and economic impact. (*Id.* at 3.) The fact that a state agency advised the Governor of AB 1437's "beneficial side effects on state industry" does not convert it into protectionist legislation. *See Clover Leaf Creamery*, 449 U.S. at 463 n.7. Further, the Report states that one of the "cons" of AB 1437 is that it "could limit the volume of shell eggs imported for consumption." (FAC, Ex. L at 8.) Far from being motivated by protectionism, the CFDA believed that the risk of a decrease in out-of-state imports was a *disadvantage* that the Governor ought to consider.

*Finally*, plaintiffs contend that the Governor's signing statement shows that AB 1437's purpose is not to protect public health, but rather to protect California farmers. It does not. In his signing statement, the Governor stated: "The voters' overwhelming approval of Proposition 2 demonstrated their strong support for the humane treatment of egg producing hens in California. By ensuring that all eggs in California meet the requirements of Proposition 2, this bill is good for both California egg producers *and animal welfare*." (FAC ¶ 75 & Ex. N (emphasis added).) Assuming that the Governor's statement[2] is evidence of *legislative* intent, the statement shows that the Governor was motivated by concerns about animal welfare. Therefore, it fails to show that public health and animal welfare "could not have been a goal" of AB 1437. *See Clover Leaf Creamery Co.*, 449 U.S. at 463 n.7.

In short, even drawing all inferences in favor of Plaintiffs, the legislative history is consistent with the stated purposes of AB 1437 and Plaintiffs fall far short of pleading a discriminatory purpose.

---

[2] Because using *executive* statements to determine *legislative* intent raises separation of powers concerns, courts routinely question the use of such statements. *See United States* v. *Story*, 891 F.2d 988, 994 (2d Cir. 1989) ("[T]here is room for doubt as to the weight to be accorded a presidential signing statement in illuminating congressional intent."); *Yakima Valley Mem'l Hosp.* v. *Wash. State Dep't of Health*, 654 F.3d 919, 934 (9th Cir. 2011) (doubting that "a presidential signing statement could establish an unmistakably clear *legislative* intent"); *Hovila* v. *Tween Brands, Inc.*, No. C09-0491RSL, 2010 WL 1433417 at *10 n.4 (W.D. Wash. April 7, 2010) ("Allowing the President to determine what a law means when adding his signature to a completed piece of legislation imperils the constitutionally-mandated roles of both Congress and the judiciary.").

-13-

## **CONCLUSION**

For all the foregoing reasons, *Amici* respectfully submit that Plaintiffs' First Amended Complaint should be dismissed.

Dated:   July 2, 2014                    Respectfully submitted,

/s/ Diane L. McGimsey
Diane L. McGimsey (SBN 234953)
Edward E. Johnson (SBN 241065)
Janet Y. Galeria (SBN 294416)
Jonathon D. Townsend (SBN 293918)
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone:   (310) 712-6600
Facsimile:   (310) 712-8800

*Attorneys for Amici Curiae Animal Legal Defense Fund, Compassion Over Killing, Inc. and Farm Sanctuary, Inc.*