Brian M. Boynton          (SBN 222193)
Francesco Valentini       (SBN 255264)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
(202) 663-6363 (fax)
brian.boynton@wilmerhale.com

Randall R. Lee            (SBN 152672)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Ave., Suite 2100
Los Angeles, CA  90071
(213) 443-5300
(213) 443-5400 (fax)
randall.lee@wilmerhale.com

Attorneys for Proposed Defendant-Intervenor
ASSOCIATION OF CALIFORNIA EGG FARMERS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF MISSOURI, ex rel. Chris Koster, Attorney General; THE STATE OF NEBRASKA, ex rel. Jon Bruning, Attorney General; THE STATE OF OKLAHOMA, ex rel. E. Scott Pruitt, Attorney General; THE STATE OF ALABAMA, ex rel. Luther Strange, Attorney General; THE COMMONWEALTH OF KENTUCKY, ex rel. Jack Conway, Attorney General; and TERRY E. BRANSTAD, Governor of the State of Iowa,<br><br>  Plaintiffs,<br><br>  v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California; KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture,<br><br>  Defendants. | CASE NO. 2:14-cv-00341-KJM-KJN<br><br>**REPLY TO PLAINTIFFS' RESPONSE TO AMICUS CURIAE BRIEFS IN SUPPORT OF DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS TO DISMISS**<br><br>Date:   August 11, 2014<br><br>Time:   2:00 pm<br><br>Before: Hon. Kimberly J. Mueller |

In accordance with this Court's Minute Order entered July 8, 2014 (Dkt. No. 73), Defendant-Intervenor the Association of California Egg Farmers ("ACEF") respectfully submits this reply to Plaintiffs' Response (Dkt. No. 75 ("Response")) to the amicus briefs filed in this case.

1. In response to the amicus briefs, Plaintiffs again urge this Court (at 2-3) to disregard the purpose declared by the Legislature in enacting AB 1437—i.e., protecting California consumers from the public health threat of contaminated shell eggs, Cal. Health & Safety Code § 25995(e). Instead, Plaintiffs ask this Court to hunt for the law's "real" purpose in AB 1437's "historical context," in expert testimony, and in "documents from the law's legislative history." Response 2-3. Plaintiffs' plea is contrary to controlling precedent. As the Ninth Circuit and the Supreme Court have held, a court reviewing a dormant Commerce Clause challenge is to "'assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [them] to conclude that they *could not have been* a goal of the legislation.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1097-1098 (9th Cir. 2013), *cert. denied*, 2014 U.S. LEXIS 4609 (U.S. June 30, 2014) (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (emphasis added)).[1] As ACEF previously explained, the Legislature's findings—which expressly reference scientific evidence, Cal. Health & Safety Code § 25995—easily clear that low bar. *See* ACEF Mem. of Law in Supp. of Proposed Mot. to Dismiss or for J. on the Pleadings (Dkt. No. 45-1 ("ACEF MTD-MJP")) 14-15. So does CDFA's thorough explanation of its rationale for promulgating § 1350 of title 3 of the California Code of Regulations. *See* ACEF MTD-MJP 3-4; CDFA, *Shell Egg Food Safety: Initial Statement of Reasons* 1, 9-10 (July 2012), a*vailable at* http://www.cdfa.ca.gov/ahfss/pdfs/regulations/Shell_Egg_ Food _Safety_ISR_July_2012.pdf.

---

[1] *See also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision, because this Court has never insisted that a legislative body articulate its reasons for enacting a statute." (internal quotation marks and citation omitted)). *Fritz* was an Equal Protection Clause case, but the Court has noted the close link between rationality analysis under that Clause and review of facially nondiscriminatory statutes under the dormant Commerce Clause. *See Clover Leaf Creamery*, 449 U.S. at 470 n.14.

1   REPLY TO PLTFS' RESPONSE TO AMICUS BRIEFS

1    Plaintiffs suggest (at 3) that they should be entitled to discovery (and perhaps a trial) on AB
2    1437's and § 1350's effectiveness as public health measures merely because they have alleged that
3    AB 1437 and § 1350 had an improper purpose.  But in the dormant Commerce Clause context,
4    "States are not required to convince the courts of the correctness of their legislative judgments."
5    *Clover Leaf Creamery*, 449 U.S. at 464.  The question is not whether the Legislature's scientific
6    judgment was *correct*, but rather whether the Legislature could possibly have *believed* that it *could*
7    be correct.  Nothing in Plaintiffs' complaints or submissions to date remotely suggests that the
8    Legislature's judgment was *implausible*—as opposed to, allegedly, at most incorrect.[2]

9    None of the cases Plaintiffs now cite (at 2-3) provides support for their attempt to second-
10   guess the Legislature's and CDFA's motives.  None involved dormant Commerce Clause claims or
11   claims subject to similarly deferential review.  Rather, they all involved constitutional provisions
12   implicating much more stringent judicial scrutiny.  *See Stone v. Graham*, 449 U.S. 39, 41 (1980)
13   (per curiam) (Establishment Clause claim); *Epperson v. Arkansas*, 393 U.S. 97, 107-109 (1968)
14   (same); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) (Equal Protection claim based on sex
15   discrimination); *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 267-268
16   (1977) (Equal Protection claim based on racial discrimination).  The cited cases thus lend no support
17   to Plaintiffs' attempt to state a claim under *Clover Leaf Creamery*'s deferential standard.

18   Finally, Plaintiffs are unable to point to *any* non-conclusory allegations in their Amended
19   Complaint that CDFA's regulations in § 1350 were enacted for a discriminatory purpose.  In their
20   Response, Plaintiffs contend that they have alleged that both AB 1437 and § 1350 "are protectionist
21   measures intended to handicap out-of-state egg producers."  Response 3.  But with respect to § 1350,
22   the Amended Complaint contains only a single conclusory assertion that the statute and the

---

[2]    Plaintiffs trumpet a legislative history document expressing skepticism about the evidence linking enhanced housing conditions to *Salmonella* prevention.  Response 3 (citing First Am. Compl. (Dkt. No. 13 ("FAC") Exh. K).  But such scientific disagreement is irrelevant:  What matters is that the Legislature could have had *Salmonella* prevention in mind as one goal of AB 1437, not whether that was a scientifically wise course of action.  In any event, the document upon which Plaintiffs rely confirms that the Legislature *did*, in fact, have *Salmonella* prevention in mind:  "The purpose of the bill is to protect California consumers from increased exposure to disease pathogens, including salmonella, by improving living conditions and overall health of egg-laying hens."  FAC Exh. K, at 1.

1  regulation are "protectionist measures intended to benefit California egg producers at the expense of
2  Plaintiffs' egg producers." FAC ¶ 97. Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),
3  and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that bare assertion is insufficient. As the Supreme Court
4  has explained, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the
5  elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at
6  555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual
7  enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, as the Court
8  has recently explained, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual
9  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at
10 678 (quoting *Twombly*, 550 U.S. at 570). Here, Plaintiffs' amended complaint comes nowhere near
11 meeting these standards with respect to § 1350. The amended complaint points to nothing in the
12 rulemaking process or the regulation itself that would support any inference that § 1350 was
13 promulgated for a discriminatory purpose. Even the snippet of legislative history upon which
14 Plaintiffs so heavily rely (at 3) pertained only to AB 1437. Section 1350, however, was not
15 promulgated to implement that provision.[3] As a result, even assuming that Plaintiffs were right that
16 they could survive a motion to dismiss by alleging that the stated purpose of the provisions they
17 challenge were not their actual purposes, they have not even adequately alleged that with respect to
18 § 1350.
19      2.      Plaintiffs next assert (at 4) that California has "no 'local' animal welfare interest in
20 regulating the housing of farm animals" in their States. That contention suffers from at least two
21 fatal flaws. First, neither AB 1437 nor § 1350 regulates hen housing in Plaintiffs' States. As
22 Plaintiffs have now conceded, AB 1437 "places no restrictions on the treatment of animals in
23 California—*or anywhere else for that matter*." Dkt. No. 46 at 6 (emphasis added). In Plaintiffs'
24 words, "[AB 1437] does not require egg producers to house hens in any particular way nor prohibit

---

[3]  *See* Cal. Code Regs. tit. 3, § 1350(a) ("In accordance with Food and Agricultural Code section 27521(a), to assure that healthful and wholesome eggs of known quality are sold in California, commencing July 1, 2013, any egg producer or egg handler as defined in sections 27510 and 27510.1 of the Food and Agricultural Code, shall ensure all flocks with a hatching date after July 1, 2013 comply with the requirements of this section.").

them from housing hens in any particular way.  It merely proscribes the sale *in California* of a subset of otherwise indistinguishable goods based on production methods that are already illegal *in California*." *Id.* (emphasis in original); *see also* ACEF MTD-MJP 10-12.  Second, Ninth Circuit precedent establishes that California *does* have a "local" animal-welfare interest that applies here: "prevent[ing] complicity in a practice that it deemed cruel to animals." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013), *cert. filed*, No, 13-1313 (U.S. 2014).

      3.     Finally, Plaintiffs' attempts to distinguish (at 5-6) several cases cited by amici fail.  In *Chinatown Neighborhood Association v. Harris*, No. 12-cv-3759, 2014 WL 1245047, at *1 (N.D. Cal. Mar. 25, 2014), the district court upheld a California law that, like AB 1437 and § 1350, banned the in-State sale of a food product—there, shark fins—as a result of the unwanted consequences of its production method.  Plaintiffs now attempt to distinguish *Chinatown* (Response 5) on the ground that AB 1437 and § 1350 affect only "*certain* shell eggs," whereas the shark-fin law affected "*all* shark fins."  But that distinction is purely semantic:  One could just as easily say that AB 1437 and § 1350 affect "*all* eggs produced in cramped conditions," whereas the shark-fin law affected only "*certain* shark parts."  Response 5.  Nor is there any merit to Plaintiffs' assertion that AB 1437 "is based not on any inherent quality of the shell eggs themselves but solely on their means of production." *Id*.  For one thing, AB 1437 targets eggs produced in cramped confinement because of an "inherent quality": the increased risk that they will carry *Salmonella*.  For another, Plaintiffs do not even attempt to explain how this "inherent quality" theory distinguishes AB 1437 from the shark-fin law, which banned the product of a method deemed cruel without reference to the product's wholesomeness or quality.

    Plaintiffs' attempts to distinguish *Cresenzi Bird Importers, Inc. v. New York*, 658 F. Supp. 1441 (S.D.N.Y. 1987), are similarly baseless.  The *Cresenzi* court upheld a New York law banning sales of live birds captured in the wild, *id.* at 1443, explaining—in reasoning that is fully applicable here—that a "State has an interest in cleansing its markets of commerce which the Legislature finds unethical" and "may constitutionally conserve wildlife elsewhere by refusing to accept local complicity in its destruction," *id.* at 1447.  In response, Plaintiffs first observe that "AB 1437 and

§ 1350 have nothing to do with conserving wildlife." Response 5. That is true, but irrelevant: The point in *Cresenzi*—and here—is that the dormant Commerce Clause does not bar a State from prioritizing ethical goals in regulating market access, whatever those ethical goals may be. Next, Plaintiffs claim that there is not "the least bit of evidence that California enacted AB 1437 and § 1350 to cleanse the market of eggs which its Legislature f[i]nds to be unethical." Response 5. But, in fact, AB 1437 provides that its provisions are in addition to "any *other* laws protecting animal welfare," and that nothing in this chapter shall "prevent a local governing body from adopting and enforcing *its own* animal welfare laws and regulations." Cal. Health & Safety Code § 25997.1 (emphasis added). Further, the gubernatorial signing statement for AB 1437—which Plaintiffs cite in their own Complaint—describes the law as "good for … animal welfare." FAC ¶ 75. AB 1437 was therefore clearly intended to serve, among other state interests, California's ethical commitment to animal welfare.[4]

Finally, Plaintiffs attempt again (at 6) to distinguish the foie gras case, *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013). Their only (perhaps) new contention is that the foie gras law "effects a complete ban on the sale of a disfavored product—foie gras—regardless of where it was made." Response 6. But, of course, that is equally true here: AB 1437 and § 1350 effect a complete ban on the sale of eggs produced by hens in tight confinement, regardless of where the eggs were laid. *Association des Eleveurs* controls here.

## CONCLUSION

Plaintiffs' suit should be dismissed.

---

[4] At one point, Plaintiffs assert that if the legislature *really* cared about animals, it would have gone further and applied AB 1437's restrictions to egg products too—not just shell eggs. But it is black-letter law that "[s]uch legislative decisions" to regulate up to a given point, but not beyond, are "'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.'" *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155 (9th Cir. 2004); *see also Pacific Northwest Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir. 1994) ("[T]he Supreme Court has long held that the fact that a state regulation addresses only one aspect of a problem does not alone cast doubt on the state's motivation." (citing *Clover Leaf Creamery*, 449 U.S. at 466)).

| | |
|---|---|
| DATED:   July 22, 2014 | Respectfully submitted, |
| | /s/ Brian M. Boynton |
| | Brian M. Boynton          (SBN 222193) |
| | Francesco Valentini       (SBN 255264) |
| | WILMER CUTLER PICKERING |
| |   HALE AND DORR LLP |
| | 1875 Pennsylvania Avenue, N.W. |
| | Washington, D.C.  20006 |
| | (202) 663-6000 |
| | (202) 663-6363 (fax) |
| | brian.boynton@wilmerhale.com |
| | |
| | Randall R. Lee                  (SBN 152672) |
| | WILMER CUTLER PICKERING |
| |   HALE AND DORR LLP |
| | 350 South Grand Ave., Suite 2100 |
| | Los Angeles, CA  90071 |
| | (213) 443-5300 |
| | (213) 443-5400 (fax) |
| | randall.lee@wilmerhale.com |
| | |
| | Attorneys for Proposed Defendant-Intervenor |
| | ASSOCIATION OF CALIFORNIA EGG FARMERS |