MICHAEL W. DE VRIES *(SBN 211001)*
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Fax: (213) 680-8500

JOHN C. O'QUINN (*Pro Hac Vice Pending*)
john.oquinn@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

JOSHUA HAWLEY (*Pro Hac Vice Pending*)
ERIN MORROW HAWLEY (*Pro Hac Vice Pending*)
MISSOURI LIBERTY PROJECT
5215 E. Highway 163
Columbia, MO 65201

*Counsel for Amicus Curiae Missouri Liberty Project*

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF MISSOURI, ex rel., Chris Koster, Attorney General; THE STATE OF NEBRASKA, ex rel. Jon Bruning, Attorney General; THE STATE OF OKLAHOMA, ex rel. E. Scott Pruitt, Attorney General; THE STATE OF ALABAMA, ex rel. Luther Strange, Attorney General; THE COMMONWEALTH OF KENTUCKY, ex rel. Jack Conway, Attorney General; and TERRY E. BRANSTAD, Governor of the State of Iowa,<br><br>Plaintiffs,<br><br>v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California; KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture,<br><br>Defendants. | CASE NO. 2:14-cv-00341-KJM-KJN<br><br>***AMICUS CURIAE* BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Complaint Filed Date: February 3, 2014<br><br>Judge:      Hon. Kimberly J. Muelle<br>Hearing Date: August 11, 2014<br>Time:       10:00 a.m.<br>Courtroom:   3, 15th Floor |

**TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 2

INTRODUCTION ................................................................................................ 2

BACKGROUND ................................................................................................. 2

    A.    Commerce Clause Principles ................................................... 2

    B.    California's Protectionist Egg Law ......................................... 5

ARGUMENT ...................................................................................................... 8

I.    THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE AB 1437 UNCONSTITUTIONALLY DISCRIMINATES AGAINST INTERSTATE COMMERCE IN PURPOSE AND EFFECT. ...................... 8

    A.    A State Statute Violates The Commerce Clause If It Discriminates Against Interstate Commerce On Its Face, Or In Its Purpose And Effects ....................................................... 9

    B.    The Purpose And Effects Of AB 1437 Are To Advantage Domestic Agriculture At The Expense Of Out-Of-State Farmers. ..................................................................................... 10

II.    THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE AB 1437 IS AN UNCONSTITUTIONAL EXERCISE IN EXTRATERRITORIAL REGULATION. ................................................ 12

    A.    California Cannot Export Its Policy Preferences To Sister States. ....................................................................................... 12

    B.    Where The "Practical Effect" Of A State Law Would Be To Regulate Economic Activity That Takes Place Entirely Beyond Its Borders, Such Extraterritorial Regulation Is *Per Se* Unconstitutional. .................................................... 13

    C.    California's Extraterritorial Regulation Of Egg Production Is Impermissible Because It Would Lead To Economic Balkanization Among The States. .......................... 15

    D.    Recent Ninth Circuit Precedent Does Not Allow California To Enforce AB 1437 Against Egg Producers Operating In Other States. ............................................................................. 16

III.    EVEN IF AB 1437 IS NEITHER DISCRIMINATORY NOR EXTRATERRITORIAL, A MOTION TO DISMISS WOULD BE INAPPROPRIATE BECAUSE THE UNDUE BURDEN IT IMPOSES UPON INTERSTATE COMMERCE MUST BE SUBJECT TO *PIKE* BALANCING. ............................................................ 18

i

## TABLE OF CONTENTS (CONT'D)

| | | Page |
|---|---|---|
| **A.** | **AB 1437 Imposes Substantial Burdens On Interstate Commerce.**......................................................................... | **18** |
| **B.** | **AB 1437 Fails To Advance A Legitimate State Interest In Light Of Less Burdensome Alternatives.**........................... | **21** |
| **CONCLUSION** .............................................................................................. | | **22** |

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
**Cases**

4
*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2nd. Cir. 2003) ................................................................................................ 4

5

6
*American Beverage Ass'n v. Snyder,*
  735 F.3d 362 (6th Cir. 2012).......................................................................................... 4, 18

7
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................................. 8

8

9
*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
  729 F.3d 937 (9th Cir. 2013)...................................................................................... passim

10
*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984) ............................................................................................................. 3

11

12
*Baldwin v. G.A.F. Seelig, Inc.,*
  294 U.S. 511 (1935) ........................................................................................................... 12

13
*Black Star Farms LLC v. Oliver,*
  600 F.3d 1225 (9th Cir. 2010) ............................................................................................. 9

14

15
*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996) ........................................................................................................... 14

16
*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
  476 U.S. 573 (1986)................................................................................................... passim

17

18
*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,*
  511 U.S. 383 (1994) ..................................................................................................... 13, 20

19
*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997)............................................................................................................. 3

20

21
*City of Philadelphia v. New Jersey,*
  437 U.S. 617 (1978)............................................................................................................. 9

22
*Dean Milk Co. v. City of Madison,*
  340 U.S. 349 (1951) ........................................................................................................... 20

23

24
*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982)................................................................................................ 3, 14, 16

25
*Gibbons v. Ogden,*
  22 U.S. 1 (1824) ........................................................................................................... 15, 20

26

27
*Hardage v. Atkins,*
  619 F.2d 871 (10th Cir. 1980)........................................................................................... 13

28

i

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Healy v. Beer Inst., Inc.,*
  491 U.S. 324 (1989)............................................................................................ passim

*Int'l Dairy Foods Ass'n v. Boggs,*
  622 F.3d 628 (6th Cir. 2010)............................................................................................ 4

*Knievel v. ESPN,*
  393 F.3d 1068 (9th Cir. 2005)............................................................................................ 8

*Maine v. Taylor,*
  477 U.S. 131 (1986)............................................................................................ 9

*Midwest Title Loans, Inc. v. Mills,*
  593 F.3d 660 (7th Cir. 2010)............................................................................................ 4, 15

*Minnesota v. Clover Leaf Creamery Co.,*
  449 U.S. 456 (1981)............................................................................................ 21

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown,*
  567 F.3d 521 (9th Cir. 2009)............................................................................................ 3

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
  682 F.3d 1144 (9th Cir. 2012)............................................................................................ 4, 18, 19

*Nat'l Collegiate Athletic Ass'n v. Miller,*
  10 F.3d 633 (9th Cir. 1993)............................................................................................ passim

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer,*
  165 F.3d 1151 (7th Cir. 1999)............................................................................................ 13

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer,*
  63 F.3d 652 (7th Cir. 1995)............................................................................................ 4

*North Dakota v. Heydinger,*
  --- F. Supp. 2d ---, 2014 WL 1612331 (D. Minn. April 18, 2014)............................................................................................ 4

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.,*
  511 U.S. 93 (1994)............................................................................................ 2, 3, 9

*Pharm. Research & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003)............................................................................................ 14

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970)............................................................................................ passim

*Raymond Motor Transp., Inc. v. Rice,*
  434 U.S. 429 (1978)............................................................................................ 16

*Rocky Mountain Farmers Union v. Corey,*
  730 F.3d 1070 (9th Cir. 2013)............................................................................................ 9, 11

*Sanchez v. Fresno,*
  914 F. Supp. 2d 1079 (E.D. Cal. 2012)............................................................................................ 8

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Shaffer v. Heitner,*
    433 U.S. 186 (1977)................................................................................................ 14

*Southern Pacific Co. v. Arizona ex rel. Sullivan,*
    325 U.S. 761 (1945)................................................................................................ 13

*Union Pac. R. Co. v. California Pub. Utils. Comm'n,*
    346 F.3d 851 (9th Cir. 2003).............................................................. 15, 16, 19, 20

*Valley Bank of Nevada v. Plus Sys., Inc.,*
    914 F.2d 1186 (9th Cir. 1990)........................................................................ 3, 14

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992)................................................................................................ 9

**Statutes and Rules**

21 U.S.C. § 1031.................................................................................................... 18

21 U.S.C. § 1052.............................................................................................. 18, 20

CAL. HEALTH & SAFETY CODE § 25982............................................................... 11

CAL. HEALTH & SAFETY CODE § 25995............................................................... 22

CAL. HEALTH & SAFETY CODE § 25996............................................................ 6, 14

CAL. HEALTH & SAFETY CODE § 25997............................................................ 6, 14

Fed. R. Civ. Proc. 12.............................................................................................. 8

LA. ADMIN. CODE tit. 7, pt. XXI, § 3113............................................................. 20

N.J. ADMIN. CODE § 2:8-4.4.................................................................................. 20

OR. ADMIN. R. 603-018-0005................................................................................ 20

OR. REV. STAT. ANN. §§ 632.840-850................................................................... 20

TEX. HEALTH & SAFETY CODE ANN. § 821.003 ................................................. 20

WIS. STAT. ANN. § 134.52..................................................................................... 20

**Other Authorities**

Hoy Carman,
    *Economic Aspects of Alternative California*
    *Egg Production Systems* (2012)............................................................................. 5

Lindsay Barnett,
    *Gov. Schwarzenegger signs bill to require out-of-state egg producers to comply with*
    *Proposition 2 space requirements for egg-laying hens*, L.A. TIMES, (July 8, 2010) ............. 7

Nicolette Hahn Niman,
    *Has California's Foie Gras Ban Gone Too Far?*, THE ATLANTIC, July 13, 2012 ................. 17

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Schwarzenegger signs bill requiring 'humane' out-of-state eggs,*
    SACRAMENTO BEE CAPITOL ALERT (July 7, 2010) ............................................... 7

Van Immersell, et. al.,
    *Improving the Safety and Quality of Eggs and Products* (2011) ............................ 22

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ............................................................................................ 2

U.S. Const. art. VI, cl. 2 ................................................................................................ 2

1

2

**INTEREST OF *AMICUS CURIAE***

Founded by constitutional lawyers and law professors Joshua Hawley and Erin Morrow Hawley, Missouri Liberty Project is a non-profit organization dedicated to promoting constitutional liberty and limited government.   As part of this mission, Missouri Liberty Project seeks to protect and promote the rights of Missouri farmers as they pursue their time-honored way of life.  Consequently, Missouri Liberty Project has an important interest in defending the rights of Missouri egg farmers under the federal Constitution, which are clearly endangered by the California regulations at issue in this lawsuit.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

California seeks to regulate the means by which farmers in other States raise their eggs for sale on the open market.  That violates the federal Constitution in at least three independent ways.  *First*, while claiming to establish new and allegedly humane chicken-behavior standards for farmers who do business in California, the act in question, AB 1437, in fact serves the clear purpose of protecting California farmers from competition from out-of-state farmers who use conventional egg-production techniques.  *Second*, the practical effect of AB 1437 is to regulate wholly out-of-state conduct.  California's purpose usurps Congress's exclusive authority to regulate interstate commerce, and has the practical effect of regulating the agriculture practices of California's sister States, which California has no right to do.  *Third*, apart from being protectionist and extraterritorial, AB 1437 places an undue burden on interstate commerce on entirely pretextual grounds.  Simply put, California's chicken-behavior standards for egg production cannot survive any level of scrutiny under the Commerce Clause.  Each of the three ways that AB 1437 fails has been pleaded with sufficient particularity and plausibility that Defendants' Motion to Dismiss should be denied, and Plaintiffs should be allowed to proceed with their claim for injunctive relief.

### BACKGROUND

**A.    Commerce Clause Principles**

A key feature of our constitutional structure is Congress's enumerated authority to "regulate Commerce … among the several states."  U.S. Const. art. I, § 8, cl. 3.  Implicit in this authority, given the supremacy of federal law, *see* U.S. Const. art. VI, cl. 2, is the fact that the various States cannot seek to regulate interstate commerce themselves.  No State may deprive another State's citizens of the right to do business on equal terms, nor may any State penalize use of the national free market without inviting the strictest scrutiny by the courts.  *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 100-01 (1994).  Under this "dormant" or "negative" reading of the Commerce Clause, a

State cannot regulate economic activity that (a) discriminates against interstate commerce, (b) regulates economic activity beyond its borders, or (c) places an undue burden on interstate commerce.

The most obvious way that a State can violate the Commerce Clause is by enacting regulations that discriminate against interstate commerce. A State "can discriminate against [interstate commerce] in one of three ways: (a) facially, (b) purposefully, or (c) in practical effect." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) (quotation marks omitted). Facial discrimination is obvious from the face of the law itself and does not require investigation into the law's purpose or consequences. *See Oregon Waste*, 511 U.S. at 100; *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575-76 (1997). If the text is not discriminatory, then a reviewing court looks to evidence of discriminatory intent by the legislature or discriminatory effects of the legislation. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).

States can also violate the Commerce Clause by regulating economic activity beyond their borders. "Direct regulation" across state lines is invalid *per se*. *Valley Bank of Nevada v. Plus Sys., Inc.*, 914 F.2d 1186, 1190 (9th Cir. 1990) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 640-42 (1982) (plurality opinion)). Yet even where a State's law explicitly limits itself to the regulation of conduct occurring within its territory, it is still impermissible under the Commerce Clause if the law's "practical effect" is to control conduct occurring outside the State. *See Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986) (invalidating New York liquor price affirmation statute).

Courts strike down extraterritorial regulations in a variety of contexts. Some of the Supreme Court's modern explications of extraterritoriality involved so-called "price affirmation" statutes whereby one State tries to normalize the price of goods with neighboring States via regulation. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326-29 (1989). In recent years, the Sixth Circuit has struck down regulations as extraterritorial

1   that sought to impose uniform product labels in other States, *Int'l Dairy Foods Ass'n v.*

2   *Boggs*, 622 F.3d 628 (6th Cir. 2010), and that maintained a unique-mark requirement for

3   returnable bottles, *American Beverage Ass'n v. Snyder*, 735 F.3d 362 (6th Cir. 2012).  The

4   Seventh Circuit has struck down extraterritorial lending regulations, *Midwest Title Loans,*

5   *Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (Posner, J.), and "effective recycling" mandates,

6   *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652 (7th Cir. 1995).  The Second Circuit

7   struck down a Vermont law that regulated the dissemination of explicit materials to

8   minors over the Internet as an extraterritorial regulation.   *Am. Booksellers Found. v.*

9   *Dean*, 342 F.3d 96 (2nd. Cir. 2003).  And at least one court in the Eighth Circuit has found

10  that Minnesota's carbon-reduction regime was an improper extraterritorial regulation.

11  *North Dakota v. Heydinger*, --- F. Supp. 2d ---, 2014 WL 1612331 (D. Minn. April 18, 2014).

12        Even if a State's economic regulations regulate in-state and out-of-state activity

13  evenhandedly and do not control out-of-state activity, the regulations still cannot place

14  undue burdens on interstate commerce.  Under a test known as "*Pike* balancing," if "the

15  statute regulates even-handedly to effectuate a legitimate local public interest, and its

16  effects on interstate commerce are only incidental, it will be upheld unless the burden

17  imposed on such commerce is clearly excessive in relation to the putative local benefits."

18  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Absent a legitimate, non-pretextual

19  purpose, the statute must be struck down.  On the other hand, "[i]f a legitimate local

20  purpose is found, then the question becomes one of degree."  *Id.*  Whether or not the

21  burden is too great will depend on the "nature of the local interest involved" and if "it

22  could be promoted as well with a lesser impact on interstate activities."  *Id.*  As such, while

23  "[m]ost regulations that run afoul of the dormant Commerce Clause do so because of

24  discrimination … in a small number of dormant Commerce Clause cases courts also have

25  invalidated statutes that imposed other significant burdens on interstate commerce."

26  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).

27

28

**B.    California's Protectionist Egg Law**

The State of California enacted a law in 2008 that sought to regulate how eggs are farmed in California.  The law, Proposition 2 ("Prop 2"), was a popular referendum that passed on the November 4, 2008 ballot with 63% of the vote.  The law mandated that any egg-laying hens must be housed in enclosures that allowed certain behavior by chickens, in particular the enclosures must provide sufficient room for each hen to stand up, lie down, turn around freely, and fully extend its limbs.  Pls.' First Am. Compl. at ¶56.  As a result of the referendum's passage, by January 1, 2015 no eggs farmed in California could be the product of conventional egg farming which involves "cage-systems that house between 4 and 7 birds per cage and provide about 67 square inches of space per bird."  *Id.* at ¶3.  Prop 2 does not specify what precise size enclosure will suffice because the standard refers to chicken-behavior (standing, turning, etc.) but "animal behavior experts have estimated anywhere from 87.3 square inches to 403 square inches per hen."  *Id.* at ¶4.

The costs of compliance with Prop 2 were burdensome for California farmers.  The cost of the initiative has been estimated by the University of California-Davis to be at least $385 million in expected capital improvements by California farmers.  *Id.* at ¶57 (citing Hoy Carman, *Economic Aspects of Alternative California Egg Production Systems* 22 (2012)).  The ***continuing*** costs of producing eggs in the Prop 2 regime are estimated to be "at least 20%" greater than under conventional farming.  *Id.* at ¶58.  The California egg industry was thus faced with the triple burden of capital-intensive improvements, high-cost operations, and low-cost out-of-state competition.

The California legislature acted quickly to protect the domestic egg farming industry.  In July 2010, the California legislature passed AB 1437, which, in pertinent part says: "a shelled egg shall not be ***sold*** or ***contracted for sale*** for human consumption in California…[if it] is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in Chapter 13.8 (commencing with Section 25990) [Prop 2]."  CAL. HEALTH & SAFETY CODE § 25996 (West

2014) (emphasis added).  As a result, any out-of-state farmer who sells or contracts  to sell her eggs in California has until January 1, 2015 to bring her farming methods into compliance with the chicken-behavior requirements laid out two years earlier in Prop 2 or "be punished by a fine not to exceed one thousand dollars ($1,000), or by imprisonment in the county jail for a period not to exceed 180 days or by both that fine and imprisonment." *Id.* at § 25997.  Thus any competitive advantage enjoyed by farmers operating in States without California's draconian production restrictions would vanish, and any out-of-state farmers caught contracting for sale in California while not complying with those restrictions would face possible criminal prosecution.

The ostensible public health justification for AB 1437 was that it would reduce incidences of Salmonella in California.  *See* Pls.' First Am. Compl. at ¶¶67-74.  California claims that "AB 1437 had two purposes: protection of farm animal welfare and protection of public health and safety through the prevention of salmonella."  Def.'s Mot. to Dismiss, Apr. 9, 2014 at 11.  This is allegedly so because AB 1437 "is based on evidence and legislative findings that farm animals that are treated well and provided with minimum living space are healthier and safer for human consumption.  Additionally, evidence and legislative findings demonstrate that reducing salmonella in egg-laying hen flocks causes a directly proportional reduction in human health risk."  *Id.* at 1.  Yet "no scientific study conducted to date has found any correlation between cage size or stocking density and the incidence of Salmonella in egg-laying hens."  Pls.' First Am. Compl. at ¶68.

In fact, the rhetoric of public health benefits notwithstanding, California public officials at the time of enactment applauded AB 1437 as a means by which to protect California farmers.   As Plaintiffs note, the California Assembly's Committee on Appropriations issued the following analysis after its May 13, 2009 hearings on AB 1437: "The intent of this legislation is to level the playing field so that in-state producers are not disadvantaged."  Pls.' First Am. Compl. at ¶69 (emphasis omitted).  The California Department of Food and Agriculture echoed this in its Enrolled Bill Report where it observed that "[w]ithout a level playing field with out-of-state producers, companies in

California will no longer be able to operate in this state and will either go out of business or be forced to relocate to another state." *Id.* at ¶73 (emphasis omitted).  This same report concluded that the law would be difficult for the State to defend against a Commerce Clause challenge, *id.* at ¶71, and that the Governor should sign it for reasons of economic protection, *id.* at ¶72.

In the end Governor Schwarzenegger agreed with the protectionists in the California government.  He signed the bill on July 6, 2010, observing as he did so how "[b]y ensuring that all eggs sold in California meet the requirements of Proposition 2, this bill is ***good for both California egg producers*** and animal welfare." *Id.* at ¶74 (quoting *Schwarzenegger signs bill requiring 'humane' out-of-state eggs*, SACRAMENTO BEE CAPITOL ALERT (July 7, 2010)) (emphasis added).  Non-governmental proponents of the law also understood its potential to influence farming beyond just California.  As Wayne Pacelle, CEO of Proposed Intervenor, the Humane Society of the United States, proclaimed after the bill was passed, "it would be hard to overestimate the potential of this bill to change the way laying hens are treated ***throughout the United States***." Lindsay Barnett, *Gov. Schwarzenegger signs bill to require out-of-state egg producers to comply with Proposition 2 space requirements for egg-laying hens*, L.A. TIMES, (July 8, 2010), *available at* http://latimesblogs.latimes.com/unleashed/2010/07/gov-schwarzenegger-signs-bill-to-require-outofstate-egg-producers-to-comply-with-proposition-2-space.html (emphasis added).

AB 1437 leaves farmers in other States with a series of unappealing choices: They can undertake costly capital improvements to comply with the requirements of a foreign legislature and price themselves out of the local market; they can forego California's critical market; or they can face prosecution for violating California's chicken-behavior requirements.  Its farmers facing this cruel trilemma, Missouri filed suit seeking declaratory and injunctive relief on February 3, 2014.  On March 5, 2014, Missouri filed an Amended Complaint, joined by the States of Nebraska, Iowa, Oklahoma, and Alabama, and the Commonwealth of Kentucky.  California moved to dismiss under Fed. R. Civ. Proc.

12(b)(1) and 12(b)(6) on April 9, 2014.  Plaintiffs opposed this motion on May 16, 2014, and California replied on June 5, 2014.  *Amicus* Missouri Liberty Project opposes California's Motion to Dismiss for failure to state a claim.

## STANDARD OF REVIEW

On a Motion to Dismiss the Court must look to the pleadings and accept any factual allegations as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The Court also must "construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  Only after this, can the Court dismiss the complaint if the Plaintiffs still do not present a plausible claim as a matter of law.  *Iqbal*, 556 U.S. at 677-78.  If further factual development beyond what is presented in the pleadings is necessary to resolve the claim, the Motion to Dismiss should be denied. *Sanchez v. Fresno*, 914 F. Supp. 2d 1079, 1098 (E.D. Cal. 2012).

## ARGUMENT

I. **THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE AB 1437 UNCONSTITUTIONALLY DISCRIMINATES AGAINST INTERSTATE COMMERCE IN PURPOSE AND EFFECT.**

AB 1437 discriminates against interstate commerce in purpose and effect.  Whether or not the text of the law is discriminatory on its face, it is clear that the Plaintiffs plead sufficient facts, appropriately construed in their favor, to show at the pleadings stage that the purpose of AB 1437 is to remove a competitive advantage from foreign agriculture in favor of domestic producers.  Furthermore, the incontrovertible effect of AB 1437 will be to handicap out-of-state producers relative to domestic producers given the latter's nearly *two years* of advance notice of the looming chicken-behavioral standards, over which time they have been free to spread their capital costs.

### A. A State Statute Violates The Commerce Clause If It Discriminates Against Interstate Commerce On Its Face, Or In Its Purpose And Effects.

If a State's economic regulation discriminates against citizens of another State on its face or in its purpose or effect, it is deemed to violate the Commerce Clause of the Constitution virtually *per se*. "When a state statute clearly discriminates against interstate commerce, it will be struck down." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). The clearest way that one state discriminates against others is through economic protectionism. The Supreme Court is "alert[] to the evils of 'economic isolation' and protectionism" and when it exists "a virtually per se rule of invalidity has been erected." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978). As such States cannot legislate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99. As the Ninth Circuit has held, a statute that discriminates against interstate commerce or favors "in-state economic interests over out-of-state interests … violates the Commerce Clause per se, and [the court] must strike it down without further inquiry." *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993).

A law need not discriminate against interstate commerce on its face to violate the Constitution because it can still do so in its purposes and effects. Heightened scrutiny "applies to a state statute that 'discriminate[s] against interstate commerce either on its face or in practical effect.'" *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) (quotation marks omitted). Indeed, "[i]f a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

The Ninth Circuit has established that "[t]he primary purpose of the Dormant Commerce Clause is to prohibit 'statutes that discriminate against interstate commerce' by providing benefits to 'in-state economic interests' while 'burdening out-of-state

competitors.'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013).  That is exactly what AB 1437 does.

> **B.    The Purpose And Effects Of AB 1437 Are To Advantage Domestic Agriculture At The Expense Of Out-Of-State Farmers.**

AB 1437 directly discriminates against interstate commerce in its purpose and effects.  The history surrounding the passage of the law clearly indicates that the purpose of the law was to protect the California egg industry from the effects of Prop 2 by ensuring that out-of-state competitors were equally burdened.

California may have been entitled to pass laws governing the treatment of chickens housed in California egg farms, but it was not entitled to protect its egg industry from any competitive advantage Prop 2 might create for farms in other States.  Yet that is exactly what California did.  As Plaintiffs allege with particularity, the legislative history of AB 1437 is rife with protectionist admissions.  *See* Pls.' First Am. Compl. at ¶¶67-74.  One committee went so far as to observe, "[t]he intent of this legislation is to level the playing field so that in-state producers are not disadvantaged," *id.* at ¶69 (emphasis omitted), while Governor Schwarzenegger himself declared the bill "good for … ***California*** egg producers" when he signed it, *id.* at ¶74 (emphasis added).  Under the applicable standard of review, Plaintiffs have alleged enough facts evincing discriminatory purpose to survive a Motion to Dismiss.

Furthermore, AB 1437 also discriminates against interstate commerce in its effects. The operation of the statute puts foreign egg producers at a significant economic disadvantage compared to their California competitors.  Indeed, the very timing of AB 1437 disadvantages out-of-state farmers in favor of those from California.  AB 1437 was not passed until 2010, giving California farmers a two-year head start over out-of-state farmers in taking the necessary—and burdensome—steps for compliance.  Compliance is capital intensive: California egg farmers are expected to spend over $385 million following Prop 2.  *Id.* at ¶57.  There is no reason to believe these improvements will be any less

costly for out-of-state producers.  Yet California farmers received a **609 day** head start in executing these costly improvements and amortizing their capital costs.

California and its allies argue that any claim of discrimination is essentially precluded by recent precedent in this circuit, *see* Def.'s Mot. to Dismiss at 13; Br. of Proposed Defendant-Intervenor Ass'n of Cal. Egg Farmers, Apr. 25, 2014 at 8-10; Br. of Proposed Defendant-Intervenor Humane Society of the United States, March 26, 2014 at 9-10, but the cases on which California and the Proposed Intervenors rely, *Rocky Mountain Farmers Union* and *Association des Eleveurs*, address entirely different circumstances.

In *Rocky Mountain Farmers Union*, plaintiffs challenged California's Low Carbon Fuel Standard (LCFS).  The argument there was that the LCFS was discriminatory on its face—treating "Midwest" fuel producers differently from "California" producers.  It did not address the circumstances, present here, where a law was specifically adopted to even the playing field to the advantage of in-state producers.  Nor was it adopted in a manner giving in-state producers a head start on compliance.

Likewise in *Association des Eleveurs*, the challenged *foie gras* laws banned *all* sales in the state of California of *foie gras* created from force feeding.  The laws burdened California producers and out-of-state producers simultaneously; California duck fatteners were given no competitive head start over their competitors in Quebec.  AB 1437, by contrast, was designed to confer just such a competitive advantage, thereby providing  a protectionist benefit to California farmers.  What is more, while AB 1437 ostensibly bans all conventionally-farmed eggs, its legislative purposes were protectionist in ways that the *foie gras* laws were never alleged to be.  *See Ass'n des Eleveurs*, 729 F.3d at 948 ("As the district court correctly found, '[s]ection 25982's economic impact does not depend on where the items were produced ….'  Because § 25982 bans the sale of both intrastate and interstate products that are the result of force feeding a bird, it is not discriminatory.").

From these facts it is clear that the Plaintiffs have stated a satisfactory claim of discrimination under applicable law and that the suit should not be dismissed.  The Ninth

1    Circuit precedent on which California relies does not remotely address the circumstances

2    presented here.

3    **II.    THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE AB 1437 IS**
     **AN     UNCONSTITUTIONAL     EXERCISE     IN     EXTRATERRITORIAL**
4    **REGULATION.**

5          In enacting AB 1437, California attempted to deploy its tremendous market share

6    as leverage to reach beyond its borders and dictate to farmers across the country how they

7    must house their egg-laying hens.  This bald attempt at regulating conduct occurring

8    entirely outside the State of California is impermissible under the Commerce Clause.

9    Permitting one State to project its regulatory might beyond its borders undermines the

10   federal system established by the Constitution and would ultimately have the effect of

11   stifling the free flow of commerce throughout the nation.

12        **A.    California Cannot Export Its Policy Preferences To Sister States.**

13        The Commerce Clause squarely prevents one state from imposing its policy

14   preferences on other states.  And that is precisely what California is attempting to do

15   here. With AB 1437, California seeks to ***override*** the decisions of sister States by forcing

16   California agricultural policy on non-Californians.

17        The Supreme Court has rejected similar attempts by other states.  In *Baldwin v.*

18   *G.A.F. Seelig, Inc.*, for example, the Court famously rejected New York's attempt to  export

19   its dairy-production policy by demanding that out-of-state milk producers comply with

20   New York minimum price laws.  *See* 294 U.S. 511, 519 (1935).  Like California in the

21   instant case, New York argued that its extraterritorial regulations  were simply good

22   policy that would ultimately  "promote health."  *Id.* at 524.  The Supreme Court rejected

23   this argument.  The Court held that "[o]ne state may not put pressure of that sort upon

24   others to reform their economic standards."  *Id.* at 524.  As Justice Cardozo explained, "[i]f

25   farmers or manufacturers in Vermont are abandoning farms or factories, or are failing to

26   maintain them properly, the Legislature of Vermont and not that of New York must

27   supply the fitting remedy."  *Id.*

28

1      The Courts of Appeals have likewise been clear that however wise a State may

2  believe its local policy to be, it may not force the people of **another** State to adopt it by

3  closing its borders to to all those who refuse to comply. *See C & A Carbone, Inc. v. Town of*

4  *Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994) (invalidating local ordinance designed "to steer

5  solid waste away from out-of-town disposal sites that it might deem harmful to the

6  environment" because "[t]o do so would extend the town's police power beyond its

7  jurisdictional bounds"); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1153 (7th

8  Cir. 1999) (per curiam) (invalidating Wisconsin statute requiring that States exporting

9  garbage to Wisconsin adopt Wisconsin recycling standards); *Hardage v. Atkins*, 619 F.2d

10  871, 873 (10th Cir. 1980) (invalidating Oklahoma law banning shipment of waste into

11  Oklahoma unless State of origin adopt Oklahoma hazardous waste disposal policies).

12  Because "[n]o state has the authority to tell other polities what laws they must enact or

13  how affairs must be conducted outside its borders," *Nat'l Solid Wastes*, 165 F.3d at 1153,

14  California may not threaten to exclude from its market eggs produced in a manner that

15  does not comply with California policy.

16      **B.**    **Where The "Practical Effect" Of A State Law Would Be To Regulate Economic Activity That Takes Place Entirely Beyond Its Borders,**

17      **Such Extraterritorial Regulation Is *Per Se* Unconstitutional.**

18      Even where a State's law explicitly limits itself to the regulation of conduct

19  occurring within its territory, it is nevertheless impermissible under the Commerce Clause

20  if the law's "practical effect" is to control conduct occurring outside the State. *See Brown-*

21  *Forman*, 476 U.S. at 583 (invalidating New York liquor price affirmation statute (citing

22  *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945))). In *Healy*, for

23  example, the Supreme Court recognized that a Connecticut price affirmation scheme that

24  regulated the price of beer sold ***in Connecticut*** had the "practical effect" of controlling

25  sales in surrounding States by preventing brewers from offering discounts or more

26  competitive pricing. *See Healy*, 491 U.S. at 338-39.

27      The Ninth Circuit has made it clear that "[d]irect regulation"—meaning regulation

28  that "directly affects transactions" that either "take place across state lines" or entirely

outside of a State's borders—is invalid *per se*.  *Valley Bank of Nevada v. Plus Sys., Inc.*, 914 F.2d 1186, 1189-1190 (9th Cir. 1990) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 640-42 (1982) (plurality opinion)); *see also Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (upholding a Maine prescription drug rebate program because it "does not regulate the price of any out-of-state transaction, either by express terms or by its inevitable effect.") (citation omitted).  The same principles of federalism that prohibit a State's court from extending its jurisdiction beyond state borders, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996); *Shaffer v. Heitner*, 433 U.S. 186, 197-108 (1977), prevent a state legislature from reaching across state lines to impose penalties on conduct that occurs wholly within the territory of a sister State, *Edgar*, 457 U.S. at 643 (plurality).

Just as the language of the price affirmation statute in *Healy* purported to regulate conduct occurring only within Connecticut, AB 1437 ostensibly directs California's regulatory power toward eggs "sold or contracted for sale for human consumption ***in California*.**  C AL. H EALTH & S AFETY C ODE § 25996 (West 2014) (emphasis added).  The "practical effect" of the law, however, is that farmers who produce eggs ***outside*** California will be forced to conform to California law.  A farmer halfway across the continent in Missouri, operating in full compliance with Missouri and federal law, would nevertheless be required to rebuild his farm to meet California requirements or face exclusion from California's market—or worse, in the case of noncompliance, criminal prosecution.  *Id.* at § 25997.  Given that California's demand for eggs fluctuates throughout the year and that California-compliant eggs would probably be too expensive to sell in other States, it would be impractical for a farmer to bring only a portion of his facility in compliance with AB 1437.  The "practical effect" of this ostensibly California-focused statute therefore would be to force an out-of-state egg farmer to expend hundreds of thousands of dollars to convert his entire facility into a California-compliant egg production site.  And even a partial conversion could impose costs that threaten the viability of many Missouri small farms.

It is no answer to say that because the eggs are ultimately sold in California, California may regulate the out-of-state production process:  Missouri has alleged that the

out-of-state conduct at issue has no effect on the eggs subsequently sold in-state.  Indeed, in striking down a New York price affirmation statute, the Supreme Court made clear that an in-state sale does not justify the regulation of conduct occurring outside the State: "[t]he mere fact that the effects of [a State law] are triggered only by sales of [goods] within the State … does not validate the law if it regulates the out-of-state transactions of [producers] who sell in-state."  *Brown-Forman*, 476 U.S. at 580.  Similarly, in *Midwest Title Loans, Inc. v. Mills*, Judge Posner invalidated an Indiana law requiring non-Indiana loan companies to comply with Indiana loan regulations if they "advertised or solicited sales, leases, or loans in Indiana by any means."  593 F.3d at 662.  The court struck down the law because allowing these in-state contacts to justify ***Indiana's*** regulation of conduct occurring ***in Illinois*** would arbitrarily "exalt the public policy of one state over that of another"—even though the Illinois plaintiff could still have complied with Indiana law without violating the laws of its home State.  *Id.* at 667-68.  And this Circuit has unanimously held that a railroad regulation "not regulat[ing] conduct outside of California" had an "undisputed" extraterritorial effect in that all trains traveling to California would need to be configured at their State of origin to comply with California safety standards.  *Union Pac. R. Co. v. California Pub. Utils. Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003).

**C.    California's Extraterritorial Regulation Of Egg Production Is Impermissible Because It Would Lead To Economic Balkanization Among The States.**

One of the fundamental purposes of the Commerce Clause was to create a nation free of "conflict[ing] … commercial regulations, destructive to the harmony of the States." *Gibbons v. Ogden*, 22 U.S. 1, 224 (1824) (Johnson, J., concurring).  Therefore courts must look not only to the actual disruptive effect of a State's attempt at extraterritorial regulation, but must also evaluate "what effect would arise if not one, but many or every, State adopted similar legislation."  *Healy*, 491 U.S. at 336; *see also Brown-Forman*, 476 U.S. at 583 ("the proliferation of state affirmation laws … has greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different States").

1    The Ninth Circuit highlighted the dangers of this Balkanization in *National*
2  *Collegiate Athletic Association,* 10 F.3d at 639.   There, the court held that Nevada's
3  attempt to require the National Collegiate Athletic Association ("NCAA") to employ
4  additional due process protections in enforcement proceedings would subject the NCAA to
5  conflicting state and national requirements.   *Id.*   A similar problem arose in the *Union*
6  *Pacific* case, where the Ninth Circuit observed, "While the extra-territorial effects of only
7  one state regulatory regime are relatively minor, if California can require the Railroads to
8  develop and to implement [its standards], so can every other state, and there is no
9  guarantee that the standards will be similar." *Union Pac.*, 346 F.3d at 871.   In no small
10  part due to this Balkanizing tendency the court there concluded that "such extra-
11  territorial burden is constitutionally infirm." *Id.* at 872 (citing *Raymond Motor Transp.,*
12  *Inc. v. Rice*, 434 U.S. 429, 445-46 (1978) and *Healy*, 491 U.S. at 336).

13          The same risks are present in this case.   If California may regulate sister
14  states' agricultural policy, those other states may regulate California's labor and
15  employment policies, or energy production, or nearly anything else.    The resulting
16  labyrinth of conflicting laws and regulations is precisely what the Commerce Clause was
17  adopted to prevent.   *See Union Pac.*, 346 F.3d at 871; *Edgar*, 457 U.S. at 642 (plurality)
18  ("[I]f Illinois may impose such regulations, so may other States; and interstate commerce
19  in securities transactions generated by tender offers would be thoroughly stifled.").
20  National economic policy is the purview of Congress, not the States.

21      **D.    Recent Ninth Circuit Precedent Does Not Allow California To
              Enforce AB 1437 Against Egg Producers Operating In Other States.**
22
23      No Ninth Circuit precedent forecloses Missouri's challenge.   On the contrary, this
24  Circuit's precedent makes clear that Missouri's claims are likely to succeed.   In *Association*
25  *de Eleveurs*, the out-of-state conduct proscribed by the *foie gras* laws was found to affect
26  the product sold in state directly.   While the plaintiffs there argued that the California *foie*
27  *gras* laws constituted a "flat ban on foie gras," the Ninth Circuit concluded that the laws
28  merely banned *foie gras* created "from using force feeding." *Association des Eleveurs*, 729

1   F.3d at 949.  That is to say, the laws **only** banned practices found to have a direct effect on

2   the duck-liver product sold in California.  But the Complaint in this case alleges to the

3   contrary: Plaintiffs allege that there is **no** direct effect on banned eggs from the method of

4   egg production, and that California's putative "findings" relating to the alleged health-

5   effects of the out-of-state eggs are merely pretextual.  The Court must accept that

6   allegation in reviewing a Motion to Dismiss, which suffices to distinguish the case at bar

7   from *Association des Eleveurs*.

8       Furthermore, while the Ninth Circuit concluded in *Association des Eleveurs* that

9   California's parochial regulations would not upset the national market, the same is not

10  true here.  *See* 729 F.3d at 950 (citing *Nat'l Collegiate Athletic Ass'n*, 10 F.3d at 638). The

11  egg industry is larger than the *foie gras* industry by orders of magnitude.  *Compare*

12  Agricultural    Marketing    Resource    Center,    eggs    profile,    *available    at*

13  http://www.agmrc.org/commodities__products/livestock/poultry/eggs-profile/ ("In 2012, the

14  number of eggs sold as table eggs totaled 80.5 billion eggs ….") *with* Nicolette Hahn

15  Niman, *Has California's Foie Gras Ban Gone Too Far?*, THE ATLANTIC, July 13, 2012,

16  *available at* http://www.theatlantic.com/national/archive/2012/07/has-californias-foie-gras-

17  ban-gone-too-far/259809/ ("per capita consumption [of *foie gras*] is 0.003 pounds per

18  person").  While it might be practical for a farmer to segregate certain ducks for

19  California-approved, non-force-fed *foie gras* production, a similar course of action would be

20  excessively burdensome or even impossible for egg production—especially if various States

21  follow California's lead and craft their own, unique regulations.

22      Indeed, the U.S. Congress recognized just this fact in passing the Egg Products

23  Inspection Act: "Requirements within the scope of this chapter with respect to **premises,**

24  **facilities, and operations** of any official plant which are in addition to or different than

25  those  made  under  this  chapter  **may  not  be  imposed  by  any  State  or  local**

26  **jurisdiction**."  21 U.S.C. § 1052(a) (emphasis added); *see also* Pls.' First Am. Compl. at ¶¶

27  75-80 (arguing that AB 1437 is preempted by the Egg Products Inspection Act).  Congress

28  explicitly stated that its motivation in passing the Act was "to provide ... **uniformity** of

standards for eggs."  Pls.' First Am. Compl. at ¶77 (emphasis added)  And part of why Congress saw the need to regularize national egg production standards was the very size of the national egg industry, because eggs "are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce."  21 U.S.C. § 1031. Therefore, unlike with *foie gras*, when it comes to eggs, production standards "must be applied even-handedly and uniformly on a national basis."  *Nat'l Collegiate Athletic Ass'n*, 10 F.3d at 638 (citation omitted).

As the Sixth Circuit recently explained in invalidating a Michigan law that forbade the sale of Michigan-labeled bottles outside the State, a State "creates an impermissible extraterritorial effect" in violation of the Commerce Clause when it forces "states to comply with its legislation in order to conduct business within its state."  *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 376 (6th Cir. 2013).  This is *precisely* what AB 1437 attempts: Raise eggs the California Way or lose access to California's market.  The Constitution does not authorize California to issue such an ultimatum.

## III. EVEN IF AB 1437 IS NEITHER DISCRIMINATORY NOR EXTRATERRITORIAL, A MOTION TO DISMISS WOULD BE INAPPROPRIATE BECAUSE THE UNDUE BURDEN IT IMPOSES UPON INTERSTATE COMMERCE MUST BE SUBJECT TO *PIKE* BALANCING.

Even if a statute lacks facial defects it can still present an undue burden to interstate commerce.  Under "*Pike* balancing," an ostensibly neutral statute still violates the Commerce Clause by burdening interstate commerce in clear excess of legitimate local benefits.  *See Pike*, 397 U.S. at 142; *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148.  Whether a State's burdens on interstate commerce overcome its local benefits depends on (1) the extent of its burdens, (2) the nature of local interests involved, and (3) the existence of equally effective, less burdensome alternatives.  *Pike*, 397 U.S. at 142.

### A. AB 1437 Imposes Substantial Burdens On Interstate Commerce.

A statute that imposes "a substantial burden on interstate commerce" violates the Commerce Clause.  *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148 (emphasis omitted).  Suspect burdens include, *inter alia*, regulation of inherently national markets

and substantially increased production costs.  *Ass'n des Eleveurs*, 729 F.3d at 952; *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1154-55.  AB 1437 is alleged to do both, and those allegations are more than sufficient to survive a Motion to Dismiss.

*First*, AB 1437 effectively regulates the national egg market.  State attempts to regulate a national market are particularly burdensome to interstate commerce.  The Ninth Circuit invalidated, for example, Nevada's attempt to regulate collegiate sports. *Nat'l Collegiate Athletic Ass'n*, 10 F.3d at 640.  The state law at issue there burdened interstate commerce by putting the NCAA in an impossible position: It could apply Nevada's disciplinary rules nationally or face potentially inconsistent compliance obligations in each State.  *Id.* at 639-40.  As with Nevada's unconstitutional statute, AB 1437 "would force [egg-producers] to regulate the integrity of [their] product in every state according to [California's rules]."  *See id.* at 639.  Using its tremendous market share, California coerces producers in distant States, with different production standards, to comply with *California's* preferences if they want to maintain uniform egg quality.  *See id.* Consequently, California "control[s] the regulation of the integrity of a product in interstate commerce that occurs wholly outside [its] borders."  *See id.*

A similar burden was at issue in *Union Pacific*.  There, California's "performance-based" railroad safety rules, which applied only in California, would have subjected railroads to myriad potential "in-state" regulations throughout the country which, in turn, would have had a tremendous extraterritorial burden on commerce.  Because of this, the Ninth Circuit concluded that the plaintiff railroads had "demonstrated that [California Public Utilities Commission's] rule, requiring the development and implementation of performance-based rules, is 'clearly excessive in relation to the putative local benefits.'" *Union Pac.*, 346 F.3d at 872 (quoting *Pike*, 397 U.S. at 142).  This constitutionally infirm burden is directly analogous to AB 1437, whose putatively in-state regulation on sales will have both an extraterritorial burden on egg producers in their States of origin and impose "the burden of requiring potentially conflicting state standards."  *Id.*

Indeed, the Constitution places the power to regulate across States in **Congress** alone and not in any single State. *Gibbons*, 22 U.S. at 199-200, 209. California may generally set itself apart from the economic union by promulgating its own, intrastate production standards, but it has no right to dragoon sister-States into confederacy with it. *Healy*, 491 U.S. at 336-37; *Brown-Forman*, 476 U.S. at 582-83. To that end, State imposition of "rigidity on an entire industry" has long been held a substantial burden under *Pike*. *See Pike*, 397 U.S. at 146. "The Commerce Clause presumes a national market" free from state interference. *C&A Carbone*, 511 U.S. 393. And here, Congress has acted to protect that national market, prohibiting parochial interference in national egg production. *See* 21 U.S.C. § 1052.

But AB 1437 does just that. It Balkanizes the market and "invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356 (1951); *see also Union Pac.*, 346 F.3d at 871-72. Farmers selling eggs in California must engage in practices different from those required to sell domestically or to other States. *See, e.g.*, OR. REV. STAT. ANN. §§ 632.840-850 (West 2014); OR. ADMIN. R. 603-018-0005 (West 2014); TEX. HEALTH & SAFETY CODE ANN. § 821.003 (West 2013); WIS. STAT. ANN. § 134.52 (West 2013); N.J. ADMIN. CODE § 2:8-4.4 (West 2014); LA. ADMIN. CODE tit. 7, pt. XXI, § 3113 (West 2014). This problem will only intensify if more States enact similar legislation. Considered in conjunction with laws "that have been or might be enacted throughout the country," AB 1437 creates "the kind of of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Healy,* 491 U.S. at 337.

*Second*, AB 1437 imposes substantial costs on egg producers. This distinguishes it from those laws that have survived *Pike* balancing, such as the Minnesota statute banning the sale of milk in plastic, nonrefillable containers upheld in *Minnesota v. Clover Leaf Creamery Company*, 449 U.S. 456, 458, 474 (1981). The *Clover Leaf* statute survived because: (1) it permitted the free flow of milk products across State borders; (2) it did not benefit in-state interests at the expense of out-of-state businesses; and (3) it imposed *de*

*AMICUS CURIAE* BRIEF IN OPPOSITION TO MOTION TO DISMISS

*minimis* costs given the industry-specific custom of  packaging in multiple, different containers.  *Id*. at 472-73.

California's egg farming regulation, in contrast, is substantially different from traditional packaging requirements.  As explained above, AB 1437 benefits California farmers at the expense of out-of-state farmers.  Furthermore, the costs imposed by California's farm practice standards cannot be described as *de minimis*.  That makes them categorically different from the packaging regulations in *Clover Leaf*:  In that case, milk manufacturers faced only minimal compliance costs because producers already packaged milk in different kinds of containers prior to enactment of the statute.  *Id*. at 472.  AB 1437, by contrast, requires farmers to retrofit entire production and poultry-housing facilities—all the while swallowing the combined costs of temporary arrangements and interim exclusion from the California market.

Egg-producers thus face a lose-lose-lose decision: Retrofit farms at great expense; sell noncompliant eggs and risk fine or imprisonment; or forego the gigantic California market altogether.  The costs imposed by AB 1437 more closely resemble the excessive and unconstitutional burdens invalidated in *Pike* than the *de minimis* costs in *Clover Leaf*.  *See Pike*, 397 U.S. at 140, 145.

## B.    AB 1437 Fails To Advance A Legitimate State Interest In Light Of Less Burdensome Alternatives.

California's regulations fail Pike balancing for another reason:  When an otherwise valid state statute does not respect territorial boundaries and burdens interstate commerce, it must advance a legitimate ***local*** interest through the least burdensome effective means available.  *See Pike*, 397 U.S. at 142.  This statute does not.

California claims that AB 1437 curbs the spread of Salmonella.  But Missouri alleges that this interest is pretextual, and consequently it cannot suffice on a motion to dismiss.  Indeed, California's purported Salmonella rationale is dubious at best, with even AB 1437 going only so far as to say that conventional farming "***may*** result in increased exposure to disease pathogens including salmonella."  Cal. Health & Safety Code

§ 25995(e) (West 2014) (emphasis added).  As Plaintiffs allege in their Complaint, "no scientific study conducted to date has found any correlation between cage size or stocking density and the incidence of Salmonella in egg-laying hens." Pls.' First Am. Compl. at ¶68 (citing Van Immersell, et. al., *Improving the Safety and Quality of Eggs and Egg Products* 112 (2011)).  In fact, "the most recent studies establish that there is no correlation between cage size or stocking density and stress levels in egg-laying hens" (increased stress in the hens being an ostensible cause of Salmonella and justification for AB 1437).  Pls.' First Am. Compl. at ¶ 68.  For the purposes of resolving California's Motion to Dismiss under *Pike*, the Court must assume that Plaintiffs are correct about the pretextual relationship between the egg farming practices at issue and Salmonella.

*Association des Eleveurs* is not to the contrary.  In that case, no party challenged the State's putative interest.  729 F.3d at 952.  And the Ninth Circuit barely considered it, concluding that the challengers in that case failed to make the requisite threshold showing of an undue burden on commerce.  *Id.*  Plaintiffs in this suit have challenged the State's putative interests in AB 1437, and it would be inappropriate to dismiss their suit before engaging in a detailed analysis of issues of material fact presented by the State's health and welfare purposes and the appropriateness of the means taken to execute them.

Thus, the facts alleged in the complaint are more than enough to state a claim under the *Pike* balancing framework to the dormant Commerce Clause and the Motion to Dismiss must be denied.

## CONCLUSION

For the foregoing reasons the State of California's Motion to Dismiss should be denied.

DATED:  July 25, 2014

Respectfully submitted,

/s/ Michael W. De Vries

Michael W. De Vries (SBN )
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Fax: (213) 680-8500

John C. O'Quinn (Pro Hac Vice Pending)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Joshua Hawley (Pro Hac Vice Pending)
Erin Morrow Hawley (Pro Hac Vice Pending)
MISSOURI LIBERTY PROJECT
5215 E. Highway 163
Columbia, MO 65201

Attorneys for Proposed Amicus Curiae
Missouri Liberty Project

*AMICUS CURIAE* BRIEF IN OPPOSITION TO MOTION TO DISMISS