UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF MISSOURI, et al., | No.  2:14-cv-00341-KJM-KJN |
| Plaintiffs, | |
| v. | ORDER |
| KAMALA D. HARRIS, et al., | |
| Defendants. | |

This case raises constitutional challenges to California legislation governing the sale of shell eggs.  The legislation, scheduled to take effect on January 1, 2015, bans the sale of shell eggs within California by producers or handlers if the eggs are the product of an egg-laying hen that was confined in an enclosure that fails to comply with certain animal care standards. Plaintiffs are six states who challenge the legislation as unconstitutional, saying it violates the Commerce and Supremacy Clauses of the United States Constitution.

On August 11, 2014, the court heard the separate motions to dismiss brought by defendants Kamala Harris and Karen Ross ("defendants") and defendant-intervenors the Association of California Egg Farmers ("ACEF") and the Humane Society of the United States ("HSUS").  John Hirth and Peggy Whipple appeared for plaintiffs; Susan Smith appeared for

/////

/////

1   defendants; Brian Boynton appeared for defendant-intervenor ACEF; and Bruce Wagman and

2   Rebecca Cary appeared for defendant-intervenor HSUS.[1]

3   After carefully considering the parties' papers and arguments, defendants' motions

4   to dismiss are GRANTED for lack of standing, without leave to amend.

5   I.      PROCEDURAL HISTORY

6   On February 3, 2014, the State of Missouri initiated this action asserting two

7   alternative causes of action under the federal Commerce and Supremacy Clauses.  Compl., ECF

8   No. 2 (relying on U.S. CONST. art. I, § 8, cl. 3 and U.S. CONST. art. VI, cl. 2).

9   On March 5, 2014, a first amended complaint was filed by the State of Missouri,

10  the State of Nebraska, the State of Oklahoma, the State of Alabama, the Commonwealth of

11  Kentucky and Terry Branstad, the Governor of the State of Iowa (collectively "plaintiffs").  First

12  Am. Compl. ("FAC"), ECF No. 13.

13  HSUS and ACEF filed motions to intervene on March 26, 2014 and April 8, 2014,

14  respectively.  ECF Nos. 27, 33.  On June 3, 2014, following the parties' briefing on the motions

15  to intervene, the court granted HSUS's alternative motion for permissive intervention and

16  ACEF's motion to intervene as of right.  ECF No. 57.

17  On April 9, 2014, defendants filed a motion to dismiss.  ECF No. 36.  HSUS

18  moved to dismiss plaintiffs' first amended complaint on March 26, 2014, ECF No. 27-2, and

19  ACEF moved to dismiss or alternatively for judgment on the pleadings on April 25, 2014, ECF

20  No. 45.  Plaintiffs filed a combined opposition to all three motions to dismiss on May 16, 2014.

21  ECF No. 54.  Defendants and defendant-intervenors HSUS and ACEF filed separate replies on

22  June 5, 2014.  ECF Nos. 58–60.

23  Amici I and Amici II filed motions for leave to file amicus curiae briefs on April

24  22, 2014 and June 10, 2014, respectively.  ECF Nos. 44, 63.  On July 1, 2014, the court granted

25  ───────────────

26  [1] The court notes the following parties were identified as present in the audience and observing the August 11, 2014 hearing:  Edward Johnson and Jonathon Townsend were present

27  for amici Animal Legal Defense Fund, Compassion Over Killing, Inc. and Farm Sanctuary, Inc. (collectively "Amici I") and Paige Tomaselli was present for amici Center For Food Safety, Consumers Union, Food & Water Watch, Food Animal Concerns Trust, Healthy Food Action, the

28  Institute for Agriculture and Trade Policy and Public Justice, P.C. (collectively "Amici II").

1   the motions.  ECF No. 70.  On July 2, 2014, both amici filed briefs in support of the outstanding

2   motions to dismiss.  ECF Nos. 71, 72.  On July 15, 2014, plaintiffs responded to the amici briefs,

3   ECF No. 75, and on July 22, 2014, ACEF and Amicis I and II filed a response thereto.  ECF Nos.

4   76, 77.

5            On July 25, 2014, amicus Missouri Liberty Project filed a motion for leave to file

6   an amicus curiae brief in opposition to defendants' motion to dismiss, which was granted by the

7   court on July 28, 2014.  ECF Nos. 82, 84.  Amicus Missouri Liberty Project filed its brief on July

8   29, 2014.  ECF No. 88.

9   II.      ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

10            Plaintiffs allege as follows in their first amended complaint.  The California

11   Legislature passed AB 1437, "which requires egg farmers in other states to comply with

12   behavior-based enclosure standards identical to those in [Proposition] 2 if they want to continue

13   selling their eggs in California."[2]  FAC ¶ 5.  As a result, "[e]gg producers in Missouri, Nebraska,

14   Oklahoma, Alabama, Kentucky, and Iowa face a difficult choice": "[e]ither they can incur

15   massive capital improvement costs to build larger habitats for some or all of their egg-laying

16   hens, or they can walk away from the largest egg market in the country."  Id. ¶ 6.  "[T]he people

17   most directly affected by California's extraterritorial regulation—farmers in our states who must

18   either comply with AB 1437 or lose access to the largest market in the United States—have no

19   representatives in California's Legislature and no voice in determining California's agricultural

20   policy."  Id. ¶ 7.

21            Plaintiffs bring this action and assert standing under the *parens patriae* doctrine[3]

22   because each plaintiff state "has quasi-sovereign interests in protecting its citizens' economic

23   health and constitutional rights as well as preserving its own rightful status within the federal

24   system."  Id. ¶¶ 10, 17, 22, 27, 32.  All plaintiffs posit each state's "economy and status within the

25   _____

26   [2] As explained below, Proposition 2 ("Prop 2") addresses the use of conventional cage-
   systems for housing egg-laying hens.  See FAC ¶¶ 56–57.

27   [3] The *parens patriae* doctrine is defined as: "A doctrine by which a government has
   standing to prosecute a lawsuit on behalf of a citizen, esp. on behalf of someone who is under a
28   legal disability to prosecute the suit."  BLACK'S LAW DICTIONARY 1221 (9th ed. 2009).

federal system will be irreparably injured if the California Legislature—who were not elected by, and are not answerable to, the people of [each plaintiff state]—is allowed to regulate and increase the cost of egg production in [each plaintiff state]." *Id.* ¶¶ 13, 19, 24, 29, 34.  With regard to the State of Missouri, "[a]lmost one third of [the] eggs" produced by Missouri's farmers are sold in California. *Id.* ¶ 12.  With regard to the State of Iowa, it is the "number one state in egg production" and "[a]pproximately 9.1% of [the state's] eggs . . . are sold in California." *Id.* ¶¶ 37–38, 53-54.  "The cost to Iowa farmers to retrofit existing housing or build new housing that complies with [AB 1437] would be substantial." *Id.* ¶ 41.  The increased cost of production "will have a detrimental impact upon and cause irreparable harm to Iowa's economy." *Id.* ¶ 43.  The States of Nebraska and Alabama are among the top fifteen largest egg producers in the United States. *Id.* ¶¶ 18, 23.  The States of Kentucky and Oklahoma produced 1.037 billion and 700 million eggs in 2012, respectively. *Id.* ¶¶ 28, 33.  "Precise figures on the number of eggs imported into California from other states are scarce, but University of California Poultry Specialist Don Bell identifies Alabama, Nebraska, and Kentucky among the states whose eggs account for another 5.6% of total California imports." *Id.* ¶ 55.

In 2008, California voters approved Prop 2 "'to prohibit the cruel confinement of farm animals' within California." *Id.* ¶ 56 (quoting FAC Ex. A, ECF No. 13-1).  Starting in 2015, Prop 2 will prohibit California egg producers from housing egg-laying hens in enclosures that prevent them from standing, lying down, turning around and fully extending their limbs, effectively banning the use of conventional cage-systems. *Id.* ¶ 57.  The cost of complying with Prop 2 "would have placed California egg producers at a significant competitive disadvantage when compared to egg producers in Missouri and other states." *Id.* ¶ 61.  "Faced with the negative impact Prop 2 would have on California's egg industry," the California Legislature passed AB 1437 in 2010, which requires out-of-state egg farmers to comply with the same requirements set forth in Prop 2. *Id.* ¶¶ 63–64.  The California Department of Food and Agriculture promulgated regulations establishing minimum dimensions, set forth in section 1350 of title 3 of the California Code of Regulations ("section 1350"). *Id.* ¶ 65.  Prop 2 provides "California egg farmers 2,249 days to come into compliance with its mandate" and AB 1437

4

provides plaintiffs' "egg farmers only 1,640 days" to comply. *Id.* ¶ 67. "The stated purpose of AB 1437 is 'to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress that may result in increased exposure to disease pathogens including salmonella.'" *Id.* ¶ 68. Plaintiffs allege the purpose of AB 1437 "was not to protect public health but rather to protect California farmers from the market effects of Prop 2 by 'leveling the playing field' for out-of-state egg producers." *Id.* ¶ 70.

Even assuming AB 1437 serves a legitimate public health purpose within California by limiting the methods of production of California-bound eggs outside California, plaintiffs allege the statute is "expressly and implicitly preempted by the Federal Egg Products Inspection Act," 21 U.S.C. § 1031, because one of its express purposes "is to protect human health in connection with the consumption of shell eggs." *Id.* ¶¶ 76–81.

AB 1437 "imposes a substantial burden on interstate commerce by forcing Plaintiffs' farmers either to forgo California's markets altogether or accept significantly increased production costs just to comply with California law." *Id.* ¶ 84.

> Those higher production costs will increase the price of eggs outside California as well as in. Because demand for eggs varies greatly throughout the year, egg producers in other states cannot simply maintain separate facilities for their California-bound eggs. In high-demand months, Plaintiffs' farmers may not have enough eggs to meet California demand if only a fraction of their eggs are produced in compliance with AB1437. In low-demand months, there may be insufficient California demand to export all compliant eggs, forcing Plaintiffs' farmers to sell those eggs in their own states at higher prices than their competitors. Given those inefficiencies, Plaintiffs' egg farmers must choose either to bring their entire operations into compliance with AB1437 so that they always have enough supply to meet California demand, or else simply leave the California marketplace.

*Id.* ¶ 85. The "necessary capital improvements" to comply with AB 1437 and section 1350 (collectively "shell egg laws") "will cost Plaintiffs' farmers hundreds of millions of dollars." *Id.* ¶ 86. Even choosing to forgo the California market will impose a substantial burden on interstate

/////

/////

1   commerce because plaintiffs' farmers would produce a surplus of eggs resulting in a decrease in

2   the price of eggs "and potentially forcing some [of plaintiffs' egg] producers out of business." *Id.*

3   ¶ 88.

4          Plaintiffs' action is ripe for review because "the injury to Plaintiffs' farmers is

5   certainly impending" as "any of [plaintiffs'] farmers who continue to export their eggs to

6   California will face criminal sanctions beginning January 1, 2015 unless they take action now to

7   come into compliance by the law's effective date." *Id.* ¶ 89 (quotations and citation omitted).

8   "Whichever path they follow, an incorrect choice spells doom for their businesses.  Coming into

9   compliance will necessarily increase productions [sic] costs; if the law is eventually struck down,

10  the farmer will not be able to compete with egg producers still using cage-systems." *Id.* ¶ 92.

11         With regard to a violation of the Commerce Clause, plaintiffs allege (1) AB 1437

12  and section 1350 "are protectionist measures intended to benefit California egg producers at the

13  expense of Plaintiffs' egg producers by eliminating the competitive advantage [their] producers

14  would enjoy once Prop 2 becomes effective;" (2) the provisions "have the purpose and effect of

15  regulating conduct" outside California; and (3) they "impose a substantial burden on interstate

16  commerce by forcing Plaintiffs' egg producers either to increase their production costs . . . or

17  forgo the largest market in the United States" with no legitimate state purpose.  *Id.* ¶¶ 96–101.

18         With regard to plaintiffs' alternative Supremacy Clause claim, plaintiffs allege

19  even if the court finds AB 1437 and section 1350 serve a legitimate, non-discriminatory purpose,

20  "the statute and regulations would be in conflict with the express terms of 21 U.S.C. § 1052(b)."

21  *Id.* ¶ 103.  "[B]ecause Congress evidenced its intention to occupy the entire field of regulations

22  governing the quality and condition of eggs by imposing uniform national standards, the Federal

23  Egg Products Inspection Act . . . implicitly preempts" AB 1437 and section 1350.  *Id.* ¶ 104.

24  III.    THE SHELL EGG LAWS

25         A.      Section 1350

26         California's shell egg food safety regulation provides for the implementation of

27  specified requirements "to assure that healthful and wholesome eggs of known quality are sold in

28  California . . . ."  FAC Ex. H, ECF No. 2-8; *see also* Cal. Code Regs. tit. 3, § 1350.  Under

section 1350(c), egg producers or handlers shall incorporate three specified provisions aimed at

the prevention of *Salmonella* contamination in shell eggs:

> (1) Implement *Salmonella enterica* serotype Enteritidis (SE) prevention measures in accordance with the Food and Drug Administration, Department of Health and Human Services' requirements for the production, storage, and transportation of shell eggs as specified in 21 CFR Part 118;
>
> (2) Implement a SE environmental monitoring program . . .; and
>
> (3) Implement and maintain a vaccination program to protect against infection with SE . . . .

Cal. Code Regs. tit. 3, § 1350(c)(1)–(3).

Section 1350 also provides for specific confinement specifications for egg-laying

hens:

> (d) Commencing January 1, 2015, no egg handler or producer may sell or contract to sell a shelled egg for human consumption in California if it is the product of an egg-laying hen that was confined in an enclosure that fails to comply with the following standards. For purposes of this section, an enclosure means any cage, crate, or other structure used to confine egg-laying hens:
>
> (1) An enclosure containing nine (9) or more egg-laying hens shall provide a minimum of 116 square inches of floor space per bird. Enclosures containing eight (8) or fewer birds shall provide a minimum amount of floor space per bird as follows, using formula $322+[(n-1) \times 87.3]/n$, where "n" equals the number of birds:

| Number of Birds | Square Inches Per Bird |
| --- | --- |
| 1 | 322 |
| 2 | 205 |
| 3 | 166 |
| 4 | 146 |
| 5 | 135 |
| 6 | 127 |
| 7 | 121 |
| 8 | 117 |

*Id.* § 1350(d).

  **B.**  **Assembly Bill 1437**

Assembly Bill 1437 was approved by the Governor of California on July 6, 2010.

FAC Ex. D, ECF No. 13-4; *see also* CAL. HEALTH & SAFETY CODE § 25995.  The legislative

*/////*

7

findings and declarations regarding treatment of egg-laying hens read as follows:

> (a) According to the Pew Commission on Industrial Farm Production, food animals that are treated well and provided with at least minimum accommodation of their natural behaviors and physical needs are healthier and safer for human consumption.
>
> (b) A key finding from the World Health Organization and Food and Agricultural Organization of the United Nations Salmonella Risk Assessment was that reducing flock prevalence results in a directly proportional reduction in human health risk.
>
> (c) Egg-laying hens subjected to stress are more likely to have higher levels of pathogens in their intestines and the conditions increase the likelihood that consumers will be exposed to higher levels of food-borne pathogens.
>
> (d) Salmonella is the most commonly diagnosed food-borne illness in the United States.
>
> (e) It is the intent of the Legislature to protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella.

CAL. HEALTH & SAFETY CODE § 25995.  Beginning on January 1, 2015, "a shelled egg shall not be sold or contracted for sale for human consumption in California if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in Chapter 13.8 (commencing with Section 25990)."  *Id.* § 25996.  The prohibitions set forth in Chapter 13.8, titled "Farm Animal Cruelty," state:

> In addition to other applicable provisions of law, a person shall not tether or confine any covered animal, on a farm, for all or the majority of any day, in a manner that prevents such animal from:
>
> (a) Lying down, standing up, and fully extending his or her limbs; and
>
> (b) Turning around freely.

CAL. HEALTH & SAFETY CODE § 25990.  An "egg-laying hen" is defined as "any female domesticated chicken, turkey, duck, goose, or guinea fowl kept for the purpose of egg production."  *Id.* § 25991(c).  "Enclosure" is defined as "any cage, crate, or other structure

8

1   (including what is commonly described as . . . a 'battery cage' for egg-laying hens) used to

2   confine a covered animal." *Id.* § 25991(d).  "Farm" is defined as "the land, building, support

3   facilities, and other equipment that are wholly or partially used for the commercial production of

4   animals or animal products used for food or fiber; and does not include live animal markets." *Id.*

5   § 25991(e).

6         A violation of the law constitutes a misdemeanor and is punishable with a fine of

7   not more than $1,000 or imprisonment for not more than 180 days or both.  *Id.* § 25997.  The

8   regulation states the provisions "are in addition to, and not in lieu of, any other laws protecting

9   animal welfare, including the Penal Code.  This chapter shall not be construed to limit any state

10  law or regulation protecting the welfare of animals, nor shall anything in this chapter prevent a

11  local governing body from adopting and enforcing its own animal welfare laws and regulations."

12  *Id.* § 25997.1.

13  IV.     LEGAL STANDARDS FOR A MOTION TO DISMISS FOR LACK OF STANDING

14        The jurisdiction of the federal courts is limited to resolving cases and

15  controversies.  U.S. CONST. art. III, § 2, cl. 1; *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

16  Because of this limited jurisdiction, cases lie outside the jurisdiction of the court unless proven

17  otherwise.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 376–78 (1994).  There are a

18  number of "doctrines that cluster about Article III," including standing and ripeness, that may

19  support a challenge to subject matter jurisdiction raised by either party or sua sponte by the court.

20  *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quotations and citation omitted); Fed. R. Civ. P.

21  12(b)(1).  A Rule 12(b)(1) jurisdictional attack may be either facial or factual.  *White v. Lee*, 227

22  F.3d 1214, 1242 (9th Cir. 2000) (citation omitted).  In a facial attack, as in this action, the

23  complaint is challenged on its face as failing to support federal jurisdiction, whereas, in a factual

24  attack, the challenger provides evidence, through affidavits or otherwise, that an alleged fact is

25  false resulting in a lack of subject matter jurisdiction.  *See Safe Air for Everyone v. Meyer*, 373

26  F.3d 1035, 1039 (9th Cir. 2004).  In a facial attack, allegations in the complaint are taken as true

27  and construed in the light most favorable to a plaintiff.

28  /////

9

1   V.      ANALYSIS

2          A.      Standing Under The *Parens Patriae* Doctrine

3                  i.       The Parties' Arguments

4          Plaintiffs bring this action in their capacity as *parens patriae*, asserting they have

5   standing because each plaintiff State "has quasi-sovereign interests in protecting its citizens'

6   economic health and constitutional rights as well as preserving its own rightful status within the

7   federal system."  FAC ¶¶ 10, 17, 22, 27, 32.  Defendants challenge plaintiffs' standing to pursue

8   their Commerce Clause and Supremacy Clause claims as *parens patriae*, arguing they fail to

9   allege an "interest apart from the private egg producers."  ECF No. 36 at 13.  Defendants assert

10  plaintiffs fail to allege a quasi-sovereign interest because the first amended complaint does not

11  properly allege an injury to a sufficiently substantial segment of the plaintiff states' populations.

12  *Id.* at 14 (quoting *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.* (*Table Bluff*), 256

13  F.3d 879, 885 (9th Cir. 2001)).

14         HSUS and ACEF also move to dismiss plaintiffs' first amended complaint for lack

15  of standing.  HSUS argues, in part, plaintiffs cannot bring this case "on behalf of an unspecified

16  number of unnamed egg producers from their states."  ECF No. 27-2 at 11–13.  Similarly, ACEF

17  argues "to the extent the complaint alleges any injury at all, . . . it is limited to the economic harm

18  that would allegedly befall some unspecified egg farmers residing within their borders who may

19  intend to sell eggs in California after January 1, 2015 . . . ."  ECF No. 45-1 at 16 (noting "for all

20  their emphasis on the egg producers within their territories, [p]laintiffs never disclose how many

21  companies belong in this limited group").

22         Plaintiffs oppose, arguing they have "sufficiently alleged injury to quasi-sovereign

23  interests" because they "have alleged an effort to restrain interstate commerce by imposing higher

24  costs on [their] producers if they want to compete in California."  ECF No. 54 at 21.  Plaintiffs

25  further argue, "California's disruption of the egg supply and the fluctuation of egg prices that

26  disruption will cause in [p]laintiff States are 'matter[s] of grave public concern . . . .'"  *Id.* at 22

27  (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 591 (1923)).  Plaintiffs also rely on *Alfred*

28  *L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez* (*Snapp*), 458 U.S. 592 (1982), in support of

10

1  their argument "challeng[ing] the violation of [their] citizens' right under the Commerce Clause

2  to the free flow of goods across state lines without undue burdens imposed by individual states."

3  ECF No. 54 at 22.

4            During the hearing on the motions to dismiss, plaintiffs averred they are not

5  bringing this action on behalf of the egg industry alone, but rather on behalf of each state's

6  residents, explaining "all of the quantifiable things that we could allege in the complaint will

7  affect the production of eggs . . . [b]ut our claim is larger than . . . simply harm to the egg

8  producers." Hr'g Tr. at 3, ECF No. 91.[4]  Plaintiffs argued "this case is actually about . . . one

9  state's decision to protect its farmers from competition by closing its borders to its sister states

10 unless they submit to regulation without representation." *Id.* at 4.  Plaintiffs posited during the

11 hearing "that the California egg laws that [they] are challenging effectively remove from the

12 people of Missouri the ability to set public policy themselves regarding agricultural regulations.

13 And -- if they want to participate in the California marketplace." *Id.* at 4–5.  Plaintiffs offered

14 *Snapp* as their best authority in support of their argument, explaining that in this action, "we are

15 talking about a statute that effectively blocks, at the California border, eggs from out of state that

16 don't comply with California's own notions of proper animal husbandry." *Id.* at 7.  In that regard,

17 plaintiffs argued non-residents do not have "political recourse" if they disagree with the policy.

18 *Id.* at 8.  Plaintiffs further clarified the issue they raise in this action is "the right of the people to

19 participate in the laws that govern them." *Id.*  Plaintiffs provided the following analogy to best

20 explain their position:

21            [I]magine that the State of Missouri decides to enact legislation that
             requires all grapes to be harvested by people with Bachelor's
22           degrees or greater in horticulture or viticulture and, in addition to
             that, passes a law that says you can't sell the product of a grape
23           unless it was harvested by someone with a Bachelor's degree or a
             Master's degree in Missouri.
24
             . . . .
25

26

27  _____

28       [4] References to the motion hearing transcript use the transcript page number, not the
    corresponding ECF page number.

11

1

2

3

> So if you had a California farmer or a California wine producer who sells a third of its wine into Missouri . . . what does that person do?  Do they -- they have several options.  They can reduce their production . . . [t]hey can lower all of their prices . . . [o]r they can acquiesce to Missouri's regulations.

4

> . . . .

5

6

7

> The problem there is because they cannot -- they have no way -- that vintner has no way of challenging Missouri law in a political process, the only thing they can do is urge their own legislature to retaliate.

8    *Id.* at 9–10.  Plaintiffs argued AB 1437 is "an attempt by California to say in Missouri you have to

9    follow this set of procedures so that when your eggs show up at the border, we will let them in."

10   *Id.* at 37.  Plaintiffs pointed to paragraphs seven and thirteen of the first amended complaint in

11   support of their standing argument.[5]  *Id.* at 40.  Plaintiffs argued they cannot point to "how much

12   money our folks have lost because the law hasn't gone into effect yet," but they have sufficiently

13   alleged "we have to make a choice now" and "it would cost about 120 million dollars in capital

14   improvements."  *Id.* at 41–42.  Plaintiffs explained to the court the egg producers in their states

15   already "have gambled one way or another," either choosing to come into compliance with

16   California's law or choosing not to come into compliance.  *Id.* at 43.  Finally, plaintiffs argued,

17   "the other issue here with having no voice in the law is if our folks spend 120 million dollars to

18   ─────────────────────

19             [5] Paragraph seven alleges:

20

21

22

23

> By conditioning the flow of goods across its state lines on the method of their production, California is attempting to regulate agricultural practices beyond its own borders. Worse, the people most directly affected by California's extraterritorial regulation-farmers in our states who must either comply with AB1437 or lose access to the largest market in the United States-have no representatives in California's Legislature and no voice in determining California's agricultural policy.

24   FAC ¶ 7.  Paragraph thirteen alleges:

25

26

27

> Missouri's economy and status within the federal system will be irreparably injured if the California Legislature-who were not elected by, and are not answerable to, the people of Missouri-is allowed to regulate and increase the cost of egg production in Missouri.

28   FAC ¶ 13.

1   come into compliance, and then next year the California legislature amends the law again, well,

2   then we'd have to go through the whole process, and we have no political way of blocking that

3   law from being changed." *Id.* at 44.

4         ii.     Legal Standards

5         "Whether a party has a sufficient stake in an otherwise justiciable controversy to

6   obtain judicial resolution of that controversy is what has traditionally been referred to as the

7   question of standing to sue." *Sierra Club v. Morton*, 405 U.S. 727, 731–32 (1972).  "[A] plaintiff

8   must demonstrate standing for each claim he seeks to press" and "separately for each form of

9   relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) (citations omitted).  In

10  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme Court defined "the

11  irreducible constitutional minimum of standing."  First, there must be an invasion of plaintiffs'

12  legally protected interest, an injury-in-fact, which is both concrete and particularized and actual

13  and imminent; second, there must be a causal connection between the injury and the challenged

14  conduct; and third, it must be likely that the injury will be redressed by a decision in plaintiffs'

15  favor.  *Id.* at 560–61; *see also Cigarettes Cheaper! v. State Bd. of Equalization*, No. 2:11–CV–

16  00631–JAM–EFB, 2011 WL 2560214, at *1 (E.D. Cal. June 28, 2011).  It is plaintiffs' burden to

17  establish their standing to sue.  *Lujan*, 504 U.S. at 560.

18        "The Supreme Court has recognized that 'States are not normal litigants for the

19  purposes of invoking federal jurisdiction,' and have interests and capabilities beyond those of an

20  individual by virtue of their sovereignty." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 970 (9th

21  Cir. 2009) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)).

22        Under the doctrine of *parens patriae*, a State cannot establish standing if it is "only

23  a nominal party without a real interest of its own." *Snapp*, 458 U.S. at 600.  "Rather, to have such

24  standing the State must assert an injury to what has been characterized as a 'quasi-sovereign'

25  interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Id.*

26  at 601.  "Although the Supreme Court has never clearly defined what constitutes a quasi-

27  sovereign interest, it does not include 'sovereign interests, proprietary interests, or private

28  interests pursued by the State as a nominal party.'" *Dep't of Fair Emp't & Hous. v. Lucent*

1   *Techs., Inc.*, 642 F.3d 728, 737 n.2 (9th Cir. 2011) (quoting *Snapp*, 458 U.S. at 602).  Rather, it

2   "consist[s] of a set of interests that the State has in the well-being of its populace."  *Snapp*,

3   458 U.S. at 602.  "A quasi-sovereign interest must be sufficiently concrete to create an actual

4   controversy between the State and the defendant."  *Id.*  In other words, "'[p]arens patriae'

5   standing allows a sovereign to bring suit on behalf of its citizens when the sovereign 'allege[s]

6   injury to a sufficiently substantial segment of its population,' 'articulate[s] an interest apart from

7   the interests of particular private parties,' and 'express[es] a quasi-sovereign interest.'"  *Table*

8   *Bluff*, 256 F.3d at 885 (quoting *Snapp*, 458 U.S. at 607).  While such interests are "a matter for

9   case-by-case development,"

10
11   > [t]hese characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general. Second, a State
12   > has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

13   *Snapp*, 458 U.S. at 602.  As the Ninth Circuit has explained:

14
15   > Generally, a state has been granted standing under the *parens patriae* doctrine in situations involving the abatement of public
16   > nuisances, such as global warming, flooding, or noxious gases. *See Massachusetts*, 549 U.S. 497, 127 S. Ct. 1438 (2007)
17   > (Massachusetts had standing to sue the EPA for failing to issue rules regarding the emission of greenhouse gases); *North Dakota v. Minnesota*, 263 U.S. 365, 44 S. Ct. 138, 68 L. Ed. 342 (1923)
18   > (North Dakota had standing to sue Minnesota for allegedly creating conditions leading to flooding of farmland); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 27 S. Ct. 618, 51 L. Ed. 1038 (1907)
19   > (Georgia had standing to sue for an injunction to prevent the defendant copper companies from discharging noxious gases over
20   > Georgia's territory). In other cases, states have been granted standing to represent the economic interests of their residents. *See*
21   > *Snapp*, 458 U.S. 592, 102 S. Ct. 3260 (Puerto Rico had standing to sue defendant apple farmers for subjecting its workers to conditions
22   > more burdensome than those established for temporary foreign workers in violation of the Wagner–Peyser Act); *Georgia v. Pa. R. Co.*, 324 U.S. 439, 65 S. Ct. 716, 89 L. Ed. 1051 (1945) (Georgia
23   > had standing to bring suit against railroads for conspiracy to fix freight rates in a manner that discriminated against Georgia
24   > shippers in violation of federal antitrust law); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S. Ct. 658, 67 L. Ed. 1117 (1923)
25   > (Pennsylvania had standing to sue for an injunction preventing West Virginia from giving other states a preferential right of
26   > purchase and curtailing the supply of gas carried to Pennsylvania).
27
28   > As the Supreme Court noted in *Snapp*, the common thread among these cases is each state's quasi-sovereign interest in the health and

14

well-being of its residents and a quasi-sovereign interest in "not being discriminatorily denied its rightful status within the federal system." 458 U.S. at 607 . . . .

*Oregon*, 552 F.3d at 970–71.  Before establishing these requirements, plaintiffs "still must allege injury in fact to the citizens they purport to represent as *parens patriae*."  *Table Bluff*, 256 F.3d at 885.

### iii.    Analysis

#### a.    Injury in Fact to Citizenry

With regard to the threshold requirement, that plaintiffs "must allege injury in fact to the citizens they purport to represent as *parens patriae*," *id.*, plaintiffs fail to allege how the citizens of each state are in fact injured by AB 1437.  While plaintiffs allege the egg farmers in each state may suffer an injury in the form of increased costs of production, this injury does not affect the citizens plaintiffs purport to represent.  *See, e.g.*, Hr'g Tr. at 4 (explaining during oral argument plaintiffs are "appearing as *parens patriae* in the interest of [their] citizens").  In fact, as plaintiffs allege, AB 1437 applies only to egg producers, not plaintiffs' residents in general.  FAC ¶ 5 (alleging California passed AB 1437, "which requires egg farmers in other states to comply with behavior-based enclosure standards identical to those in Prop 2 if they want to continue selling their eggs in California"); *see also id.* ¶ 61 (alleging AB 1437 requires out-of-state egg farmers to comply with the same requirements set forth in Prop 2).  To the extent plaintiffs argue the implementation of AB 1437 may result in an increase in the cost of eggs, which may injure their citizens who are egg consumers, this argument is without merit.  First, the allegations in plaintiffs' complaint point to a potential decrease in the cost of eggs, FAC ¶ 88, which may benefit plaintiffs' citizens rather than injure them.  Second, even assuming plaintiffs' citizens may be faced with an increase in the cost of eggs, this speculative argument alone does not satisfy the requirement of showing an injury in fact.  *Table Bluff*, 256 F.3d at 885 (citing with approval the reasoning in *Hise v. Philip Morris, Inc.*, 46 F. Supp. 2d 1201, 1209–10 (N.D. Okla. 1999), "that no constitutional injury occurs when a manufacturer passes on higher costs in the form of price increases").

/////

15

1    With regard to whether plaintiffs have sufficiently alleged interests apart from

2    those of private parties, *see Table Bluff*, 256 F.3d at 885, the allegations in the first amended

3    complaint amount only to generalized grievances on behalf of plaintiffs' egg farmers and

4    potential injuries the farmers face as a result of the shell egg laws.  Other than plaintiffs'

5    conclusory allegation that each plaintiff State "has quasi-sovereign interests in protecting its

6    citizens' economic health and constitutional rights as well as preserving its own rightful status

7    within the federal system," FAC ¶¶ 10, 17, 22, 27, 32, plaintiffs fail to set forth any allegations

8    that support a finding they are bringing this action to protect their citizens' economic health or the

9    well-being of each state's populace.  *Snapp*, 458 U.S. at 602.  Rather, the allegations throughout

10   the first amended complaint specifically focus on the impact of AB 1437 on plaintiffs' egg

11   farmers.  *See, e.g.*, FAC ¶ 7 ("the people most directly affected by California's extraterritorial

12   regulation [are the] farmers in our states").  If there were any doubt, plaintiffs clarify in their

13   opposition brief that "[p]laintiffs here have alleged an effort to restrain interstate commerce by

14   imposing higher costs on our producers if they want to compete in California."  ECF No. 54 at 21.

15   A finding that plaintiffs are not bringing this action on behalf of a substantial

16   segment of their populations is further bolstered by plaintiffs' representations to the court during

17   oral argument, that not all of their egg farmers have chosen to forgo compliance with AB 1437.

18   Hr'g Tr. at 43–44 ("All of the producers in our states have gambled one way or another.  They've

19   -- if they have not come into compliance, they have gambled that the law will be struck down . . .

20   . If they have come into compliance, they have gambled that the statute will be upheld because

21   they would have invested hundreds of millions of dollars in the bringing their -- their facilities

22   into compliance . . . .  And because of the lag time, I think a lot of them have made the choice one

23   way or the other.").  In other words, a fair construction of the complaint is that plaintiffs bring this

24   action on behalf of only those egg farmers who have not brought their farming procedures into

25   compliance with California's laws and regulations.  A subset of plaintiffs' egg farmers is not

26   tantamount to the citizenry of plaintiffs' states and the court "cannot accept such a claim as 'an

27   interest apart from the interests of particular private parties.'"  *Oregon*, 552 F.3d at 974 (quoting

28   *Snapp*, 458 U.S. at 607); *see also Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335 (1st

1   Cir. 2000) (*parens patriae* "is a judicially created exception that has been narrowly construed").

2   The court concludes plaintiffs have not brought this action on behalf of their interest in the

3   physical or economic well-being of their residents in general, but rather on behalf of a discrete

4   group of egg farmers whose businesses will allegedly be impacted by AB 1437.  Plaintiffs are

5   therefore only nominal parties without real interests of their own.  *Snapp*, 458 U.S. at 600.

6                              b.  Quasi-Sovereign Interests

7           With regard to whether plaintiffs have sufficiently articulated quasi-sovereign

8   interests, *see Table Bluff*, 256 F.3d at 885, they argue "[a]s in [*Georgia v. Pa. R. Co.*], . . .

9   Plaintiffs here have alleged an effort to restrain interstate commerce by imposing higher costs on

10  our producers if they want to compete in California."  ECF No. 54 at 21.  Further, plaintiffs state

11  that, similar to *Georgia*, these restraints will shackle each state's industries and relegate the states

12  to an inferior economic position compared to states unaffected by California's shell egg laws.  *Id.*

13  Plaintiffs also claim, as in *Pennsylvania*, 262 U.S. at 592, the health, comfort, and welfare of

14  plaintiffs' citizens are "seriously jeopardized by the threatened [disruption of] the supply of [a

15  vital commodity] in the interstate stream."  *Id.* at 22 (alterations in original).  Finally, plaintiffs

16  argue "[t]he gravamen of the Amended Complaint is that California is attempting to regulate

17  conduct that occurs in [plaintiffs' states]," and, consequently, plaintiffs' citizens have been left

18  "at the mercy of legislators they did not elect and cannot vote out of office."  *Id.*  In response to

19  this attempted regulation in violation of the Commerce Clause, plaintiffs claim they "assert the

20  same quasi-sovereign interest identified by Puerto Rico in *Alfred L. Snapp & Son*—preserving

21  our rightful place as co-equal sovereigns in our federal system."  *Id.*

22          Plaintiffs' analogies are inapt.  In *Georgia*, the plaintiff set forth numerous

23  allegations concerning the general effects the defendants' conduct would have on the state's

24  citizens and economy, including "limit[ing] in a general way the Georgia economy to staple

25  agricultural products, . . . restrict[ing] and curtail[ing] opportunity in manufacturing, shipping and

26  commerce, and . . . prevent[ing] the full and complete utilization of the natural wealth of the

27  State."  *Georgia*, 324 U.S. at 444.  Unlike the extensive allegations made in *Georgia*, plaintiffs

28  here have presented no allegations concerning the effects of California's shell egg laws on the

1    states' general populations beyond fluctuating egg prices that may in fact result in lower egg

2    prices for consumers in the Midwest.  ECF No. 13 at 20.  As already noted, plaintiffs' remaining

3    allegations exclusively concern plaintiffs' farmers, which plaintiffs have not demonstrated are a

4    "sufficiently substantial segment" of their populations.  *Snapp*, 458 U.S. at 607.  Far from

5    "shackling" plaintiffs' industries, plaintiffs have alleged nothing to suggest California's shell egg

6    laws will detrimentally affect anyone outside of an identifiable group of individual egg farmers.

7          Plaintiffs also attempt to equate the withdrawal of gas in *Pennsylvania* to a

8    potential "disruption" in the supply of eggs within plaintiffs' borders.  However, *Pennsylvania*

9    concerned the total withdrawal of gas by West Virginia from the Pennsylvania market; gas was a

10   vital commodity used and depended upon by millions of citizens. *Pennsylvania*, 262 U.S. at 553.

11   To change to another fuel source would have cost more than $100 for each domestic consumer

12   and more than $100 million in 1923 dollars between the plaintiff states of Pennsylvania and Ohio.

13   *Id.*  Plaintiffs here allege nothing to suggest eggs are a vital commodity necessary to preserve

14   plaintiffs' citizens' health, comfort and welfare.  Even if plaintiffs had alleged such additional

15   facts, plaintiffs fundamentally allege only potential "disruptions" in the supply of eggs, not the

16   total withdrawal of this commodity from the plaintiff states.  As noted, potential changes in

17   supply and demand could result in price fluctuations that may even benefit the majority of

18   plaintiffs' citizens at times.  These allegations do not establish an inability for citizens to obtain a

19   vital resource or purchase a substitute good.

20         Similarly, plaintiffs' comparison to *Snapp* is premised on defendants' alleged

21   violation of the Commerce Clause.  However, in *Snapp*, the Commonwealth of Puerto Rico

22   established *parens patriae* standing to "pursue the interests of its residents in the

23   Commonwealth's full and equal participation in the federal employment service scheme

24   established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of

25   1952."  *Snapp*, 458 U.S. at 609.  The Commonwealth brought its claim based on allegations of a

26   violation of certain federal acts that guaranteed employment benefits.  *Id.* at 609–10.  Here,

27   plaintiffs do not assert a quasi-sovereign interest in assuring their residents benefit from

28   identifiable federal legislation. *Cf. Maryland v. Louisiana*, 451 U.S. 725, 737–39 (1981) (finding

1    Maryland maintained a quasi-sovereign interest in securing benefits of the Natural Gas Act for its

2    residents).  Indeed, as noted above, plaintiffs bring this action on behalf of egg farmers, not the

3    general populace of their states.  Plaintiff states' conclusory allegation that each has a quasi-

4    sovereign interest in "preserving its own rightful status within the federal system," FAC ¶¶ 10,

5    17, 22, 27, 32, without more, is insufficient to establish *parens patriae* standing.

6            Finally, plaintiffs argue that if their egg farmers choose to withdraw from the

7    California egg market, resulting in a flood of the "markets in the remaining 49 states with surplus

8    eggs while artificially driving up the price of eggs in California," this would "negatively impact

9    anyone employed in egg production or sales" in plaintiffs' states.  ECF No. 54 at 25; *see also*

10   Hr'g Tr. at 39–40 (arguing other people such as egg transporters and distributers are affected by

11   the price of eggs).  Plaintiffs continue that while the number of egg producers in one plaintiff

12   state may be small, "the number of egg consumers in each state numbers in the millions" and

13   those consumers are affected by California's shell egg laws.  ECF No. 54 at 25 (emphasis

14   omitted).

15           To the extent plaintiffs argue the first amended complaint establishes a quasi-

16   sovereign interest based on each state's egg consumers' economic well-being, this argument fails.

17   As noted, the first amended complaint does not allege an injury to consumers as a result of the

18   shell egg laws but rather an injury to plaintiffs' egg farmers.  The section of the first amended

19   complaint where plaintiffs address a potential increase in the price of eggs focuses on the impact

20   of a potential increase on plaintiffs' egg farmers, alleging the higher production costs may

21   ultimately "forc[e] Plaintiffs' farmers to sell those eggs in their own states at higher prices than

22   their competitors," FAC ¶ 85, which "will cost Plaintiffs' farmers hundreds of millions of

23   dollars," *id.* ¶ 86.  At the same time, plaintiffs allege a decrease in the market price of eggs, which

24   would presumably benefit plaintiffs' consumers, that will potentially force some of plaintiffs' egg

25   producers out of business.  *Id.* ¶ 88.  These allegations fail to establish a quasi-sovereign interest

26   in the economic well-being of plaintiffs' egg consumers but rather assert an interest in plaintiffs'

27   egg farmers' businesses.  In sum, plaintiffs fail to articulate how this action would benefit

28   plaintiffs' residents in general as egg consumers.  *See, e.g.*, *Ohio v. GMAC Mortg., LLC*, 760 F.

1  Supp. 2d 741, 784 (N.D. Ohio 2011) (noting "[t]he fact that the State chose to act on behalf of a

2  group of residents . . . does not, by itself, automatically turn the action into an action that benefits

3  all Ohio consumers" (quotations omitted)).  Plaintiffs therefore lack standing to pursue their

4  claims in this action under the *parens patriae* doctrine.  *Oregon*, 552 F.3d at 974.

5          B.      Justiciability

6                  1.      Arguments and Relief Requested

7                  Plaintiffs argue their complaint "presents a case or controversy ripe for review,"

8  FAC at 21, because California's shell egg laws "have already caused 'concrete, particularized,

9  and actual' injury to Plaintiffs, and additional injury is 'clearly impending.'" ECF No. 54 at 23.

10  Plaintiffs claim that, "[a]bsent some additional action by . . . this Court, any of our farmers who

11  continue to export their eggs to California will face criminal sanctions beginning January 1, 2015

12  unless they take action now to come into compliance by the law's effective date." FAC ¶ 89.

13  They argue at least 1.5 billion eggs were exported by plaintiffs' farmers to California in 2012 and,

14  thus, "it is hardly speculative for Plaintiffs to allege that a similar number would be shipped to

15  California again in 2015." ECF No. 54 at 23.  Further, plaintiffs argue it is not speculative "to

16  allege that the vast majority of eggs produced in Plaintiff States . . . do not comply with AB1437

17  and §1350." *Id.*  Rather, plaintiffs claim "[i]f history is any predictor of future events, it is

18  eminently reasonable for the court to infer that egg producers in Plaintiffs [sic] States would

19  continue to ship 1.5 billion eggs to California per year but for AB1437 and §1350." *Id.* at 23

20  (emphasis omitted).  Plaintiffs also make reference to the criminal provisions of AB 1437, noting

21  the law "provides that a violation of § 25996 shall constitute a misdemeanor punishable by up to a

22  $1,000 fine and 180 days in county jail." FAC ¶ 64.  Finally, plaintiffs contend it is not

23  "speculative that AB1437 and §1350 will become effective on January 1, 2015 or that Defendants

24  will carry out their oaths to enforcement [sic] them." ECF No. 54 at 23.

25                  Plaintiffs seek declaratory and injunctive relief based on the Declaratory Judgment

26  Act.  FAC ¶ 105.  The Act provides in "a case of actual controversy within its jurisdiction, . . .

27  any court of the United States, upon the filing of any appropriate pleading, may declare the rights

28  and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

1    However, "[t]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is

2    not sufficient to create a 'case or controversy' within the meaning of Article III, and is thus

3    insufficient to satisfy the 'actual controversy' requirement of the Declaratory Judgment Act." *W.*

4    *Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir. 1981).

5            When questioned during the hearing regarding any imminent injury flowing from

6    AB 1437, plaintiffs argued they do not have an affidavit itemizing which egg farmers intend to

7    sell eggs in California; but the court "should take everything that we allege as true and then

8    decide whether there is a -- whether we've stated a claim." Hr'g Tr. at 23.  Plaintiffs referred the

9    court to egg sales from last year, arguing the court can infer, for example, Missouri egg farmers

10   will continue to sell one third of their eggs in California.  *Id.*  Finally, plaintiffs argued:

11           The -- if we were required, in order to bring this claim, to predict in
             advance the harm that will occur next year in a quantifiable
12           number, you know, if -- and, in fact, to some extent I have done that
             by saying 120 million dollars is the cost of doing this.  That is one
13           potential harm.  But there are also harms related to the loss of sale
             [sic].  Those are things that have not happened but they are clearly
14           impending.

15   *Id.* at 44.

16           2.      Analysis

17           Regarding questions of justiciability, "[w]hether framed as an issue of standing or

18   ripeness, the inquiry is largely the same: whether the issues presented are 'definite and concrete,

19   not hypothetical or abstract.'"  *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)

20   (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)).

21   "Where a dispute hangs on future contingencies that may or may not occur, it may be too

22   impermissibly speculative to present a justiciable controversy."  *In re Coleman*, 560 F.3d 1000,

23   1005 (9th Cir. 2009) (citation and internal quotations omitted).  "[W]hile it is well-established

24   that an individual need not await prosecution under a law or regulation before challenging it, we

25   require a genuine threat of imminent prosecution and not merely an imaginary or speculative fear

26   of prosecution."  *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 772–73 (9th Cir. 2006)

27   (citation and internal quotations marks omitted).

28   /////

When evaluating whether a claimed threat of prosecution is genuine, we consider:

> (1) whether the plaintiff has articulated a concrete plan to violate the law in question; (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the challenged statute.

*Wolfson*, 616 F.3d at 1058 (citing *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126–28 (9th Cir. 1996)).  "Plaintiffs bear the burden of showing that the [law in question] is actually being enforced.  A specific warning of an intent to prosecute under a criminal statute may suffice to show imminent injury and confer standing," but "a general threat of prosecution is not enough to confer standing."  *San Diego*, 98 F.3d at 1127 (citation omitted).  Further, allegations amounting to a "chilling effect" on plaintiffs' desire and ability to engage in conduct prohibited by the law in question "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* at 1129 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

As noted, plaintiffs' argument as to harm focuses on the potential harm plaintiffs' egg farmers will face.  *See, e.g.*, Hr'g Tr. at 44.  Plaintiffs allege nothing additionally to suggest their claimed threat of prosecution is genuine.  Plaintiff states fail to articulate any concrete plan by their egg farmers to violate California's shell egg laws.  Plaintiffs allege in conclusory fashion their "farmers who continue to export their eggs to California will face criminal charges," FAC ¶ 89, but plaintiffs allege nothing to indicate any of their egg farmers will or intend to continue to export their eggs to California.  Further, that plaintiffs' farmers would likely prefer exporting their eggs to California as they have done in the past or that their enclosures do not currently comply with California's shell egg laws does not amount to a "concrete plan to violate the law[s] in question."  *Wolfson*, 616 F.3d at 1058 (citing *San Diego*, 98 F.3d at 1126–28).  Indeed, plaintiffs assume some of their egg farmers have chosen to comply with AB 1437.  Hr'g Tr. at 43–44.  Though California's shell egg laws may create a "chilling effect" in that plaintiffs' egg producers must "[e]ither . . . incur massive capital improvement costs . . . or . . . walk away from the largest egg market in the country," FAC ¶ 6, rather than violate California law by supplying

1   California with eggs that do not meet required standards, this generalized effect does not amount

2   to a threat of specific future harm.  As the Ninth Circuit has recognized, "[e]very criminal law, by

3   its very existence, may have some chilling effect on personal behavior.  That was the reason for

4   its passage."  *San Diego*, 98 F.3d at 1129 (alteration in original) (quoting *Doe v. Duling*, 782 F.2d

5   1202, 1206 (4th Cir. 1986)).

6          Plaintiffs also do not  identify any threat to initiate proceedings made against their

7   egg farmers.  Within their complaint, plaintiffs reference only the language of AB 1437 itself.

8   This is far from a specific warning of an intent to prosecute.  Plaintiffs also reference defendants'

9   "oaths," but, as noted above, "a general threat of prosecution is not enough to confer standing."

10   *San Diego*, 98 F.3d at 1127.  Lastly, as California's shell egg laws have not yet gone into effect,

11   there is no history of past prosecution or enforcement under the challenged statute.  Defendants

12   are correct in arguing "[t]he court can thus make no reasonable inference that any of the states or

13   their producers would suffer prosecution."  ECF No. 36 at 16.

14          To the extent plaintiffs argue their claims are brought on behalf of the residents of

15   their states in general because they do not have a "voice in the law," Hr'g Tr. at 44, this argument

16   also fails.  Plaintiffs' arguments focus on the potential harm each state's egg farmers face.  The

17   alleged imminent injury, however, does not involve an injury the citizens of each state face but

18   rather a potential injury each state's egg farmers face when deciding whether or not to comply

19   with AB 1437.  Nothing before the court supports the conclusion this action is brought by

20   plaintiffs because their residents face imminent injury as a result of California's shell egg laws, or

21   that their residents in general intend to or are even capable of violating California's shell egg

22   laws.  Plaintiffs also point to nothing to show the threat of prosecution of their egg farmers is

23   imminent.

24          Plaintiffs' claims are not justiciable.

25   C.    Leave to Amend

26          In light of the arguments presented by plaintiffs during oral argument, the

27   undersigned has carefully considered whether plaintiffs can amend their complaint to state a

28   claim over which this court would have subject matter jurisdiction.  "Valid reasons for denying

leave to amend include undue delay, bad faith, prejudice, and futility." *Cal. Architectural Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1472 (9th Cir. 1988); *see also Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983) (holding that, while leave to amend shall be freely given, the court does not have to allow futile amendments). For the reasons discussed below, leave to amend would be futile and will therefore not be granted.

To the extent plaintiffs argue their claims are brought on behalf of the general populace of their states because California's law "effectively remove[s] from the people of Missouri the ability to set public policy themselves regarding agricultural regulations," Hr'g Tr. at 4, this argument is unavailing. As noted above, plaintiffs' first amended complaint, their opposition papers and their arguments during the court's hearing all focus on how California's legislation affects or may affect each state's egg farmers. During oral argument, plaintiffs made arguments to strengthen this conclusion. They argued, "we are talking about a statute that effectively blocks . . . eggs from out of state," *id.* at 7, and the issue here is "the right of the people to participate in the laws that govern them," *id.* at 8. Plaintiffs further argued California's regulations are "an attempt by California to say in Missouri you have to follow this set of procedures so that when your eggs show up at the border, we will let them in." *Id.* at 37. Plaintiffs noted "the other issue here with having no voice in the law is if our folks spend 120 million dollars to come into compliance . . . we have no political way of blocking that law from being changed." *Id.* at 44. These arguments all clearly rest on the plaintiff states' egg farmers purportedly not having a voice during the process leading to passage of a California law that governs their egg farming procedures, and potentially having to expend resources to comply with it; these concerns are not those of each state's residents in general.

As discussed above, AB 1437 does not regulate the general populace of plaintiffs' states. *See, e.g.*, FAC ¶¶ 5, 61. The residents of each state are not participating in the egg market such that their eggs must comply with AB 1437 when they "show up at [California's] border." Hr'g Tr. at 37. Plaintiffs' arguments characterize the issue before the court as the right of citizens to "participate in the laws that govern them," Hr'g Tr. at 8, arguing these citizens will have to

1  spend 120 million dollars to comply with a law whose passage they could not affect, *id.* at 44.

2  The only citizens who may have to spend 120 million dollars to comply with California's

3  legislation are the egg farmers who intend to participate in California's egg market. Likewise, the

4  only citizens who may be "govern[ed]" by California's legislation are egg producers and handlers

5  who intend to sell eggs in California.

6          Plaintiffs' own grape legislation analogy squarely supports this conclusion.

7  Plaintiffs hypothesize that if Missouri passed legislation requiring "all grapes to be harvested by

8  people with Bachelor's degrees or greater in horticulture or viticulture . . .," Hr'g Tr. at 9, a

9  California "*vintner* has no way of challenging Missouri law in a political process," *id.* at 10

10  (emphasis added). It is patently clear plaintiffs are bringing this action on behalf of a subset of

11  each state's egg farmers and their purported right to participate in the laws that govern them, not

12  on behalf of each state's population generally. In light of the nature of the allegations in

13  plaintiffs' first amended complaint and the arguments made at hearing, leave to amend would be

14  futile, as plaintiffs lack standing to bring this action on behalf of each state's egg farmers.

15  *Oregon*, 552 F.3d at 974.

16  VI.    CONCLUSION

17          For the foregoing reasons, defendants and defendant-intervenors' motions to

18  dismiss for lack of standing are GRANTED without leave to amend. Plaintiffs' first amended

19  complaint is dismissed with prejudice. The Clerk of the Court is directed to close this action.

20  DATED: October 1, 2014.

21

22

23                            UNITED STATES DISTRICT JUDGE

24

25

26

27

28